# EXHIBIT  A

Transcript of Ashok Pai
Conducted on March 26, 2018

1 (1 to 4)

---

**1**

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF VIRGINIA
3            ALEXANDRIA DIVISION
4
5   - - - - - - - - - - - - - - -x
6   UNITED STATES EQUAL       :
7   EMPLOYMENT OPPORTUNITY     :
8   COMMISSION,               :
9            Plaintiff,  :
10       v.              : Case No.
11  CAMBER CORPORATION,       : 1:17cv1084 (AJT/JFA)
12           Defendant.  :
13  - - - - - - - - - - - - - - -x
14       Videotaped Deposition of ASHOK PAI
15       McLean, Virginia
16       Monday, March 26, 2018
17           9:33 a.m.
18
19
20  Job No. 179321
21  Pages 1 - 314
22  Reported by:  Karen Young
```

---

**2**

```
1        Videotaped Deposition of ASHOK PAI, held at
2   the offices of:
3            PLANET DEPOS
4            8270 Greensboro Drive
5            Suite 110
6            McLean, Virginia 22102
7            (888) 433-3767
8
9
10
11
12       Pursuant to notice, before Karen Young,
13  Notary Public of the Commonwealth of Virginia
14
15
16
17
18
19
20
21
22
```

---

**3**

```
1        A P P E A R A N C E S
2   ON BEHALF OF PLAINTIFF:
3       JEFFREY A. STERN, ESQUIRE
4       U.S. EQUAL EMPLOYMENT
5       OPPORTUNITY COMMISSION
6       Cleveland Field Office
7       AJC Federal Building #3001
8       1240 East Ninth Street
9       Cleveland, Ohio 44199
10      (216) 522-7458
11
12  ON BEHALF OF CAMBER CORPORATION:
13      ROBERT L. ORTBALS, JR., ESQUIRE
14      CONSTANGY, BROOKS, SMITH & PROPHETE LLP
15      7733 Forsyth Boulevard
16      Suite 1325
17      St. Louis, Missouri 63105
18      (314) 925-7270
19
20  ALSO PRESENT:
21      Jeff Bauer, Esq., Huntington Ingalls
22      Joe Donahoe, Videographer
```

---

**4**

```
1        C O N T E N T S
2   EXAMINATION OF ASHOK PAI            PAGE
3       By Mr. Ortbals........................   8
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

21

1  Camber, I reviewed that, but other than that, I
2  can't think of anything.  I didn't keep very good
3  record of it either because I was relying more on
4  the EEOC guidance than anything else because
5  obviously I'm totally unexperienced in this
6  situation, so I didn't know what was relevant and I
7  didn't want to make any mistakes by jumping to
8  wrong conclusions.  So I -- I think anything
9  relevant probably has already been discussed with
10 the EEOC that I could think of, yeah.
11     Q    Well, let me ask you, out of these
12 hundreds of e-mails that you reviewed, how many had
13 something to do with Camber?
14     A    I didn't count them.  Sorry.  A very -- a
15 small fraction, a really small fraction, and
16 whatever -- whatever did have have been turned over
17 to EEOC.
18     Q    So it's your testimony that every e-mail
19 that you have that had something to do with Camber
20 has been turned over.
21     A    I cannot guarantee that, but the best of
22 my effort, I have.

22

1     Q    Is there anything else that you've done
2  to prepare for today's deposition?
3     A    I came here from California, Southern
4  California.
5     Q    Have you discussed this case with anybody
6  other than EEOC's counsel?
7     A    I have been very careful not to discuss
8  this with any Camber employee, so to the best of my
9  recollection, they might have accidentally heard
10 something, but I've been very, very careful and not
11 really mentioned anything that I can recollect
12 directly to a Camber -- except for the ones that I
13 already mentioned the e-mail, these are official
14 Camber communications to me, you know, like a
15 termination letter, for example.
16        So whenever somebody from Camber has
17 communicated to me directly, I had to respond, but
18 other than that, I cannot recollect any of the
19 Camber employee, which are mostly past employees
20 now -- almost of all of them I associated with
21 apparently are past -- most of them are past
22 employees because Camber lost the DOG contract

23

1  about -- about two years after I was terminated,
2  they lost the contract.
3        So as a result, most of my colleagues at
4  Camber, it's my understanding that they're all
5  either -- they're all -- mostly resigned on their
6  own two years after when the contract was lost.
7     Q    And sir, my question was broader.  It
8  wasn't just confined to Camber employees.  Is there
9  anybody else other than EEOC's counsel who you've
10 talked to about this case?
11     A    I talked to my wife.
12        MR. STERN:  Objection with respect to --
13        THE WITNESS:  Oh, yeah, sorry.
14        MR. STERN:  -- communications between Mr.
15 Pai and his spouse are privileged by spousal
16 communication privilege, and communications with
17 your wife --
18        THE WITNESS:  Obviously, yeah, yeah.
19        MR. STERN:  -- are privileged.
20        THE WITNESS:  Yeah, I understand.
21        MR. STERN:  You're cautioned not to --
22        THE WITNESS:  Yeah, understand, yeah.

24

1        MR. STERN:  -- accidentally waive that by
2  disclosing those communications.
3        THE WITNESS:  So -- and I've been very
4  careful not to mention this to any of my friends.
5  As far as I can recollect, I have not directly said
6  this to them.  Now, if they found out some other
7  way, I can't be held responsible for that, but I
8  cannot recollect directly saying that to -- because
9  I've been careful.  I didn't want to -- I didn't
10 want to do anything which I thought may be
11 inappropriate.
12 BY MR. ORTBALS:
13     Q    Why would it be inappropriate to talk
14 about the case with other people?
15     A    Well, generally it's inappropriate to
16 talk about any legal case, right?  I mean, it's
17 considered very bad form to talk about legal cases.
18     Q    Other than EEOC counsel or your wife, is
19 there anybody else you recollect talking to about
20 this case?
21     A    I cannot think of anybody offhand, yeah.
22     Q    What's your current home address?

Transcript of Ashok Pai
Conducted on March 26, 2018

25

1    A    My mailing address is 5319 University
2  Drive, Number 335, Irvine, California 92612.
3    Q    And what's the address where you live?
4    A    19431 Sierra Chula in Irvine, California
5  92603.
6    Q    How long have you used the a 5319 address
7  as your mailing address?
8    A    To the best of my understanding, since
9  1997, and that's why I didn't change it, you know,
10 because of moves and all that, I didn't want to
11 have any loss of mail, so I kept this since 1997.
12   Q    Is that a -- is that a postal box or --
13   A    It's a service, yeah. It's postal
14 service, yeah.
15   Q    What's the purpose of using a separate
16 mailing address from your home address?
17   A    Well, when we first -- '97 was the year
18 we moved to California, and at that time we were
19 looking for a house, and so as a result, we -- we
20 knew that would be changing very quickly, so we
21 thought as a temporary moment, we moved to our own
22 house, so we did move into our own house in 2000,

26

1  as we -- we live in the same house as then, and --
2  but we just didn't change it because we wanted very
3  convenient because, you know, they receive mail any
4  time. There's somebody there all the time, things
5  like that, yeah.
6    Q    So you've lived in the 19431 Sierra Chula
7  address since 2000?
8    A    I have lived there in the sense that that
9  is my permanent address, but for about seven years,
10 six, six plus years, I was mostly working in
11 Washington, D.C. and I was traveling home to
12 California practically, you know, every month or
13 every two months, so very frequently traveling
14 back, but after 2008 when a big economic down-turn
15 happened, that is the time I took up a job at Uncle
16 Sam because I figured Uncle Sam will not run out of
17 money, as all the other companies were. So since
18 then, I've been primarily working in Washington,
19 D.C. here and -- but commuting back home, and my
20 wife and -- I don't have minor children, but that's
21 been our home, but I've also had apartments in D.C.
22 during that time.

27

1    Q    When did you move back to California
2  permanently?
3    A    That's hard to say in the sense that I
4  think I gave up my apartment in the D.C. area in
5  2014, yeah, right after my termination, yeah, for
6  sure, because I had to pay lease up until the end
7  of the year. So even though I was terminated
8  effective October 31st, I had to pay my lease up to
9  December 31st. I think I may even have paid
10 January. So it's -- I actually had to obviously go
11 back when I was terminated, so for about three or
12 four months, I had this apartment here, and I
13 finally closed my apartment only in January of 2015
14 I believe.
15   Q    And for those few months after your
16 employment at Camber ended, you weren't living in
17 that apartment.
18   A    Yeah.
19   Q    You just leased it.
20   A    Yeah, yeah, so I was not living. I was
21 trying to get out of the lease, but the lease break
22 fee was higher and all that, and it wasn't -- so

28

1  also, you know, I was hopeful that maybe Camber
2  will take me back or maybe something else will come
3  up here in this area. So things were obviously in
4  very confused state at the time, and I really
5  couldn't get out of the lease basically. I had to
6  pay the lease, and so I have not done -- I always
7  avoid doing anything that's even a shade of
8  illegal. I always very, very legal and upstanding,
9  so I didn't want to even break the lease and fight
10 it out or anything like that.
11   Q    Who lives with you at your Sierra Chula
12 address?
13   A    My wife. I have a dog and a cat too.
14   Q    Nobody else lives at that address?
15   A    No, no, my son, he's also -- he's a
16 disabled son, lives there, but he has to spend a
17 lot of time in various facilities too, so he's in
18 and out. My son -- I'm sorry, my wife takes care
19 of him, and so he has a separate section of the
20 house actually, but he's totally disabled, totally,
21 nonverbal and everything, so -- so we have kind of
22 got used to, you know, that situation.

Transcript of Ashok Pai
Conducted on March 26, 2018

---

29

1    And so -- so you know, we -- we have to
2 take him frequently to skilled care and stuff like
3 that, and he's there for some periods of time, but
4 he's very -- he's very healthy though. He's hardly
5 been hospitalized, and the one major
6 hospitalization was at the time where I requested
7 FMLA, and he was actually fighting for his life at
8 the time because he had aspiration pneumonia and he
9 was in the hospital for several weeks, and that was
10 the time I got terminated too, so --
11    Q    So your wife is the person in your
12 household who takes care of your son?
13    A    Right, but she does have assistance time
14 to time, and she also, like I said, if there any --
15 any kind of complication or treatment, because he
16 needs various kinds of treatments on a regular
17 basis so he's taken to these facilities, and so he
18 actually has a second home in a sense, a skilled
19 care facility.
20    Q    And then there'll be what, personal care
21 attendants that come to the household if --
22    A    Yeah, yeah, generally, yeah, but my wife

---

30

1 takes most of the care, but yeah, personal care
2 attendants do come time to time, yeah, because his
3 care is pretty standardized, so it's very
4 standardized, because -- you know, change diapers
5 twice or day or so and things of that nature. He's
6 fed through a tube, stomach tube, so there's no
7 feeding issues, so medications also put through the
8 tube, so --
9    Q    Have you gone by any other names other
10 than Ashok Pai?
11    A    I have a middle name, Kochikar, which is
12 a family name. So Pai is my last name, Kochikar is
13 my family name, because, you know, we basically go
14 family name, so that is passed on from father to
15 son. Last name is Pai, yeah. Not changed my name
16 at all, yeah. I haven't changed my name. It has
17 always been -- although I should have probably
18 because I confuse people like hell with my name,
19 but my name has always been Ashok Kochikar Pai.
20    Q    How do you spell your family name?
21    A    What say?
22    Q    How do you spell your family name?

---

31

1    A    K-O-C-H-I-K-A-R.
2    Q    What's your wife's name?
3    A    Her original name is Manorama, and she
4 goes by Manorama Pai Kochikar, because I also was
5 Ashok Pai Kochikar in India, but after we came to
6 U.S., I made K my middle initial so I became Ashok
7 Kochikar Pai, but otherwise people call me Kochikar
8 and people will be confused with my last name,
9 which was my last name. So I made it Ashok
10 Kochikar Pai, A -- Ashok K. Pai, but my wife has
11 typically kept it as K. Manorama Pai, which is
12 actually the way it's kept in India, Kochikar
13 Manorama Pai, or she sometimes goes by Manorama Pai
14 Kochikar, but she's smart. She also adopted the
15 name Anita, so she also goes by Anita Pai.
16    Q    And how do you spell -- is it Manorama?
17    A    Yeah, M-A-N-O-R-A-M-A.
18    Q    Have you had any other marriages other
19 than your current one?
20    A    No. Yeah, we've been married for 44
21 years. Forty-four and a half.
22    Q    And your birth date is July 17th, 1949?

---

32

1    A    That's right.
2    Q    Where were you born?
3    A    Madras, India, which is now called
4 Chennai.
5    Q    And where did you go to college?
6    A    I did my initial schooling all in
7 Bangalore, India because my family moved from
8 Madras to Bangalore when I was one year old, and so
9 I did all my schooling up to the completion of my
10 five-year degree program -- it's a five-year degree
11 program there for engineering. So I completed my
12 engineering degree in Bangalore, the five-year
13 degree. After that, I did a two-year degree
14 program in Madras. This was M.Tech, master's --
15 master of technology in aeronautical engineering.
16 There's a two-year program at IIT Madras, and IIT,
17 there are -- I think now there are more IITs, but
18 it used to be five IITs, one in each corner of
19 India, and these were absolutely the top schools in
20 India, you know, and even though the IITs are
21 valued very highly, and the Madras IIT was actually
22 started -- established by German collaboration. So

---

33

1  many of the books, many of the professors were all
2  from Germany.
3       In fact, the library was mostly stocked
4  with German book, so I speak fluent German.  I can
5  speak fluent German and read and write German, and
6  actually, we had to write papers in German and all
7  that too, and many of the professors didn't even
8  understand English properly, so if you had to pass,
9  we had to know German.
10      So that was German -- the other IITs, one
11 is Russian, the Bombay's Russian.  It's called IIT,
12 Indian Institute of Technology.  So five of them
13 were established just after independence in India,
14 independence in 1947.  So after that, five IITs are
15 established, each by collaboration from one major
16 country, you know.
17      So Madras IIT, which I attended for two
18 years and got my master's in technology, that was
19 by Germany, and then Bombay IIT was Russia.  Kampur
20 was England, Britain.  Delhi -- I'm sorry, Delhi
21 was Britain.  Kampur was the U.S.  Kharagpur was a
22 joint collaboration of several countries.  So there

34

1  are five IITs.
2       So I was -- I was in the Madras IIT,
3  which we used to lovingly call it concentration
4  camp because it was the toughest IIT of all.  It
5  was German, so the German system was very, very
6  tough with very few -- a lot of hours, lot of
7  additional hours and work needed compared to the
8  other IITs.  So I was able to survive that, which
9  we lovingly called concentration camp, and then we
10 -- I got the degree and master's, master of
11 technology.
12     Q    Have you had any schooling in the United
13 States?
14     A    Yes, I did my MBA in finance and banking.
15     Q    Where was that at?
16     A    Wright State University in Dayton, Ohio.
17     Q    When did you graduate with your MBA?
18     A    1981, December.  I got my degree in '82.
19     Q    Have you had any other formal education
20 or training since your MBA?
21     A    I've had a lot of training because I'm
22 I.T., I'm in information technology, which

35

1  obviously requires training, never stops.  So I've
2  had a lot of training in that area, in that whole
3  field, and mostly in cyber security.  I have the
4  CISSP certification, and that is complete -- all
5  over the world is recognized as the top
6  certification in cyber security.  It's called
7  CISSP, Certified Information Systems Security
8  Professional.  So that is generally -- generally
9  recognized all over the world as the top, and it's
10 a very tough certification, and I have that, which
11 required several months of training.
12      And then I have several Microsoft
13 certifications because I worked at Microsoft for a
14 while, so I have several Microsoft certifications
15 in the I.T. area, mainly in SharePoint, which was
16 my main specialty.  Also in Dot Net certification,
17 SharePoint SQL server, solutions, solution
18 architect type training, and I was a senior
19 consultant at Microsoft, a senior consultant.
20     Q    Any other I.T. certifications you hold?
21     A    Yeah, I hold some others.  I've forgotten
22 them some extent.  Yeah, the Microsoft, I worked at

36

1  four certifications with Microsoft.  I have a few
2  others which I don't use very much.  I'm trying to
3  remember what they are, but yeah, the main one is
4  CISSP, my proudest achievement I think in
5  certifications, and then the Microsoft
6  certifications.  I can't think of anything offhand
7  right now, yeah.
8       The SharePoint and Dot Net has been my
9  main area of work, you know, and cyber -- now cyber
10 security.  My current job in cyber security with
11 some SharePoint and some Dot Net, but prior to that
12 even, because I got my CISSP in 2002.  So since
13 2002, because I have the certification, one of the
14 -- one of the problems I got as soon as I got the
15 certification was that at that time, cyber security
16 was not considerably important in 2002.  I did that
17 certification because -- in 2002, because of 9/11.
18 So when 9/11 happened in 2001, I thought the next
19 war is going to be cyber war, you know.  And not
20 only that, all these people are gunning for us, so
21 I do this -- my job for my country, you know?
22     Q    Have you ever --

**41**

1     A    Uh-huh.

2     Q    Have you been in a courtroom for any

3   other reason?

4     A    Traffic school -- traffic court

5   obviously.  Other than that, I cannot think of any

6   time except as a tourist.

7     Q    How did you first learn that there was a

8   job opportunity at Avaya?

9     A    I'm sorry, could you repeat the question?

10    Q    How did you first learn there was a job

11  opportunity at Avaya?

12    A    Oh, oh, okay.  I was working the Federal

13  Reserve Board on a one-year contract, but at the

14  end of that, the contractor took the contract, just

15  like happened to Camber in DOJ.  So we lost the

16  contract, and I was going to a new contractor.  The

17  new contractor offered me less money, so I left at

18  that point.  I said no, I'm not going to go for

19  less money to go to the same job, because they

20  asked to continue at the Federal Reserve Board but

21  for less money, you know?  So I refused to do that

22  and I resigned.

**42**

1         And then the -- I started looking around

2   at that point, and I saw this offer from Avaya and

3   I had communications with a recruiter named

4   Ferdaussi, and Ferdaussi was a recruiter for Avaya,

5   you know.  He was recruiter, he was an employee of

6   Avaya, and Ferdaussi, by the way, means man from

7   paradise, you know.  So I thought well, I'd like to

8   work in paradise, you know.  So that's the reason I

9   applied to Avaya.

10    Q    And the position you applied for was a

11  software systems architect?

12    A    I believe so.  I don't remember the exact

13  title, but I -- I -- I applied for that role at

14  Avaya.

15    Q    And that was to work on the U.S.

16  Department of Justice Executive Office of

17  Immigration Review project?

18    A    Correct, yeah.  It's a -- it's a agency

19  of the government, yeah.  It's a agency of DOJ,

20  yeah, within DOJ.

21    Q    And if we refer to it as the EOIR

22  project, you'll understand that that's what I'm

**43**

1   talking about?

2     A    Yeah, I mean, there are several --

3   several projects within that, but for the Camber,

4   it was the EOIR project, yeah, because that was the

5   project assigned to Camber, yeah, but there were

6   other projects with EOIR too obviously, other

7   companies.

8     Q    Right, but -- but what you were hired to

9   do at Avaya and then what you did at Camber was for

10  EOIR.

11    A    Correct, correct.

12    Q    You mentioned speaking with a recruiter

13  at Avaya.  Was there anybody else at Avaya that you

14  interviewed with for your job?

15    A    Yeah, yeah, of course.  My first contact

16  was from this gentlemen named Ferdaussi.  I forget

17  his first name.  So he called me up, and I don't

18  remember where he saw my resume or where he heard

19  of me or whatever, but he called me up.  And so we

20  had several conversations, and then -- then he set

21  me up for an interview.

22        So we had an interview at EOIR.  So there

**44**

1   was something like 20 people at that interview,

2   which was quite daunting.  And there was other

3   people from Avaya.  Most of them were Avaya, but I

4   think there were at least one or two there from DOJ

5   at that time, but that was my first introduction to

6   Avaya, you know.  That was an interview by this

7   board, yeah.

8     Q    So you interviewed both with Avaya

9   persons and persons within EOIR?

10    A    That is my understanding, because that

11  was the first time I was seeing any of them, so I

12  was -- I'm not even hundred percent sure who were

13  all the people that -- there were like 20 people.

14  That was pretty daunting, yeah, and I was the only

15  one on this side of the table.

16    Q    Who are the people at Avaya that you

17  recall?

18    A    Atif was there, Nan Li was there because

19  they have been two staples at EOIR project, because

20  Atif was the director of EOIR project at Avaya, I

21  mean Avaya's EOIR project at the EOIR.  So Atif was

22  the director, so he was the director.  He was at

45

1  the interview.  Nan Li was there because Nan Li is
2  right-hand man, so he was there at the interview.
3  The others, I have a hard time remembering this,
4  I'm sorry, because most of them are gone.  Most
5  have left even before I left, yeah.
6      Q    And Atif is Atif Khalil?
7      A    Correct.
8      Q    And he was in charge of the EOIR project?
9      A    Yes, for a while, yeah.
10     Q    And Nan Li reported directly to Atif; is
11 that right?
12     A    Yes, yes, he was the project manager, but
13 he was Atif's -- he's always Atif's right-hand man.
14     Q    And Nan Li was your immediate supervisor
15 when you started?
16     A    When I started, there was somebody else
17 temporarily, but yeah, I think Nan Li was
18 effectively the supervisor because temporarily I
19 think he had me reporting to somebody, and then it
20 became Nan Li.  And then a new guy joined the last
21 few months I was there called a Suditian -- I'm
22 sorry, Sudhakar Nallamothu, so he became my

46

1  supervisor just in the last few months.  In
2  between, I think there was somebody else too.  I'm
3  not remembering, because I was there for a total of
4  almost two years between Avaya and Camber.
5      Q    And when you applied to Avaya, you were
6  63 years old; is that right?
7      A    Let's see.  Which year was that?  2013 --
8  2012, yeah, 2012, so 2012, I was -- yeah, I was 63,
9  you're right.
10     Q    Does November 6th, 2012 sound right for
11 your start date at Avaya?
12     A    I thought it was October, but November
13 might have been the official start date.  Yeah, it
14 was right there, yeah, 2012.
15     Q    Did Atif hire you at Avaya?
16     A    Well, I don't remember who signed the
17 letter, but Atif was the main guy in the interview
18 at least.  He was the chairman of the -- or he was
19 doing the interview.  Of course, there was some --
20 I think there were some DOJ people, so obviously
21 were not all of them, but they were just there as
22 -- as visitors I think.

47

1      Q    So Atif was running the interview?
2      A    Yeah, he was running the interview, yes.
3  He was the top man at the project, yeah.
4      Q    Were you offered that job on the spot or
5  -- or later on?
6      A    Pretty much on the spot, yeah.  He -- he
7  liked my background very much, and he also liked
8  the fact that I worked with the creator of Unix,
9  the man who actually -- Dennis Ritchie, he created
10 Unix language and the C language, so I had the
11 great pleasure of working with them for one week in
12 AT&T Bell Labs in New Jersey.
13         So the Unix operating system was born
14 there, and Dennis Ritchie was the founder or
15 creator of that operating system.  And Unix is now
16 the basis of all operating systems, Windows, Mac,
17 IBM, you name it, all operating systems have gone
18 to Unix, various motions or -- or -- and so I had
19 the pleasure of working with him for one week, a
20 very simple man, very easy, and he used to -- I was
21 working in Pittsburgh at the time.  I was working
22 at Carnegie Mellon, and I was working for Cray at

48

1  Carnegie Mellon.  Cray was a supercomputer company.
2         So I was working at Carnegie Mellon, and
3  so I was sent by Cray for one week to work with
4  Dennis Ritchie because we were converting our Cray
5  operating system to Unix.  So I went there for a
6  week, but the reason I bring that up is when I --
7  and so Dennis Ritchie also created Unix and the C
8  language.  The C language became the basis for C
9  plus plus, which became the basis for Dot Net and
10 SharePoint and all those things.  It also became
11 the basis for Java.
12         So all the programming language came from
13 C.  So the amazing man Dennis Ritchie was the
14 father of -- both the Unix and C language were his
15 brainchildren, you know, so he actually dreamt --
16 it was his dream, yeah.  So he created Unix
17 operating system and C language, and today all --
18 pretty much all operating systems and pretty much
19 all computer languages have come from those two.
20         So what I'm saying -- the reason I
21 brought that up is Atif was very -- very glad that
22 I had that opportunity to work with Dennis Ritchie

Transcript of Ashok Pai
Conducted on March 26, 2018

49

1  for a week.  I think that was one of the things
2  that influenced him to let me join.
3      Q    So during your interview, Atif gave you
4  positive --
5      A    Yeah, very positive feedback.  He was
6  very positive.  He made it very clear that he
7  wanted to hire me.  That's what my understanding.
8  You know, I can't tell.  And they were urgently in
9  need of someone because DOJ was pressing on them to
10 get a qualified person, so they were in need of
11 getting someone I believe.  That is my
12 understanding again, so he made it fairly clear
13 that he wants me.
14     Q    So it's your understanding in working on
15 the EOIR project, the project team, part of their
16 job responsibilities were to satisfy the DOJ
17 customer.
18     A    Oh, the entire responsibility of the team
19 was to satisfy the DOJ customer, yeah.
20     Q    During your Avaya interview, did you talk
21 about your son's --
22     A    No.

50

1      Q    -- situation?
2      A    No, I stayed away from that simply
3  because it's not relevant, and I've heard that --
4  and in fact, I didn't tell Atif until I think the
5  summer of 2014 probably of his disability, you
6  know.  I don't believe I told him until 2014
7  summer.  And he was actually surprised and, you
8  know, shocked to hear that, but I had to tell him
9  in summer because something happened in summer to
10 him.  I forget.
11         I had to go back urgently -- I had to
12 make an emergency trip to California in summer
13 2014.  I can't recall the exact circumstances, but
14 at that time I had to tell him, and that was the
15 time I told him I think, because my son has been
16 very healthy.  And I have another son too.  I have
17 two sons, and this son has been very healthy.
18         Both of them have been very healthy
19 actually, but what I'm saying is in spite of his
20 disability, he has been very healthy, and that's
21 why it was so shocking when he had this long
22 hospital stay, and actually, when he was admitted

51

1  to hospital in ICU for probably two weeks or
2  something, and that was the start of all this --
3  the events that -- the events that led to my
4  termination started with that hospitalization of my
5  son, which I think was first week of September, and
6  so October 17th, I was given the termination
7  letter.
8      Q    Okay, so if I -- if I understand your
9  testimony correct, you don't believe that you
10 talked with Atif about your son's medical condition
11 until 2014 when you were already at Camber; is that
12 right?
13     A    Yeah, that's my recollection, yes.  I was
14 very careful not to talk about it because I heard
15 that it can be a source of some kind of, you know,
16 feelings that he may not be able to work properly
17 and all that, you know.
18     Q    Who told you that it could -- who told
19 you it might be an issue with whether you could
20 work properly or not?
21     A    My wife.
22     Q    Okay.

52

1      A    And others, yeah, because I've heard
2  people saying that in a work environment, don't
3  reveal, you know, the situation.
4      Q    But there was nobody at Camber that told
5  you that.
6      A    I cannot recollect.  Now, I did talk
7  about -- I don't know I talked or not, but I don't
8  -- I was very careful basically.  I was very
9  careful not to explicitly discuss that with
10 anybody, you know.
11     Q    Your son's approximately two-week
12 hospitalization took place in late August and early
13 September of 2014; is that right?
14     A    No, it was much more than two weeks.  It
15 was about two weeks in ICU.
16     Q    Okay.
17     A    Intensive care, yeah, where he was really
18 fighting for his life.  That was the first two
19 weeks, because he had -- he had aspiration
20 pneumonia, aspiration pneumonia.
21     Q    Okay, so the hospitalization may have
22 lasted longer than two weeks, but at some point you

Transcript of Ashok Pai
Conducted on March 26, 2018

53

1  went out to California because he was in the
2  hospital; is that right.
3      A   What happened was he was admitted to the
4  hospital, I'm not sure it was August 31st or first
5  week of September.  At that time I had to -- the
6  interesting thing though was I was actually in
7  transit to -- to California.  I'd taken, you know,
8  a couple days of leave and I was on my way when I
9  got a call on the plane.  When we stopped at a
10 stop-over, I picked up the call that my wife said
11 he has been admitted to the hospital, you know.  So
12 he -- that was the first admission.  That I believe
13 was August 31st or some day, first week in
14 September.
15      So I rushed over to the hospital from the
16 airport because he was literally fighting for his
17 life because he was in ICU.  So he was there -- I
18 don't remember exact duration, but two to three
19 weeks maybe, something like that.  There was also
20 -- there's some other variation of ICU there which
21 he was there and all that.
22      So anyway, he ended up being in the

54

1  hospital for something like six weeks to -- six to
2  eight weeks as far as I can remember.  I'm not
3  exactly sure and I'm a little confused, but it was
4  something of that nature that he was -- the total
5  hospitalization.  So that's the reason I asked for
6  FMLA.
7      Q   And when you -- when you discovered that,
8  as you were flying back to California, that he was
9  hospitalized --
10     A   Uh-huh.
11     Q   Did you reach out to Camber to let
12 anybody know?
13     A   No.  Let me think for a minute what
14 happened there.  Yeah, yeah, I think what happened
15 was I delayed my return.  At that time I said yes,
16 my son has been hospitalized because I had to take
17 unpaid leave at that point because what happened
18 was the government shut down, happened in 2013,
19 October -- October 1st through the 15th, I
20 remember, the beginning of the government fiscal
21 year, October 1st through the 15th I think was the
22 government shutdown, you know?  So our -- was it

55

1  Avaya?  Avaya gave us a choice at that time, all
2  employees, they could either take those two weeks
3  as unpaid leave, because government was not paying,
4  or we could take our vacation time.  So vacation
5  time obviously repaid, but it was a vacation.  It's
6  a forced vacation.
7      Q   Yeah.
8      A   So I did that, so I lost my vacation
9  time.  I think I had a few more days left after
10 that because if I remember correctly, I had three
11 weeks of vacation, so I had a few more days.  So
12 after that, so when I was in California and my
13 ticket was actually to come back the next day, I
14 had to -- I had to e-mail Nan and Atif I think --
15 maybe I talked to them on the phone, that this is
16 the situation, so I need more time, but no vacation
17 time, you know?
18     So I said I'll take unpaid leave, you
19 know.  I think they said I could take future leave
20 or something, future vacation.  So whatever it is,
21 it was effectively unpaid leave because at the --
22 after I was terminated, they actually didn't pay me

56

1  for that future vacation obviously, you know.  So
2  the -- so basically that -- that extend my --
3  extend my leave after I found out his situation,
4  yeah.
5      So at that point Deidra Martin I believe
6  sent me an e-mail saying we heard that you took --
7  had to take some unpaid leave or something, you're
8  eligible for FMLA, you know.  I said I may not be
9  eligible for FMLA because the previous year, my
10 wife had been diagnosed with breast cancer.  So
11 that was 2013.  So I took FMLA for that, you know?
12 And so I exhausted my FMLA -- I mean not exhausted.
13     I took FMLA in 2013.  It was then, so I
14 said, you know, I've taken FMLA in 2013, so I don't
15 think I can take FMLA now because I took it last
16 year for my wife's breast cancer.  Luckily she
17 recovered completely and now she's been out of
18 breast cancer for more than five years, 2013 to
19 now, five years, yeah, so she's considered in
20 remission now.
21     So the FMLA -- Deidra Martin I think,
22 somebody from HR, Camber HR, said you can take FMLA

Transcript of Ashok Pai
Conducted on March 26, 2018

57

1  now, okay?  So when I said maybe I can't, she said
2  no, now it's a different company than Avaya.  This
3  is Camber.  That's one thing.  And you've been
4  working continuously, so you are eligible for FMLA.
5  So she said you are eligible for FMLA, okay?  So I
6  said that's fine, I'll take it then, you know.  So
7  of course, FMLA's unpaid too.  FMLA I don't get
8  paid, you know.  So -- so I took FMLA again, and
9  about three weeks into that FMLA is when I received
10 the termination letter, while I was in California,
11 yeah.
12     Q    So when you learned your son was going to
13 be hospitalized, you reached out to Nan and Atif
14 about the need to stay in California longer; is
15 that right?
16     A    Right, right, exactly, yeah.
17     Q    Did you let them know what the reason was
18 for your stay?
19     A    I said he's hospitalized.  Yeah, of
20 course, he has to be hospitalized, yeah.
21     Q    Did you let them know the nature of his
22 condition at that point in time?

58

1      A    I -- I'm not exactly sure at that point
2  what I told them because I did say he's
3  hospitalized, a serious situation, and I probably
4  should have told them it's aspiration pneumonia,
5  because that was the diagnosis.  So I'm fairly sure
6  I must have told them that, you know.  And so but I
7  didn't discuss much further than that, not even the
8  disability, you know.
9          And to the best of my recollection, I've
10 never told Nan about the disability.  Only Atif.
11 So Nan might have been unaware of the disability.
12 I'm not sure again.  I don't know, because Atif
13 might have told him.  So I don't remember telling
14 Nan about the disability, so the only person I told
15 about disability prior, back in the summertime, was
16 Atif.
17          And then the -- when this happened, I
18 told him he's -- told them he's hospitalized with
19 aspiration pneumonia I believe, and then he's in
20 ICU at the time, so that's the reason I have to
21 stay a few more days.  And then the return,
22 September 7th I think, 6th or 7th, that is the time

59

1  -- first thing I did after my -- I think I returned
2  September 8th.  I don't know if it's -- probably
3  was a Monday.
4          So first thing I did when I went to the
5  office was I went over to Atif's office, and I
6  waited there aside for him.  He didn't show up.  So
7  I went back to my cube and sent him an e-mail
8  because I was feeling very guilty that I'm taking
9  time off from Camber like this, especially it's
10 unpaid -- I mean especially after I exhaust my
11 vacation.
12          So that's when I sent him an e-mail,
13 which was part of the things I gave, where I said
14 that this is the situation, my son's
15 hospitalization, he's in ICU and all that, and so I
16 have made some contacts with the recruiter for --
17 for Camber and so I want to consider -- I want to
18 stay with Camber, but I want to see if I can get a
19 project there.
20          And I can -- I said I'm in no rush.
21 Actually, I even said that I'm in no rush, but I
22 want to get a -- get a project there, you know.  I

60

1  mean, not want to, but if it's available, I clearly
2  said there's no rush, I'll work with Camber on
3  this, but I -- I need to see if I can get one of
4  the Camber projects there, because I heard there
5  was some Camber projects available, so I'll ask for
6  a transfer if available, and I said I'm in no rush.
7          But Atif told me to write a letter, write
8  an e-mail officially specifying that October 31st
9  date.  I said why do I need to specify the date?
10 He said yeah, we need a date, and that will be
11 changed later, but right now we need a date.  So I
12 sent back that e-mail saying that I want to be
13 considered for a transfer.  I didn't say I will
14 resign at all.  Just for a transfer, and if it's
15 available, with no rush, and -- and I put in the
16 date that -- that Atif had requested me to put,
17 October 31st.
18          Then I got a call saying that -- two or
19 three days later -- those are just -- just -- all
20 the wording for that little e-mail have been
21 dictated by Atif, you know, because the first
22 e-mail was very casual that I sent him saying, you

61

1  know, my son is in the hospital, I need to -- yeah.
2  Second e-mail was small, but just as he dictated
3  me.
4        Couple days later, I get a call from HR
5  saying your -- your exit interview is being
6  scheduled because you asked for resignation.  I
7  said what the hell?  I never asked for resignation.
8  I never offered to resign.  I mean I never wanted
9  to resign.  I said that if there is something
10 available there, if a transfer is possible, I'm in
11 no rush, I should be considered a transfer.  That's
12 all, you know.
13       So there was a long string of e-mail
14 after that where I -- you know, I said, you know,
15 what makes you think I resigned?  Finally they
16 admitted, saying yes, now we understand, you have
17 not resigned.  So the whole thing quite frankly was
18 triggered by that e-mail that Atif wanted me to
19 write, actually dictated the wording to me, the
20 significant words at least, and that's what causes
21 this thing about that I resigned, rather than I
22 really requested just a transfer, no rush.

62

1        MR. STERN:  Would this be an okay time to
2  take a pit stop?
3        MR. ORTBALS:  Sure.
4        THE WITNESS:  Thank you.
5        THE VIDEOGRAPHER:  We're going off the
6  record.  The time is 10:37 a.m.
7        (Recessed at 10:37 a.m.)
8        (Reconvened at 10:52 a.m.)
9        THE VIDEOGRAPHER:  We're back on the
10 record.  The time is 10:52 a.m.
11 BY MR. ORTBALS:
12 Q    Okay.  We're back on the record, Mr. Pai.
13 I remind you you are still under oath.  Before we
14 broke, I believe you had testified that before your
15 son was hospitalized in late August or early
16 September of 2014, you had spoken with Atif about
17 his disability; is that right?
18 A    Right, right, yeah.  Summer I believe,
19 sometime summer, and --
20 Q    Sometime in the summer of 2014?
21 A    Right, yeah.
22 Q    And you all were at Camber at that point;

63

1  is that right?
2  A    Right, because I think effective date of
3  Camber is March 31st I believe of 2014, but Camber
4  already had control starting in about January.  The
5  official transition happened May 31st -- sorry,
6  March 31st, but there was an overlap, to my
7  understanding, because Camber people already --
8  they're doing presentations and stuff starting
9  January at least, yeah.
10 Q    Do you remember how many days or weeks
11 before your son's hospitalization that you had the
12 conversation with Atif about his disability?
13 A    Again, I remember it was summer.  See,
14 the thing is I didn't even think of it other than
15 it was at a time that I had to go for something for
16 my son, so -- so in conversation, I said I had to
17 go and take some time, because I still had some
18 vacation time at that time.  I had about a week I
19 think left over if I understand correctly, beyond
20 the -- what the -- the last of the government shut-
21 down.
22       So I had to take some of that, and I

64

1  might have said it in connection that after this, I
2  would have to take unpaid leave maybe.  You know,
3  that's what I think the reason was, but I'm not
4  sure is it.  But I don't remember the exact date,
5  and the only reason I remember that was afterwards
6  when I -- when all this started happening, I
7  started thinking that maybe I shouldn't even have
8  discussed disability.  Maybe they felt that I
9  couldn't do the job, you know?  I don't know.  I
10 just -- kind of just my feeling at the time.
11 Q    Right, that was your own personal
12 speculation.
13 A    Yeah, because at the time that I talked
14 to him in summer, I didn't think of it -- or think
15 much of it I think, but afterwards, it kind of
16 seemed to --
17 Q    At the time you talked to him in the
18 summer, you didn't think of it because he was
19 supportive when you told him?
20 A    I'm sorry?
21 Q    He was supportive when you told him?
22 A    Yeah, he was always supportive, yeah,

Transcript of Ashok Pai
Conducted on March 26, 2018

65

1  yes.  Like I said, even when I went to him the
2  September 8th, he was very supportive, but he asked
3  me to write this letter, and I just wrote it
4  exactly as he wanted me to, the little -- little
5  e-mail that I had that he asked me to write, but
6  that was the one that was construed as a
7  resignation later because it had the October 31st
8  date and all that, so unfortunately, so you know --
9      Q    In the summer 2014 conversation where you
10 disclosed your son's disability to Atif, what did
11 you -- what did you tell him about his condition?
12     A    What did I tell him?
13     Q    What did you tell Atif about your son's
14 condition?
15     A    Oh, that he's disabled, yeah, yeah, that
16 he's disabled, that he's unable to talk and all
17 that.  Now, Atif had a baby somewhere about that
18 time, so I don't know if that was in connection
19 there.  I don't remember, yeah, but it's -- I did
20 tell him that he's totally disabled and he is
21 nonverbal and all that, yeah.
22     Q    What did Atif say in response?

66

1      A    Oh, he was very supportive, like I said,
2  you know.  He was always really a -- a very shocked
3  -- you know, you know, all the best to you or
4  something.  I don't know exactly, but he was very
5  supportive definitely.
6      Q    And then when your son was hospitalized
7  and you had no leave time available, it was Atif
8  who allowed you to use future leave time to --
9      A    Yeah, that was a policy, because we were
10 told when we gave up the -- my understanding again,
11 Camber, we were told -- no, no, Avaya policy,
12 Avaya's policy, what Avaya said at the
13 government shutdown, when it happened in October,
14 that we can either give up our vacation or we can
15 take unpaid leave.  So the question came up, you
16 know, so we have no vacation after it all.
17         They said you know, if you have more
18 vacation than the two weeks, you do have that, but
19 even if you exhaust all your vacation, you'll be
20 allowed to borrow vacation from future leave, you
21 know.  That was the offer from Avaya, you know.  So
22 -- so Camber -- because Camber said in their

67

1  presentation that all the benefits will be better
2  than Avaya, and that everything that Avaya promised
3  will be carried out, that kind of thing, you know.
4         So unfortunately the benefits were not
5  better.  There were some serious back -- you know,
6  I don't remember exact details, but some of them
7  are not as good as Avaya with Camber.  However,
8  they did live up to, as far as I understood, they
9  did live up to Avaya's promises.  So it was -- it
10 was part of the deal that we would be allowed to
11 take vacation from future vacation.  So that part
12 was strictly not unpaid.  It became unpaid leave
13 only when FMLA started, which I think was around
14 October 1st, something like that.
15     Q    And when you told Atif you needed to stay
16 in California longer because of your son's
17 hospitalization --
18     A    Uh-huh.
19     Q    -- and you were going to use future leave
20 to cover it, he approved the request.
21     A    Now, again, I had take -- I had gone to
22 California, if I remember correctly, on real leave,

68

1  because I was already en route.  Remember, I was en
2  route when I heard this.  Once I reached there, I
3  realized I needed more time, you know.  That is
4  when the discussion came up, and I asked, if I
5  understand correctly, if I remember correctly, I
6  asked I would need to have to take future leave
7  because I don't have any vacation left, you know.
8         So I don't remember the exact
9  conversation, but he kind of -- you know, he kind
10 of agreed in the sense that I -- I kind of reminded
11 him that that was the deal we had from Avaya back
12 in previous October 1st when the government
13 shutdown happened, and we had a choice, you know,
14 each employee had a choice, either take unpaid
15 leave or take a vacation with a promise of future
16 leave if necessary.
17     Q    So Atif agreed you could use your future
18 leave.
19     A    Yeah, I'm pretty sure he did.  I don't
20 remember him disagreeing or I don't -- because if
21 he had disagreed, I realize, oh, this is a promise
22 not kept up.  So I did not get the feeling that a

Transcript of Ashok Pai
Conducted on March 26, 2018

69

1 promise was broken or anything like that, so I
2 agreed -- I assume that yes, that is a promise back
3 in October, and he's living up to it, it's good,
4 you know.
5    Q   And when you told him your son was
6 hospitalized, was he -- did he express well wishes
7 or support?
8    A   Yeah, yeah, Atif is very supportive all
9 the time. I mean, he's very -- you know, he speaks
10 -- he speaks well, yeah, so I don't recall any kind
11 of disagreement on that.
12    Q   So Atif never made any negative comments
13 about your son's medical condition.
14    A   No, I don't believe so. I don't think he
15 would do that, yeah.
16    Q   What was the EOIR project that Avaya was
17 performing for the Department of Justice?
18    A   We did several projects because that's
19 why I was saying there were multiple projects, but
20 EOIR was the -- was the contract basically. The
21 contract was EOIR.
22    Q   Uh-huh.

70

1    A   And there were several projects under
2 that, and so I worked with several projects, and I
3 don't -- some of them were very small projects.
4 Some of them were larger, and this particular one,
5 I forget the details of it again, but it was kind
6 of a -- kind of a comprehensive database kind of
7 thing. We were trying to document -- we were
8 trying to collect all information, and -- and
9 SharePoint was an ideal platform for that because,
10 you know, there are a lot of scattered information,
11 and EOIR also has to deal with almost all the DOJ
12 agencies, so there was a lot of interfacing needed.
13    So this was a project where it was very
14 -- if I remember correctly, it was a pretty loosely
15 defined collection of databases and interfaces with
16 other DOJ sub-agencies, you know? And also with
17 DHS, Department of Homeland Security, and a few
18 other -- few other agencies too, Treasury and all
19 that. So we had interfaces with it, so it was --
20 it was a fairly complex project, did several data
21 storages and several data interfaces with other
22 agencies.

71

1    Q   What was your duties as the software
2 systems architect?
3    A   I had to design part of the system, and
4 it was partly SharePoint, partly Dot Net, and so it
5 was -- and I did not have the primary role for
6 that. I was only one of the -- one of the -- one
7 of the architects of that, yeah.
8    Q   And when you're talking about the design
9 of the system, are you talking about the way the
10 system's laid out?
11    A   Yeah, yeah, the -- what kind of databases
12 are needed, what kind of interfaces are needed, how
13 do they interconnect, how do they talk to each
14 other, how do they -- how do they talk to each
15 other, how do they interact, the databases and the
16 interfaces.
17    Q   And what's the difference between an
18 architect and a developer in that context?
19    A   Typically the architect's role is higher
20 level. The developer is just following the -- the
21 specifications created by the architect. So the
22 architect does a lot of creative thinking

72

1 generally, and it's mainly creative thinking in
2 terms of -- you know, because there's wide choice
3 of technologies, for example, that we can use.
4    There's a wide choice of data structures
5 we can use, a wide choice of interfaces. So we are
6 to make all the right -- right choices from our
7 experience, and that's where our experience and
8 knowledge comes in and those certifications,
9 because all that gives us the ability to choose
10 wisely, because those choices are going to be very
11 critical, you know, obviously.
12    So then the -- usually the developers or
13 the programmers are -- typically just take those
14 choices and fulfill the programming needed for
15 that, but -- but we also do some programming too.
16 Time to time, I was called in to do programming too
17 obviously, so --
18    Q   But that wasn't the primary duty of your
19 job?
20    A   Exactly. My understanding -- yeah, as an
21 architect, my understanding was that it was all
22 design work with programming as needed.

Transcript of Ashok Pai
Conducted on March 26, 2018

---

73

1    Q    And Nan Li was your immediate supervisor
2  at Avaya at the time?
3    A    Most of the time, yes.  There were
4  different -- for example, I think Joe Barbaretta
5  was at some point too.  He had joined I think in
6  2013 I think, and so he became my supervisor some
7  time.  Then that -- Sudhakar Nallamothu became
8  supervisor in 2014 I believe.  So there have been a
9  few, but Nan was the one constant from the -- from
10  my interview to my termination, you know.
11    Q    During your time at Avaya, were there any
12  issues with Atif that you believed were
13  discriminatory?
14    A    I don't know.  I mean, it's hard to say.
15  I didn't feel that -- I mean, I -- I guess I did
16  feel at times, but you know, in a work environment,
17  sometimes hard to judge, and I'm very -- I'm very
18  generous in that regard.  I never say that people
19  are -- you know, I never ascribe a negative
20  attitude to people.  I always take the positive
21  approach, you know?  I always assume that they're
22  positive, and so any such feelings I got I

74

1  suppressed and kept going.
2    Q    When did you have feelings that there
3  might be something discriminatory at Avaya?
4    A    Well, I don't know.  At times, I felt
5  that I was the most senior person but I was not
6  given -- I was given, you know, subordinate roles,
7  but I went on.  I didn't -- I didn't any -- voice
8  my opinion on that, but I just said that -- so I
9  don't know.  I mean, it's hard to say that it's
10  really discriminatory, you know.  It's just that
11  sometimes we don't like a decision, but we -- we
12  are good soldiers, you know.
13    Q    So you're just talking about some of the
14  work assignments you received?
15    A    Yeah, yeah, I mean, it's -- you know,
16  depends on the work assignment.
17    Q    Atif never made any comments about your
18  age when you were at Avaya; is that right?
19    A    Well, he has mentioned several -- he
20  mentioned several times that I was the highest paid
21  person at -- in fact, he said my salary is higher
22  than his.  That was one mention he had made, and he

75

1  had kind of referred to my age at times, but I
2  can't remember any specific instances.
3    Q    Well, when he said you were the highest
4  paid person, he was speaking -- that's factually
5  true; is that right?
6    A    That is my understanding because -- but
7  you know, he might have other bonuses and things
8  like that, but in terms of pure salary, apparently
9  I was.  That's what I was told.
10    Q    So what does that have to do with your
11  age?
12    A    Because generally -- I mean, I felt that
13  he might have meant that in connection with the age
14  too because government generally gives more value
15  to age than private industry sometimes, and -- and
16  as a result, you know, higher -- older people tend
17  to be paid more sometimes, so I just got the
18  feeling that maybe that's what he was referring to.
19    Q    They weren't working on a seniority
20  system, right?
21    A    I don't know that.  I don't know what you
22  mean by seniority system.

76

1    Q    Avaya set your wage.  You weren't paid
2  based on your years of service; is that right?
3    A    Well, Avaya set my salary.
4    Q    Uh-huh.
5    A    Now, obviously they were setting a salary
6  based on what they could charge the government.  So
7  I don't know what they were charging the
8  government, but I've heard that the government pays
9  more to companies -- I've heard that again.  I
10  don't know if it's true or not and I have no way of
11  telling for sure, but I've heard that the -- the
12  rate that contractors charge the government is
13  based on age and certifications and experience, you
14  know.
15    Q    Where have you heard that from?
16    A    Oh, fellow employees.  I mean, just a
17  rumor mill, you know, say oh, yeah, you know, it's
18  like you got a lot of experience or -- so -- so
19  you're probably being charged higher or something.
20  I don't know.  It's just a -- just rumors kind of
21  thing.
22    Q    So you have no firsthand knowledge of

Transcript of Ashok Pai
Conducted on March 26, 2018

77

1  that at all.

2      A   No, I don't really, you know.

3      Q   And really it's your only speculation
4  that reference to your salary had something to do
5  with your age.

6      A   I don't recollect very specific
7  references to age, but I sometimes got the feeling
8  that he was, but I didn't -- I can't recollect a
9  specific reference to age.

10      Q   Well, what cause -- what -- what happened
11  that gave you this feeling?

12          MR. STERN: Objection, asked and answered
13  already.

14  BY MR. ORTBALS:

15      Q   Go ahead and answer the question, sir.

16      A   I'm sorry, what is the question?

17      Q   Well, let me ask it this way just so we
18  can close the loop on this. Other than Atif making
19  reference to your salary --

20      A   Uh-huh.

21      Q   Is there anything else that gave you this
22  feeling about something to do with your age at

78

1  Avaya?

2      A   I mean, I've never -- I got the feeling
3  time to time, but the exact occurrences, I have to
4  think back and see what might have triggered that.
5  I have to really think hard and long for that to
6  try to actually remember the specific instances,
7  but I was getting the feeling at times because I
8  think I was the oldest in the -- in the group, you
9  know, so -- so you know, others sometimes made
10  jokes about it, that I was the oldest in the --
11  there were -- I think if I joined there, if I
12  remember correctly, if what I heard was correct,
13  there were 55 people in the EOIR project, and Atif
14  was the head of the project. You know, he was the
15  director of about 55 people.

16          But that number shrank throughout the two
17  years -- almost two years I was there, and probably
18  by the time I left, there was probably 30 or
19  something like that. I don't know the reasons for
20  the shrinkage, but almost the whole time I felt
21  that I was the oldest person there in that 55 -- 55
22  to the lower number, whatever the number was, I

79

1  generally felt I was the oldest person, and some
2  people also kind of joke hinted at or joked at that
3  sometimes. But I don't recall Atif -- Atif
4  specifically, but I -- I -- I kind of got the
5  feeling that I was recognized as the oldest person.

6      Q   Were you in fact the oldest person?

7      A   I think so. I mean, from all
8  indications, I was.

9      Q   And you were 63 years old when you were
10  hired.

11      A   When I started, yeah, yeah.

12      Q   Okay.

13      A   Yeah, and again, I don't know -- I don't
14  have any -- I mean, I can't go around asking
15  people's age, you know, so --

16      Q   Who was it that -- who was it that made
17  jokes that you thought might have something to do
18  with your age?

19      A   You know, it like -- it's like an office
20  party, you know, you go ahead, you're older, age
21  before beauty and things like that, you know.

22      Q   Who -- who did that?

80

1      A   I don't recall the people who did that.
2  Many -- see, the thing is there was a lot of
3  turnover because there were many contractors, you
4  know, many contractors, and mostly contractors,
5  they were more loose with their talk than the
6  employees, you know, generally, because employees
7  tended to be a little more concerned about the
8  organization and all that, but -- but contractors
9  would be freer in talking. That's one thing.

10          And then, like I said, the number shrank
11  dramatically, and there was also turnover. People
12  joined and left too. So with all that, I don't
13  remember who exactly made, but there were generally
14  sometimes some jokes reserved for me.

15      Q   How many times did somebody make an age
16  before beauty comment?

17      A   Probably about twice maybe. I seem to,
18  you know, remember once or twice, yeah, but again,
19  I don't remember the specific instance. It was
20  mostly at office parties or we are standing in line
21  for something or we're trying to enter the same
22  door or something of that nature, you know.

Transcript of Ashok Pai
Conducted on March 26, 2018

---

**81**

1    Q    And your recollection is that these two
2  times may have been -- the person may have been a
3  contractor?
4    A    Yeah, most likely, most likely.  And
5  again, I don't remember the specific two times.
6  There's probably been more than two too, but I
7  didn't — I didn't really, you know, feel that was
8  bad, but now that you ask me, now it looks like —
9  now if I think back about it, I feel that these are
10 all age-related issues, you know, and they're all
11 jokes, but you know, who knows what they're
12 thinking?
13   Q    And Atif wasn't the person that made this
14 age before beauty comment.
15   A    No, I don't believe he said that, no.  He
16 was very careful that way.  He was — so I wouldn't
17 think he made that.  I mean, he might have made —
18 for example, the salary comment, that kind of
19 thing, which did not directly say age, but other
20 than that, I don't recall him — at least right
21 now, I can't think of any instance where he
22 specifically said you're too old or something.

---

**82**

1    Q    Did you ever complain to anybody at Avaya
2  about these --
3    A    No.
4    Q    -- jokes?
5    A    No, I never felt that was bad until I got
6  terminated.  Then I don't know why I got
7  terminated, so —
8    Q    Other than the two times that somebody
9  made a joke at a party --
10   A    Uh-huh.  It probably was more than two
11 times.  I'm thinking about two times, but it — it
12 — it — it happened, you know, a few times I
13 think, but yeah, I'm sorry, go ahead.
14   Q    But you cannot recall any more than the
15 two times sitting here today.
16   A    Yeah, I mean, there were several comments
17 off and on in a very easy, you know, camaraderie
18 like way, not meant to hurt or harass or anything
19 like that, but it was just general comments that
20 you're obviously old, you know.
21   Q    And at the time, you weren't offended by
22 it.

---

**83**

1    A    No, I was not, because I didn't feel that
2  was bad.
3    Q    You didn't tell the person making the
4  comment that they needed to -- that it was
5  inappropriate or they needed to stop?
6    A    No, I would typically make a joke about
7  them being too young or not experienced or
8  something like that, but I always took it easy and
9  never really took it to heart.  I mean, I never
10 took it as -- as offense, you know.
11   Q    Any other specific references to your age
12 at Avaya that you recall?
13   A    I cannot recall anything specific.  No, I
14 can't — I can't think of anything right now, yeah.
15   Q    And it's your -- I think it was testimony
16 earlier that no one at Avaya knew about your son's
17 condition?
18   A    As far — I made the point not to discuss
19 it specifically with anybody.  It's possible they
20 came to know to some other way or other, but I
21 don't recall discussing specifically with anybody,
22 yeah.

---

**84**

1    Q    And you don't remember anybody at Avaya
2  making reference to your son's condition during
3  your time there?
4    A    No, I don't recall, no, because you know,
5  one of the things, I didn't want them to feel any
6  pity about -- I don't like to be pitied.
7    Q    I think you had mentioned earlier that in
8  2013, you took some leave from Avaya because of
9  your wife's condition; is that right?
10   A    Right, right, right, right.  She was
11 already diagnosed with — yeah, in fact, I think
12 when Atif -- I was -- she was actually undergoing a
13 surgery -- that -- she had just been diagnosed, and
14 I -- I was not an Avaya employee at the time, but I
15 was -- I -- I was in the hospital with her.  I was
16 waiting outside for the doctor when I got a call
17 from Atif, I think it was either -- either -- I
18 think it was after the -- it might have been before
19 the interview, inviting me to the interview I
20 think, yeah.  He was saying that I want you to come
21 for the interview kind of thing.  So I actually
22 remember talking to Atif while she was undergoing

---

Transcript of Ashok Pai
Conducted on March 26, 2018

93

1  That's why I have to take FMLA really I think.
2      Q    So you used the FMLA because you
3  physically needed to be in California.
4      A    Yeah, exactly.
5      Q    What was the response from either Atif or
6  Nan when you told them that you were doing this
7  full-time work from California?
8      A    That I was doing this work?
9      Q    Right.
10     A    I don't recall anything negative.  I can
11 tell you that.  I don't recall anything negative
12 said specifically.  So you know, I was obviously —
13 I obviously had my hands full in my wife's
14 situation with this new project and all this, so I
15 told them, I did inform them, and since there was
16 no complaint, I just carried on, you know.  British
17 term, yeah.
18     Q    And then you returned to Avaya in
19 February of 2014?
20     A    Right, yeah.  I don't remember the exact
21 date, but it was February.
22     Q    And by that time, you had learned about

94

1  the Camber acquisition; is that right?
2      A    Yes, yes, yes, because I was getting
3  e-mails saying -- you know, talking about this
4  Camber -- Camber and Avaya agreed to be -- to --
5  for an acquisition, and then there were Camber
6  presentations and with slide decks and all coming
7  through, PowerPoint slides all coming through
8  explaining what Camber is and, you know, all their
9  goals and, you know, the -- their philosophy and
10 everything else, yeah.
11     Q    And was it your understanding the entire
12 EOIR team was going to move with the acquisition?
13     A    Yeah, yeah.  Avaya was being acquired.
14 Avaya Government Solutions was acquired.  So
15 everything in Avaya Government Solutions, all the
16 projects they had in different -- different
17 agencies, government agencies all going to Camber,
18 yeah.  Avaya was getting all the business of
19 government services.
20         And the interesting thing is Avaya came
21 from AT&T Bell Labs, you know.  That's interesting
22 point too because when AT&T was divested by the

95

1  government decree, it was divested -- it went in
2  two companies.  One was a French company which got
3  all the regular business, and anything to do with
4  the government, anything -- the defense related,
5  all these, they created a very good company called
6  Avaya.  So Avaya originally started at Bell Labs,
7  and that's one of the reasons I think Atif liked
8  the fact that I had worked at Bell Labs, you know.
9      Q    Towards the end of your time at Avaya,
10 there was an issue with you being gone on some
11 unapproved time off; is that right?
12     A    Well, there are two sides of that -- at
13 least two.  Multiple sides to that, because my
14 understanding was the permission was granted first,
15 and then after I had invested some money, I'd
16 actually paid $1,500 for registration and another
17 1,500 plus for hotel, travel and all that for
18 SharePoint conference, then at the last minute,
19 after all that was nonrefundable, they said no, you
20 can't go, at the last minute, it's a real
21 about-face, you know.  That's my understanding of
22 it.  So -- yeah.

96

1      Q    Who gave -- who gave you the permission
2  originally?
3      A    My understanding — it was all verbal
4  unfortunately.  The original one was verbal, later
5  on, verbal, because I wanted to go for that
6  conference in the sense that it would benefit the
7  company, and it was -- Microsoft would -- it was a
8  Microsoft thing and all that.  So I asked if Avaya
9  will send me to conference.
10         This was -- this was earlier.  This was I
11 think -- anyway, I don't remember exactly when it
12 was, but it was prior to this, and they said no,
13 they can't send me because only certain people can
14 go and all this kind of thing.  So I said will it
15 be okay if I took my vacation time and go for it?
16 They said yes, you can do that.
17         So that -- that was what the
18 understanding was, and so I -- I registered the
19 $1,500, which is nonrefundable, and after all that
20 was done, just three days before the conference I
21 think, I told them yeah, so everything's set, I got
22 my -- I think I had a question of vacation time or

Transcript of Ashok Pai
Conducted on March 26, 2018

---

101

1  conference coming up, so can I do that?  So both of
2  them agreed.
3         And I mentioned that after that too
4  several times, and I may have even mentioned it to
5  the government people, and everybody was supportive
6  of that because I was going on my own, I was
7  spending my own money, going -- taking my own
8  vacation time and going.  So everybody was
9  supportive of that, and they felt that -- they even
10 asked for -- you know, to distribute the stuff that
11 I brought back because the PowerPoint slides, the
12 class notes, even videos that -- it came with like
13 60 or so videos because all the sessions were
14 videotaped too.  With all that, they asked me to
15 bring it back, and I did bring it back.  I
16 distributed that too afterwards even though this is
17 what happened with the denial at the last minute,
18 you know?  I didn't -- I didn't have any hard
19 feelings because of that.  In spite of that, I
20 brought back all the stuff and gave it to people,
21 you know.
22    Q    So again, so I understand it, at the time

---

102

1  that you got this verbal approval, you had vacation
2  time available; is that right?
3     A    Yeah, that's probably part of it too,
4  because then the shutdown happened, the government
5  shutdown, so I think that was a factor there, yeah.
6  I think the agreement was before the shutdown using
7  my own vacation time.  Then the shutdown happened
8  and then we had to make a choice, give up our
9  vacation, you know, but we gave up vacation only on
10 the condition that we can borrow from future
11 vacation.
12        So this is a future vacation, and if I
13 remember correctly, since I had three weeks
14 vacation by -- by my original agreement, instead of
15 two, I still had about a week's vacation left after
16 the shutdown.  So -- so the time I took off for the
17 conference I think was for my real vacation, not
18 even the future vacation.
19    Q    Except, sir, you had used up all your
20 time off during your leave for your wife.  Is that
21 true?
22    A    I'm sorry.  Say it again?

---

103

1     Q    You'd used all of your time off during
2  your leave for your wife.
3     A    It was FMLA though, right?
4     Q    Right, but you used time off for that.
5     A    FMLA's unpaid leave.  It's not part of
6  vacation.  It's really not vacation.
7     Q    Once you burn up your paid time off,
8  sure.
9         MR. STERN:  Objection as to form of
10 counsel's last question.
11 BY MR. ORTBALS:
12    Q    Let me put it this way, sir.
13    A    Uh-huh, uh-huh.
14    Q    You were gone for three months; is that
15 correct?
16    A    Whatever the FMLA period is, yeah.
17    Q    You were gone for three months.
18    A    Uh-huh.
19    Q    You were working for another company full
20 time during your time away; is that right?
21    A    Yes, yes.
22    Q    You came back.

---

104

1     A    Uh-huh.
2     Q    Correct?
3     A    Uh-huh.
4     Q    Your supervisors told you you couldn't
5  take any more leave to go to this conference; is
6  that right?
7     A    They told me three days before the
8  conference.
9     Q    They told you you couldn't go to the
10 conference.
11    A    Right.
12    Q    And you went anyway.
13    A    I was going for five days -- I'm just
14 telling you my -- my side of the story there, you
15 know?  Because it was a total shock to me when they
16 said you can't go when I've already spent 3,000,
17 okay?  And I said there was a clear agreement to me
18 that I could go, and I trusted them.  I did not ask
19 for the agreement in writing.  So I trusted them
20 and they said if it's your own vacation, your own
21 time, you can go, you know.
22        So I did have a choice -- see, again, I'm

---

109

1  client deliverable work required your attention
2  such that your absence would pose a problem for the
3  group, and Nan told you on February 25th that we
4  could not accommodate your request." Did I read
5  that correctly?
6      A    Could not accommodate your request, yeah,
7  yeah, the 24th, when I said -- reminded him of the
8  conference coming up first week of March, he said
9  he has to talk to Atif about it, which was actually
10 a surprise to me because I thought Atif had agreed.
11 So he said he'd talk to Atif.  And then 25th, he
12 called me back -- everything was verbal
13 unfortunately, and he called me back and said that
14 you can't go, you know.
15         So I said this is a total surprise to me.
16 I've already spent $3,000, you know, and -- and I'm
17 willing to go on my own, I'm willing to either take
18 vacation or unpaid leave and all that.  And I said
19 also I'll only go for three days instead of five.
20 So I tried to make all these, you know, sacrifices,
21 and he said no, he has to -- he can't agree with
22 that, and I refuted that.

110

1          I don't believe the statement entered, I
2  did not say that, I don't think that's correct,
3  that it says I did not -- I understand that you
4  acknowledged the decision and did not disagree.  So
5  I do not agree with the did not disagree.  The last
6  -- last phrase there, last phrase, and did not
7  disagree --
8      Q    But -- but you understood the decision
9  was --
10     A    Yeah, yeah.
11     Q    -- that you were not approved to go.
12     A    Because -- yeah, I acknowledged the
13 decision, yes.
14     Q    And that the decision was made because of
15 client deliverable work needing your attention.
16     A    Yeah, so did not disagree also means I
17 did not agree, right?  So he did not say I agreed.
18 He's saying I don't disagree.
19     Q    Well, I understand you didn't agree,
20 because you went without permission.
21         MR. STERN:  Objection as to the form of
22 the question.

111

1  BY MR. ORTBALS:
2      Q    Right?
3      A    Well, I don't know how you'd put that, I
4  mean, you could -- because from my standpoint,
5  permission had been granted.  I spent $3,000.  I
6  was bringing back valuable material.  I sacrificed.
7  I said instead of five days, I'll go three days.
8  I'm making all the sacrifices there, so -- and it
9  was a total shock to me, you know, that they're
10 suddenly saying no, you can't go after all that.
11     Q    I understand that you think that you were
12 justified.  I'm just saying you didn't have
13 permission, sir.
14     A    Where was the written -- a written
15 message to me that you don't have permission?  This
16 is after the fact.
17     Q    And you just told me that it's true that
18 Nan came to you and told you before the conference
19 --
20     A    Verbally, verbally.
21     Q    I'm not -- that's the same thing, sir.
22 You were told you didn't have permission to go,

112

1  correct?
2      A    I acknowledged their decision, yes.
3      Q    Okay.
4      A    But why did they not give me written
5  statement there, that you cannot go?
6      Q    Sir, you understood -- you understood
7  that you were not given permission to go, correct?
8      A    I did not fully understand that, quite
9  frankly, because I was told verbally you cannot go,
10 and I wanted clarification, why is it that you're
11 -- you're -- you're agreed that I can go, why is it
12 that you let me spend all that money, why is it
13 that you even wanted material brought back, and
14 after that now you're saying you can't go, three
15 days before the conference.  So that was a total
16 shock to me.
17         So -- so I did not disagree is correct
18 because I did not agree, you know?  All I'm saying
19 is that was the -- what was told to me, and that I
20 can't go, you know?  So I did not look at it as a
21 permission issue at that point.  It was just Nan
22 telling me you can't go, you know?  So I don't know

117

1      THE VIDEOGRAPHER:  We're going off the
2  record.  The time is 11:48 a.m.
3          (Recessed at 11:48 a.m.)
4          (Reconvened at 11:54 a.m.)
5      THE VIDEOGRAPHER:  Here begins Disk
6  Number 2 in the videotaped deposition of Ashok Pai.
7  The time on the video monitor is 11:54 a.m., and
8  we're back on the record.
9  BY MR. ORTBALS:
10     Q   Okay, we're back on the record after a
11  short break.  I'll remind you, Mr. Pai, you're
12  still under oath.  Before we broke, we were
13  discussing Deposition Exhibit Pai 3.  If you turn
14  to page 4 of that -- of that document, Atif,
15  towards the middle of the page, forwarded your
16  e-mail response to him to Lisa Thompson in human
17  resources; is that right?
18     MR. STERN:  Objection as to the form of
19  the question, whether your characterization or
20  reading is correct or is that to imply he knows
21  that that's what happened?
22     MR. ORTBALS:  He can answer the question.

118

1      MR. STERN:  Objection as to form.
2      THE WITNESS:  You have a question open?
3  I didn't know that, because I was shocked by --
4  I've not seen this e-mail before, so I was shocked
5  --
6  BY MR. ORTBALS:
7     Q   But you agree with me this reflects that
8  Atif forwarded your e-mail to Lisa Thompson in HR;
9  is that right?
10    **A   It appears that Atif must have forwarded**
11 **it to her, yeah.**
12    Q   And he says, "Lisa, Please see the
13  response below from Ashok.  His leave started in
14  late October 2013 and he did not have any approved
15  leave to attend the conference before he left.  We
16  need to know if we can terminate him ASAP, as I
17  have to manage the client expectation," slash,
18  "communication."
19    **A   Uh-huh.**
20    Q   Did I read that correctly?
21    **A   That's what it says, yeah.**
22    Q   Were you aware that there was discussion

119

1  about terminating your employment over your
2  unapproved absence?
3    **A   What's that again?**
4    Q   Were you aware that there was discussion
5  about your terminating your employment --
6    **A   No.**
7    Q   -- over your unapproved absence?
8    **A   Well, I was aware in some way, but I was**
9  **not actually told that by Atif or by anybody at**
10 **Camber, yeah.**
11    Q   How were you aware that there was
12  discussion of terminating your employment?
13    **A   After the -- you know, after the fact, I**
14 **came -- came to know some sources -- from some**
15 **sources, but nothing at that point, yeah.  I didn't**
16 **know at that point at all.**
17    Q   Who was the source that told you?
18    MR. STERN:  Objection as to discovery of
19  any communications from EEOC counsel with Mr. Pai
20  after commencement of litigation.  Those are all
21  privileged and further protected, so do not
22  disclose communications --

120

1      THE WITNESS:  Yeah.
2      MR. STERN:  -- with EEOC counsel.  Answer
3  --
4      THE WITNESS:  I found much later, yeah,
5  much later.  Not during -- nobody at Camber told
6  me, yeah.
7  BY MR. ORTBALS:
8     Q   Okay.  And then if you turn to the page
9  before that, page 3 of Exhibit 3 --
10    **A   Uh-huh.**
11    Q   At the bottom, Atif again sends Lisa an
12  e-mail dated March 12th, 2014; is that correct?
13    **A   Uh-huh.**
14    Q   Yes?
15    **A   I see the e-mail, yeah, yeah.**
16    Q   And he again says, "Yes, we would like to
17  proceed the termination."  Is that right?
18    **A   Yeah.**
19    Q   And then if you go to the top of the
20  page, Adesh Jain --
21    **A   Uh-huh.**
22    Q   -- who is Atif's supervisor; is that

Transcript of Ashok Pai
Conducted on March 26, 2018

---

121

1  right?

2    A   Yeah, yeah.

3    Q   Sends an e-mail to Lisa Thompson --

4    A   Uh-huh.

5    Q   -- and Atif --

6    A   Uh-huh.

7    Q   -- saying, "Yes, term is the appropriate

8  decision." Is that right?

9    A   Yes, there's something in between too,

10 which probably is relevant too, right? Apologies

11 for the delay.

12   Q   Sir, you need to answer the questions

13 that I'm asking you.

14   A   I'm sorry.

15   Q   Not -- not --

16   A   What is the question again please?

17   Q   Again, Adesh Jain sends an e-mail to Lisa

18 and Atif saying, "Yes, term is the appropriate

19 decision." Is that correct?

20   A   I see that e-mail, yeah, I can see it,

21 and I'm seeing it now. I had no idea about these

22 e-mails.

---

122

1    Q   But you'd agree with me this reflects

2  that Atif took your unapproved leave seriously.

3        MR. STERN: Objection as to the form of

4  question and lack of foundation based on the

5  witness' knowledge.

6    A   Well, I just want to mention one thing in

7  this regard. Atif also took my transition request

8  and converted to a resignation letter, okay,

9  without any reason for it. He actually dictated

10 wording to make it look like a resignation letter.

11 He essentially dictated many of the wordings which

12 made him go towards termination here.

13   Q   You'd agree with me you requested a

14 termination.

15   A   I see that e-mail, yeah, yeah.

16       MR. STERN: Objection as to the form of

17 the question.

18       (Deposition Exhibit Number 4 was marked

19 for identification.)

20 BY MR. ORTBALS:

21   Q   The court reporter's handing you

22 Deposition Exhibit Pai 4.

---

123

1    A   Uh-huh.

2    Q   And this is a performance improvement

3  plan --

4    A   Uh-huh.

5    Q   -- slash final warning you were placed on

6  on March 24th, 2014; is that correct?

7    A   Yes, I see that.

8    Q   And that's your signature on the second

9  page?

10   A   Uh-huh.

11   Q   Yes?

12   A   Yes, it's my signature, yes.

13   Q   And in the first page of the description

14 of the performance discusses the issue with your

15 attendance at the SharePoint conference and having

16 three unapproved days of absence; is that correct?

17   A   I don't agree with these statements here,

18 but I -- I can see it's there, yeah.

19   Q   You'd agree with me this is one of the

20 reasons you were placed on this performance

21 improvement plan final warning; is that right?

22   A   That's what it states here, yeah. It

---

124

1  states that -- that during this performance

2  improvement plan, because of that situation, yeah.

3  But like I said, it was -- I was under clear

4  impression both from Atif and Nan that had been

5  agreed to before my FMLA. Just after return from

6  FMLA and just three days before the conference,

7  after they've actually agreed to my spending all

8  that money of $3,000, to me, it was like -- I'd

9  just returned from FMLA. Now they changed the

10 decision after they agreed, so it looked like they

11 were just getting back at me for going on FMLA.

12       So I agreed to go down to three days, and

13 then I only took two days really out of work, so I

14 made my sacrifices, but I -- I agree with you that

15 all this is said here in this thing, but I'm saying

16 that I don't agree with that stuff.

17   Q   Did anybody tell you they were getting

18 back at you for being on FMLA?

19   A   They didn't say it in so many words, but

20 this seemed to be an indication of that.

21   Q   In fact, they told you they needed you

22 there for client deliverables; is that right?

---

133

1  standpoint, but to a large extent, my hands were
2  tied because of the -- of the political issues
3  between Avaya people and government people.  And
4  so, you know, I do not agree with that statement,
5  but you know, they're -- they're trying to pin the
6  blame on me.
7      Q    What political issues are you referring
8  to?
9      A    They were -- there was -- you know, I --
10 I don't want to refer to them as I have to answer
11 that question because it's purely my -- you know,
12 my feelings there.  I -- I don't want to specify
13 something which may not -- but what I'm saying is
14 there were a lot of factors there which went into
15 the not delivered on time.
16        See, the accusation here is the project
17 was not delivered on time.  First of all, I was not
18 the lead for that project.  I was not the project
19 lead, okay?  Secondly, I was not given any kind of
20 warnings or notices at that time that something was
21 not done.  So I did everything I could, okay?  So
22 if it was not delivered on time, you should ask the

134

1  project lead at the time and you should ask other
2  people who were in charge -- in charge at the time
3  rather than say -- than pin it on me, you know?
4  Because I did the best I could and did an
5  outstanding job there, and like I said, the result
6  of this performance plan was also outstanding and
7  acknowledges.
8      Q    Now, you'd agree with me that the time
9  frame for this performance improvement plan for the
10 technical task was --
11     A    Uh-huh.
12     Q    -- March 24th, 2014 through April 11th,
13 2014?
14     A    Yeah, yeah, that -- I mean, I don't know
15 of exact dates, but that -- that seems to be what
16 it says, yeah.
17     Q    And for part of that time frame, that
18 would have been when you were with Camber; is that
19 right?
20     A    Yeah, yeah, yeah, that -- Camber became
21 effective March 31st.
22     Q    So you understood when you were issued

135

1  this performance improvement plan that the
2  expectations would carry over --
3      A    Uh-huh.
4      Q    -- to Camber; is that right?
5      A    Yeah, yeah, that was pretty clear
6  because, you know, transition happened, official
7  transition happened March 31st, yeah.  Now, the one
8  thing I see strange here is that HR has not signed
9  this, okay?  It is a place where HR signature,
10 which has not been signed.  So did they disagree
11 with this or what?
12     Q    So you're just speculating as to why --
13     A    Yeah, I'm just asking why is it they're
14 not signed and why is it official if it's not
15 signed?
16     Q    Well, is this accurate at the bottom of
17 the second page, names of persons at meeting, Atif
18 Khalil, Lisa Thompson, Nan Li and Ashok Pai?
19     A    See, quite frankly, I do not recall Lisa
20 Thompson being there.  She probably was, but the
21 main players were Atif, Nan and me I guess, yeah.
22     Q    And Atif, Lisa and Nan all also

136

1  transitioned over to Camber; is that right?
2      A    Yeah, everybody transferred -- everybody
3  transitioned over to Camber except some people who
4  resigned.  No, quite frankly, I cannot -- I'm not
5  -- I don't believe Lisa was there, but I could be
6  wrong, yeah, but the fact is she has not signed.
7      Q    And then when the Camber transition
8  occurred on March 31st, 2014 --
9      A    Uh-huh.
10     Q    Your job duties and title remained the
11 same; is that right?
12     A    Yeah, everything was supposed to remain
13 the same, yes.
14     Q    Your pay remained the same.
15     A    Yeah, yeah, everything's still the same,
16 yeah,
17     Q    You were still performing as a software
18 systems architect on the EOIR project.
19     A    As one of the software system architects,
20 yeah.
21        (Deposition Exhibit Number 5 was marked
22 for identification.)

Transcript of Ashok Pai
Conducted on March 26, 2018

137

1        THE WITNESS:  Oh, thank you.
2    BY MR. ORTBALS:
3        Q    The court reporter's handing you what's
4    been marked Deposition Exhibit Pai 4, and is that
5    your signature on this document?
6        A    Yeah, it looks like it, yeah.
7        Q    And you dated it April 11th, 2014; is
8    that correct?
9        A    That's what it says, yeah.  I mean, what
10   I'm saying is I don't have a recollection of
11   signing this, but it does look like my signature,
12   yeah.
13       Q    And this is an acknowledgment that you
14   received Camber's employee handbook and verifying
15   that you have read it.
16       A    Uh-huh.
17       Q    Is that correct?
18       A    That's what it says, yeah.
19       Q    Do you recall receiving Camber's employee
20   handbook?
21       A    I don't -- well, I have to think back.
22   We were given a lot of documents at the time of the

138

1    transition, a lot of them.  At the same time, we're
2    supposed to, you know, keep our job going full
3    speed too.  So obviously I don't think I read every
4    word of it.  I don't think I could read every word
5    of it and still do my job, because there was a lot
6    of items.
7        Q    So you got it.  You just don't know that
8    you read all of it?
9        A    I'm saying I got it because it appears
10   that I signed it.  That's all I can say, you know.
11       Q    And I believe you testified earlier that
12   you disclosed to Atif in the summer of 2014 about
13   your son's condition; is that right?
14       A    That is my understanding, yes, my -- my
15   memory of it, yeah.
16       Q    Was there anything discriminatory that
17   happened to you at Camber from the time you -- of
18   the transition until you disclosed to Atif about
19   your son's condition?
20       A    Anything discriminatory that happened.  I
21   can't think of anything personally, but there were
22   a lot of people who either left in strange

139

1    circumstances at the time, so I don't know why they
2    left or whatever, but as far as I'm concerned, I
3    was too busy working I guess, plus reading all the
4    documents too.
5        So I can't recollect any specific
6    instances other than of course this PIP was in
7    progress at the time, and to me -- this performance
8    improvement plan was in progress, and I was doing
9    my best job on it, even though I didn't agree with
10   it.  So in a way, that was discriminatory against
11   my FMLA, but I'm not -- I'm not going to insist --
12   I'm not -- I don't know, I cannot say because it
13   appears to be a tremendous coincidence that I just
14   returned from FMLA and they tried to terminate me.
15       Q    They recommended you to be terminated
16   because you took time off without permission, sir.
17       A    I was given permission originally, sir,
18   because permission originally was granted verbally.
19   Permission was denied also verbally, okay?  Neither
20   of them was written, okay?  So the point is I was
21   under full impression that I had the permission,
22   and -- and why would I spend $3,000 nonrefundable

140

1    if I didn't have permission?
2        As you can see from all my other actions,
3    I never disobey anybody, I've not been arrested
4    ever.  I've not committed a crime that I can -- I
5    mean, I've not committed a crime, I can say, and
6    with such a performance record, why would I, you
7    know, go out of my way to do something like that
8    unless I had the clear understanding that they've
9    given me permission, okay?  And like I said, they
10   gave me permission verbally and they took away
11   permission verbally, and they're talking about a
12   deliverable too, which to me, it was just an
13   excuse.
14       Q    That's your personal opinion.
15       A    Yes, because the deliverable, I cannot
16   recall any deliverable that was specified to me at
17   the time as being, you know, critical to be -- to
18   be delivered in that period.
19       Q    Were there any other issues under this
20   performance improvement plan after it had been
21   issued?
22       MR. STERN:  Objection as to the form of

Transcript of Ashok Pai
Conducted on March 26, 2018

141

1 the question.

2    A    When you say any other issues, how many

3 -- how many --

4    Q    I mean, after you were given the

5 performance improvement plan --

6    A    Uh-huh.

7    Q    -- was it brought up again?

8    A    Well, I had to give progress reports on

9 it, and I kept on doing my job and they kept saying

10 this is good, this is good, this is good, and they

11 finally agreed that it's a wonderful performance.

12 That's it, you know?  So they -- they liked this --

13 liked my work on the performance plan, and I can't

14 think of any issues.

15    Q    So there were no new issues that came up

16 from the time that you were issued the performance

17 improvement plan until the summer of 2014; is that

18 right?

19    A    Between that period.  The performance

20 plan ended in April, right?  I can't think of any

21 issues.  I cannot recollect anything right now.

22    Q    At the time the Camber acquisition was

142

1 completed on March 31st, 2014, you were 64 years

2 old; is that correct?

3    A    Yeah, I was born in 1949, so yeah, I -- I

4 would have been 65 in July.

5    Q    Did Atif make any comments about your age

6 from the time of the Camber acquisition through the

7 summer of 2014?

8    A    I was busy working with the performance

9 plan at the beginning, and then -- then there's

10 obviously other work involved.  So I do not recall

11 -- so the question was did he make any comments

12 about my age, and like I said, I don't recall him

13 making explicit comments about the age, but there

14 have been other comments, some of which he made,

15 some of which others made which kind of seemed to

16 refer to my age, but he didn't tell me point blank

17 that you're too old to work here or anything like

18 that.  He never said that point blank.

19    Q    And by the other comment that Atif made,

20 you're referring to his reference to your salary.

21    A    That's one I can remember for sure, you

22 know, but like I said, there was a lot of joking

143

1 around about my age too, but I didn't take it

2 seriously.  I don't remember most of the things

3 except for this age before beauty thing which kind

4 of sticks in my mind.  And again, I don't think

5 Atif wasn't at that.  I'm pretty sure Atif wouldn't

6 say that, but some others have said that.

7    Q    And the age before beauty comment -- that

8 was still while you were still at Avaya?

9    A    Probably both Avaya and Camber, because

10 there was -- there was a smooth transition, so I

11 don't remember -- it probably was both, yeah.

12    Q    So you don't actually remember when it

13 happened at all.

14    A    I do remember this happened several

15 times, okay?  And like I said, mostly it was at

16 parties or some other reason we are standing in

17 line or entering a door or all this kind of

18 circumstances.  So it has happened multiple times,

19 but I don't recall the exact dates and

20 circumstances of it.

21    Q    Right.  You're just guessing as to

22 whether it happened at Avaya versus Camber.

144

1       MR. STERN:  Objection as to the form of

2 question.

3    A    I would say it happened in both places

4 because they're the same people, you know?  But I

5 don't know his name, because I cannot swear to it

6 that -- I cannot give you a specific date and say

7 it happened on this date.  And again, there was a

8 -- there was a overlap between the two too.  Avaya

9 -- Camber started the negotiations with Avaya in

10 late 2013 I think, and there was a lot of overlap

11 with Camber people coming in and presenting things.

12 So I don't even know if it was a Camber person who

13 said that or who said that, so --

14    Q    Sir, how can you say it was the same

15 people when you testified earlier that the staff

16 size changed and the contractors came in and out?

17       MR. STERN:  Objection as to form.

18    A    Okay, am I supposed to answer this

19 question or not?

20    Q    Yes.

21    A    I am supposed to?  Okay, okay, could you

22 repeat the question then?

Transcript of Ashok Pai
Conducted on March 26, 2018

145

1    Q   How can you say that it was all the same
2  people when you testified earlier that the staff
3  size had changed, got smaller, got smaller --
4    A   Yeah.
5    Q   -- and that there were contractors coming
6  in and out?
7    A   I take that back.  It was not all the
8  same people.  It was some of the same people, yeah.
9  So some people continued on between the two.  And
10 even when it was purely Avaya or purely Camber,
11 people were coming and going, you know, contracts
12 coming and going.  So that was a constant flow of
13 people in and out.  So it was not necessarily all
14 the same people because there were no -- there was
15 only a few -- a few stable people there, like
16 mainly Atif and Nan, but there were a lot of --
17 Atif and Nan were -- were there all through, but
18 most of the others were coming and going, yeah.
19    Q   Were there any comments made about your
20 son's medical condition from the time of Camber
21 acquisition through the summer of 2014?
22    A   Well, let's see.  The only thing I can

146

1  say for sure was that there was some e-mail about
2  this HR, you know, saying that we need proof of the
3  disability and all that.
4    Q   And that was for purposes of getting
5  FMLA.
6    A   Yeah, yeah, yeah, that's true, yeah.
7    Q   But before that FMLA discussion, nobody
8  made any negative comments about your son's medical
9  condition.
10       MR. STERN:  Objection as to form of
11 question.
12    A   You said nobody made.  I -- I can't
13 definitely say nobody made, you know?
14    Q   Well, who made a negative comment about
15 your son's medical condition?
16    A   I cannot recollect anyone specifically
17 saying that in those words, you know, that your
18 medical -- your son's medical condition is bad, you
19 know.  They didn't say that.
20    Q   Anything that you would consider
21 disparaging about your son's condition that was
22 said at Camber.

147

1    A   Well, in my experience, people don't say
2  things explicitly.  You know, they're not going to
3  say -- use those words.  There may be things that
4  happened, things that you feel, but -- but people
5  may not say that.  So I cannot recollect anybody
6  standing there and saying your son is -- is, you
7  know, worthless or something like that.  I didn't
8  hear that.  I don't remember anybody saying things
9  of that nature, you know, specifically addressing
10 my son's situation, you know.  But other things I
11 cannot really speak for because I don't know what
12 was meant in which way, you know.
13    Q   In fact, to the contrary, what was
14 expressed was -- was support.
15    A   Well, whenever the issue was mentioned,
16 which the only thing I can remember is talking to
17 Atif, Atif was supportive, yes, yeah, but he was
18 supportive in words, yes, but nothing else.  I
19 mean, he didn't say, for example, I'll give you
20 some extra vacation or anything like that, no.
21 What I'm saying is there was no action that was
22 supportive.  There were words that were supportive,

148

1  yes, because I mean, he didn't give me a bonus or
2  get extra vacation time or any other benefits in
3  terms of support.  The supportiveness was
4  definitely in words, yeah.
5    Q   Sir, he allowed you to stay in California
6  on future PTO.
7    A   But the future PTO had been agreed on as
8  a -- as a vacation, you know, with Avaya, you know?
9  So in other words, Avaya said if you need to take a
10 vacation, you can take future PTO.  So that was
11 what I was told.  However, you're right in saying
12 that Avaya denied me -- I'm sorry, Atif denied me
13 the vacation, but he did not deny me vacation
14 specifically, but as far as I requested the
15 vacation and it was granted as future PTO, yes.
16    Q   And is it your testimony that the only
17 other way he could have been supportive in his
18 actions was to give you more money --
19    A   No, no.
20    Q   -- or give you extra benefits that you
21 didn't otherwise earn through the company?
22    A   No, I'm not saying that at all, because

Transcript of Ashok Pai
Conducted on March 26, 2018

149

1   what I'm saying is you asked me the question was he
2   not supportive, and my answer to that was he was
3   supportive in words, but there was no action that I
4   can recall that was specifically supportive.
5       Q    After you disclosed your son's medical
6   condition to Atif in the summer of 2014 --
7       A    Uh-huh.
8       Q    Were there ever instances where he asked
9   you how your son was doing?
10      A    I mean, we -- we are busy with work and
11  all that, but -- but I think he did.  Pretty sure
12  that he did, time to time.
13      Q    So he expressed interest in your son's
14  health.
15      A    Yeah, yeah, he'll be supportive in words,
16  but -- but the concern I have is that he has
17  dictated some e-mails that I should send that
18  turned out to be dangerous to me, you know?  But
19  all I'm saying is, you know -- all I'm saying is he
20  asked me to write an e-mail, asked me to put in
21  some things there which later became -- this
22  October 31st date specifically I'm talking about.

150

1       (Deposition Exhibit Number 6 was marked
2   for identification.)
3       THE WITNESS:  Oh, thank you.
4   BY MR. ORTBALS:
5       Q    Court reporter's handed you what's been
6   marked as Deposition Exhibit Pai 5.
7       A    This is 6.
8       Q    Is this 6?  Six, sorry, Pai 6, and this
9   is a three-page e-mail string between you and Atif;
10  is that correct?
11      A    Yeah, yeah.
12      Q    And starting at the kind of bottom half
13  of the second page --
14      A    Uh-huh.
15      Q    -- is your first September 8th, 2014
16  e-mail to Atif about exploring transfer
17  possibilities; is that correct?
18      A    Yes.
19      Q    And this is the e-mail you sent before
20  you were able to meet with Atif; is that right?
21      A    Yeah, yeah.  If you look at the time,
22  it's 9:33 a.m., right?  So what happened is I came

151

1   in -- this was the day I returned from California,
2   my first day back at -- at Camber.  So I went over
3   to his office because I wanted to ask him --
4   because I actually felt guilty that -- that this
5   situation is making me take time off from Camber,
6   and that's why I was asking about the possibilities
7   that I can work for Camber in California.  So
8   anyway, the -- so I went and waited there at his
9   office.  He was not coming in, so I went back to my
10  cube, and that's when I sent this e-mail saying
11  came over a couple of times to your office this
12  morning, as I want to explore the possibilities of
13  transfer within Camber, yeah.
14      Q    And the next sentence you wrote after
15  that was --
16      A    Uh-huh.
17      Q    "My son's hospitalization has emphasized
18  the need for me to be nearer to my family."  Is
19  that correct?
20      A    Yes, and I said although it's not urgent,
21  I need to plan for it.  So I didn't say that I'm
22  quitting right now or get me something right now.

152

1   I didn't say that.  I said it's not urgent.  I need
2   to plan for it.  I don't understand how he could
3   take this as a resignation, you know.
4       Q    But being nearer to your family meant
5   moving back to California; is that right?
6       A    Yeah, yeah.  I was even willing to be
7   halfway, like St. Louis, for example, you know.  I
8   even mentioned that to him verbally, that you know,
9   at least if I'm closer, I can go there if there's
10  an emergency, you know, that kind of thing.  So
11  yes, nearer to the family, not to Southern
12  California, yeah.
13      Q    But you couldn't do your EOIR project
14  from St. Louis or California; is that right?
15      A    That was -- you know, they were not
16  allowing telecommute, but I think -- I don't
17  remember for a fact that I think some government
18  people were working, telecommuting, but I think
19  even some -- even some Avaya may have been -- but I
20  can't -- so the general policy was that
21  telecommuting was not possible, yeah.
22      Q    So you understood you would have to leave

Transcript of Ashok Pai
Conducted on March 26, 2018

40 (157 to 160)

157

1  of Camber, John Lord, visited us -- he only visited
2  once that I can recall.  At least he gave a public
3  meeting for all EOIR project employees at EOIR.  He
4  gave -- and he said two of his things are -- two of
5  his priorities are new -- new projects, and cyber
6  security.  He said those are his two priorities for
7  Camber.
8        Okay, that's the reason I'm mentioning
9  cyber security there, because I felt that I could
10 do a lot of work in cyber security for Camber, you
11 know?  And the new projects.  And even offer
12 somewhere here or maybe there, but I -- I'm very
13 good at writing.  I can write very well.  So I -- I
14 was -- I was offering to write proposals for new
15 projects either in cyber security or otherwise,
16 because those were the two priorities that John
17 Lord mentioned, new projects and cyber security, so
18 I said I will contribute to Camber in both these
19 areas, you know.
20    Q    The work you were doing for EOIR didn't
21 involve cyber security; is that correct?
22    A    Oh, it involved in indirect ways, yeah.

158

1  In fact, I gave some presentations on cyber
2  security, like a training class.  I did a single
3  sign-on project for EOIR.  Single sign-on is a very
4  important aspect of cyber security because instead
5  of signing on with multiple passwords on multiple
6  machines, you sign on on one, and that password and
7  everything is encrypted and transported securely to
8  other machines and other applications so that you
9  only need to remember one password and -- and be
10 able to sign on anywhere.
11        So that's a very important feature.  So I
12 was working on that project too, and I did a good
13 job on that project, but they decided not to put it
14 in right away because there were some issues with
15 encryption and all that in the deliverable, so it
16 was put off.  It was put on hold, but I did -- I
17 did that project, I gave a presentation on it to
18 the whole EOIR group, including some government
19 people.
20        So I did some cyber security work,
21 several cyber security work, several little
22 projects in cyber security.  And I also used it in

159

1  my SharePoint work in the databases, interface.
2  All that became useful, but there was not -- the
3  emphasis was not cyber security there.  The
4  emphasis was the databases and interfaces I talked
5  about earlier, yeah.
6        Yeah, I'm mentioning here too, you know,
7  CEO John Lord came in in March.  His two major
8  points were new proposals and cyber, you know?  So
9  also, U.S. government is going cyber forecast to
10 California because California is where the new
11 federal CTO is located and all that.  So one of
12 those things I can -- supporting cyber security
13 proposals for Camber.
14    Q    Your last sentence is, "So I want to
15 explore the possibility of supporting cyber
16 security proposals for Camber and being able to
17 reunite with my family."  Is that right?
18    A    Yes, exactly, yeah, because the point is
19 the two -- two priorities I mentioned is new
20 proposals and cyber, and I can do -- do both in
21 that thing, and that way I can achieve my, you
22 know, ability to be with the family along with

160

1  these two things.
2    Q    And when you say a possibility of
3  supporting cyber security proposals, does that mean
4  writing the proposals?
5    A    Everything, yeah, yeah, writing,
6  following up on it, answering questions.
7    Q    That wasn't work that was billable to a
8  customer; is that right?
9    A    I'm sorry?
10    Q    That's not work that's billable to a
11 customer.
12    A    No, it can be.  Sometimes it is,
13 sometimes it's not, yeah, yeah.  Sometimes
14 presales, or sometimes it's -- because if it's an
15 existing project and they want to add some
16 additional features and it's a proposal for new
17 features, that can be billable.
18    Q    Supporting cyber security proposals would
19 not have been within your software system
20 architect's role; is that right?
21    A    But like I said, if it's a new feature to
22 be added and you design a new feature, then that

161

1   will be proposal to design a new feature, yeah.  So
2   it can be, yeah.
3       Q     Before you wrote this e-mail, did you go
4   within -- well, actually, let me ask this.  Camber
5   had an internal --
6       A     Yeah.
7       Q     -- system where you could look up job
8   openings within the company; is that right?
9       A     I did that, yeah.
10      Q     And so before you sent this e-mail, did
11  you look for open positions within California in
12  Camber?
13      A     Yes, yeah, yeah.  So some of them, they
14  said I'm overqualified, things like that.  So there
15  was some of that, but I did talk to several
16  recruiters within Camber, and that's the reason I'm
17  mentioning the new proposals here actually, because
18  I'm suggesting that if there's no existing
19  position, we can create this new positions by
20  submitting proposals, you know, for new customers,
21  for example.
22      Q     So before you sent this e-mail, you had

162

1   already talked with recruiters within Camber?
2       A     Yeah, yeah, I did, yeah.
3       Q     When was the first time you talked with a
4   recruiter within Camber?
5       A     I cannot recollect again, but let's see.
6   This is dated September 8th, right?  Yeah, so I
7   think the whole thing was triggered by the Camber
8   acquisition, you know.  When the Camber acquisition
9   happened, John Lord came over and said those are
10  the priorities and all that, I started thinking how
11  can I be more useful to Camber, you know?  And so
12  that is when I felt that, you know, I have the
13  strengths, so I should try to find positions that
14  can be more useful -- more -- what do you call?
15  Use my skills more.  So that is when I started,
16  after the Camber acquisition.
17      Q     So even before your son's
18  hospitalization, you were looking -- you were
19  working with a recruiter within Camber to try to
20  find something on the west coast.
21      A     Well, yeah, yeah, because remember, the
22  summer is when he had some incident, I forget, and

163

1   that is when I revealed to -- to Atif that my son
2   was disabled.  So that was a triggering event
3   because I realized at that point that because of
4   the future vacation situation, that I have to
5   reveal the situation to Atif, because before that,
6   I could take vacation on my own, but now I have to
7   -- I have to use future vacation, which kind of
8   denied to me actually because of the Avaya promise,
9   but I still had to let him know, so -- so the whole
10  situation is that I just was wanting to see what I
11  could do to mitigate the situation.
12      Q     So did you let Atif know that you were
13  trying to find other positions --
14      A     Yeah.
15      Q     -- within Camber within the --
16      A     Yeah.
17      Q     -- in the summer of 2014?
18      A     I don't know when I specifically told
19  him, but I -- I told him when I was -- because one
20  of the -- one of the things is this.  I heard
21  again, whatever -- whatever the -- whatever his
22  words, that -- that your boss can be very upset if

164

1   you -- if he finds that you are looking for other
2   jobs even within the same company, you know,
3   because it looks like I want to get out, right?  So
4   what I -- that's what I told him, that I -- I would
5   like to talk to recruiters at more cyber security
6   jobs, you know?
7             So he had agreed with that, that it's
8   okay to talk to recruiters within Camber about
9   cyber security jobs because that's a skill that I
10  can bring, and the shortage of the skill, and
11  there's a need for that within the company with
12  Camber, because that again was triggered by Camber
13  saying in -- probably in January-February time
14  frame, John Lord visited us before the March 31st
15  time, and he's -- that's when I -- that -- that's
16  what spiked my -- sparked my interest in doing
17  something for Camber, you know,
18      Q     So just so I understand or make sure that
19  I'm clear --
20      A     Uh-huh.
21      Q     In the summer of 2014, you talked with
22  Atif about your son's medical condition; is that

Transcript of Ashok Pai
Conducted on March 26, 2018

165

1  right?
2      A    Summer of 2014, yeah, right.
3      Q    And in and around that same time, you
4  also talked with him about working with recruiters
5  within Camber to find a cyber security job nearer
6  to your family.
7      A    I asked him if he has any objection to my
8  talking to recruiters, and he said you can talk to
9  recruiters if you -- you know, if you feel that you
10  can get jobs that are -- that can use your skills
11  for Camber.
12     Q    So he was supportive of you talking with
13  recruiters.
14     A    Yeah, he didn't -- he didn't forbid it,
15  yeah.
16     Q    And he didn't treat that conversation as
17  a resignation.
18     A    No, that he did not, yeah, but you know,
19  they already tried to terminate me in March, and
20  that didn't go through, so I don't know.
21     Q    And so at the time you had sent this
22  e-mail on September 8th, 2014 --

166

1      A    Uh-huh.
2      Q    -- sounds like you'd been working with a
3  recruiter for several months.  Is that right?
4      A    Oh, it was not a continuous thing like
5  that, you know.  It was like occasional calls.  I
6  put in my information into the internal database,
7  and -- and then follow up with calls.  So it was
8  not a continuous intensive process.  It was just
9  sporadic calls, and you know, generally the -- this
10  thing was wait and see, we may have proposals
11  coming on that, we may have projects starting on
12  that, we don't have anything right now, or you're
13  overqualified for what we have right now.  So those
14  are the kinds of -- so those are like dead-end
15  situations when I called the recruiters most of the
16  time, so there was not an ongoing process for that,
17  yeah.
18     Q    But it was a back and forth that had been
19  happening over the course of several months.
20     A    Off and on, yeah.
21     Q    And you hadn't located anything
22  internally yet.

167

1      A    Yes, and that was a reason in fact I
2  asked about this possibility of transfer, because I
3  felt that if Atif pushes it, it can happen, you
4  know?  So I was doing this on my own until then,
5  you know, but that -- that possibility of transfer
6  request is specifically hoping that Atif will push
7  that, you know?  And he didn't obviously, so that
8  means in that sense he was not supporting, you
9  know?  And through that, he tried to turn into a
10  resignation.
11     Q    And you mentioned I think earlier that
12  your last sentence in this e-mail also meant that
13  if you couldn't find a job within Camber that fit
14  your skill set, you were hoping that they would
15  create a position for you; is that right?
16     A    I'm sorry.  Could you repeat it again?
17     Q    Part of what you were asking Atif was if
18  they could create a position for you.
19         MR. STERN:  Objection as to form.
20     A    I didn't say that, yeah.  I didn't ask
21  him to create a position for me.  I simply asked
22  him about the possibilities, you know?  So he would

168

1  know the possibilities, not me.  So I didn't ask to
2  create a position for me.  All I'm saying is I have
3  these skills and I can offer them to Camber, and
4  either write new proposals or find an existing
5  position, but I didn't say that you'll create a
6  position for me.
7      Q    Now, after you sent the first September
8  8th e-mail --
9      A    Uh-huh.
10     Q    -- you met with Atif; is that right?
11     A    September 8th -- right, a couple of
12  times, yes.  That's right, so Atif responded --
13  yeah, he called me.  He called me to come over to
14  the office, yeah, because here I'm saying that I
15  came a couple of times and all that.  He asked me
16  to come over, you know?  Then -- yeah, then the
17  next e-mail --
18     Q    Wait.  Before we get to the e-mail, let's
19  -- I want to try to go in --
20     A    Sure, sure.
21     Q    -- in order.  So Atif called you to come
22  over to his office; is that right?

Transcript of Ashok Pai
Conducted on March 26, 2018

169

1    A    Right, right, I did, yeah, he did.
2    Q    What -- did you go over immediately or
3  was there --
4    A    I went immediately, yes, yes, yes.
5    Q    What happened when you got to his office?
6    A    He said oh, you know, I got your e-mail.
7  You know, basically he was supportive again, you
8  know, saying oh, it's terrible that he's been
9  hospitalized, so you know, I will -- you know, what
10 -- you know, saw the possibility of transfer.  At
11 that point again he asked about the recruiters and
12 all that.
13       So he didn't volunteer to do anything
14 specifically, but he said that he wants a letter
15 from me specifying some of these things, and I did
16 not in my wildest dreams think that he was trying
17 to make that a resignation letter, you know?  I
18 didn't think of it as a resignation letter at all
19 because he just said he wants a letter from me so
20 he can look into the possibilities.  That's all.
21       So -- so I asked what do you want?  And
22 then he said that, you know, you should -- you

170

1  should say that you can't relocate to D.C., and you
2  want to explore -- even it's compared to explore
3  the possibility, pretty much his words.  So
4  basically he's saying that we cannot relocate to
5  D.C., we want to find something -- I mean I want to
6  find something in Southern California, and
7  accordingly decide to request a transition.
8       See, all these -- if you look at the
9  previous e-mail and this one, you see the huge
10 contrast there, you know?  Previous one I'm simply
11 saying I want to explore the possibility of a
12 transfer, I can do this to help Camber and all this
13 thing.  But here he's specifying saying that we
14 can't relocate.  And I've not totally ruled out
15 relocation either, quite frankly, because we could
16 move our son.  A lot more facilities in -- a lot of
17 facilities in D.C. area too, you know?  A lot of
18 facilities in D.C. area for disabled people.  So we
19 have not ruled out completely that we can move him,
20 you know?
21       So -- but he wanted me to say that, that
22 we -- we are not going to relocate.  And then I

171

1  decided to request a transition out of my current
2  project.  See, again, I said here there's no
3  urgency, I need to plan for it, but he's asked me
4  to say I have decided to request a transition out
5  of my current project as of October 31st, and he
6  said I had to specify the date, October 31st.  So
7  all this was basically -- he asked me to do, you
8  know?
9       So this e-mail is his version, and the
10 previous e-mail are mine, you know?  That's what
11 I'm saying.  And then this e-mail, after I sent
12 this e-mail, I didn't hear from him for a while,
13 for a couple days, and then I get this phone call
14 from HR saying your -- your exit interview's being
15 scheduled.
16       So what I put in as purely a suggestion
17 and a plan had been turned into a definitive date
18 and saying we will not relocate and all that, you
19 know?  And actually, I added this, may need some
20 flexibility in the date, because I was horrified
21 that I'm specifying a date of October 31st, even
22 though it's only September at the time.  So I

172

1  actually -- I may need some flexibility in that
2  date, I added that.  So I had no -- I didn't dream
3  that this would be construed as a resignation.  So
4  basically, you know, this his version, this my
5  version.
6    Q    Sir, Atif was the director of the EOIR
7  program; is that right?
8    A    Yeah, for Camber, yeah.
9    Q    That was his area of responsibility,
10 right?
11   A    Yes, yeah.
12   Q    He had no business need within EOIR to
13 transfer you somewhere else within the company; is
14 that right?
15   A    That I don't know.  I don't know what
16 business needs he has.
17   Q    Well, did Camber have any transfers
18 within EOIR to somewhere else within the country?
19   A    Well, people are moving in and out.  I
20 don't know where they're going, so to my knowledge,
21 I -- I -- I -- I didn't have any knowledge of that,
22 yeah, where they're going and what was happening,

173

1 yeah.
2    Q   In other words, in working with a
3 recruiter and looking at open positions with
4 Camber, there was no open EOIR position somewhere
5 other than Falls Church, Virginia.
6    A   Yeah, in the database at least, because
7 again, all positions don't get put into that
8 database. Only when -- when they can't find people
9 internally, when they need somebody transferred,
10 that is when they're put in the database. I think
11 there's a mention somewhere in here I think, of the
12 database, you know? That there's a database within
13 Camber for people who want to transfer, yeah, so
14 that is where they talk to the recruiters.
15    Q   So if he's responsible for EOIR, why
16 would he have something to do with you transferring
17 somewhere else?
18    A   Because he's in a director role, so he
19 knows other directors of other projects, and even
20 within EOIR, EOIR, the government agency EOIR has
21 offices and work in California, so he could extend
22 a possibly -- may possibly extend the projects

174

1 there. It could also be that even though they
2 don't have telework policy, they may let me work at
3 a EOIR office in California, you know? All those
4 posibilities were there.
5    Q   For him to make an exception with the
6 customer for you.
7    A   I don't know if it would be an exception
8 because the exception would be if you allowed
9 telecommute, you know? That would be an exception,
10 but if it's to transfer me to a EOIR location in
11 California, that would not be an exception because
12 he's in charge of the EOIR project, and if he says
13 that this part of the project is being relocated to
14 that California, it would be just one person or
15 maybe two people or whatever, you look at
16 California, that's within Camber and EOIR, that
17 EOIR may not care where that part of the project is
18 located, you know.
19    Q   That's all your speculation, sir.
20    A   Exactly, yeah, it is, because you asked
21 me a question that was speculatory, I'm telling you
22 that, because you asked me what is the business

175

1 goal and all that and you're saying -- you also
2 asked me the question of why would he do something
3 within EOIR, and he said it's an exception, no,
4 it's not -- it does not have to be an exception.
5 It may be within EOIR.
6    Q   Sir, there was no posted EOIR positions
7 for California; is that right?
8    A   Yes, that's right.
9    Q   You never applied for an EOIR position in
10 California.
11    A   I'm sorry?
12    Q   You never applied for an EOIR position in
13 California.
14    A   No, I did not, yeah.
15    Q   After you spoke with Atif on September
16 8th, 2014, did you apply for any transfer within
17 Camber?
18    A   See, right after that, there's a gap
19 here, right? A ten-day gap here, so the ten-day
20 gap was very significant because, you know, what
21 happened was day or two later, HR calls me and says
22 your exit interview's scheduled, okay? So at that

176

1 point I was totally in shock, you know? How in the
2 world could this be construed as a resignation, you
3 know? So -- and she said -- you know, she says on
4 the phone that we heard you resigned, so your
5 position, you resigned, you know? I said how --
6 how are you saying -- how I resigned? I mean, if
7 they're terminating me, it's a different story, but
8 how can you say that I resigned, because I'm not
9 resigned, you know?
10      So that was September 8th, totally out of
11 the blue, and -- I mean, the call back was 9th or
12 10th, something like that. So there's a ten-day
13 gap here, you know, so that was a very tough time
14 for me, and so I don't recall if I put in any
15 specific applications at that time, no, probably --
16 maybe not, yeah.
17    Q   You didn't -- you didn't apply for any
18 transfers after speaking --
19    A   Yeah, because --
20    Q   -- to Atif; is that right?
21    A   Because Atif has not -- see, the whole
22 purpose of this first e-mail to him was that Atif

177

1   would actually authorize -- in other words, I
2   wanted his permission here, you know, to transfer.
3   So I've already tried the recruiters.  Now I'm
4   saying can you help me transfer, and he was not
5   going to, you know?
6         So he didn't give any indication that he
7   will.  So I didn't know what the reason was.  Maybe
8   -- whatever the reason was, I can't speculate, but
9   since he did not, I did not want to apply against
10  his wishes at that point, you know?  Because like I
11  said, my whole goal was to stay within his --
12  within his permission space when I apply for other
13  jobs within Camber.
14      Q   He didn't tell you not to apply to any
15  jobs.
16      A   Well, I asked for what possibilities of
17  transfer, and he didn't indicate any possibilities,
18  so -- so he did not seem to encourage me to
19  transfer.
20      Q   What open position was available that you
21  wanted to apply to that you weren't able to apply
22  to?

178

1   A   There was a very important project that
2   was starting just outside San Diego, and I was
3   willing to commute a good 40 miles to that.
4   Actually, I went 50 -- 50 miles or so.  I was
5   willing to commute to that, and I discussed that
6   with a recruiter there, but it was a phone
7   discussion.  I didn't really apply for it, because
8   he told me right away that that's -- you know,
9   that's -- that's -- you can't get in your -- it's a
10  much lower position, is what he said, yeah.
11      Q   So you didn't apply for the San Diego
12  position.
13      A   Because he said it's a much lower
14  position.  I cannot even apply for it.
15      Q   The recruiter did.
16      A   Yeah, yeah.
17      Q   Not Atif.
18      A   No, not Atif, yeah.
19      Q   So again, what -- what open position at
20  Camber was available that you wanted to apply for
21  that you didn't?
22      A   Anything that I wanted to, I discussed

179

1   with the recruiter and I got turned down, okay?
2   Either overqualified or -- so I did -- I don't
3   recall any position that I applied and that it
4   actually gone through.  So I cannot recall -- and
5   that is why I was hoping that Atif would support
6   that, but he did not obviously, you know, because
7   Atif is at a director level, right?  He can pick up
8   the phone and talk to any director, right?  And he
9   can put somebody from EOIR at the other EOIR
10  office, so I believe he has all those powers.
11        So that is the situation I was in,
12  because I didn't want to just apply for something
13  if he's not agreeable to that, you know.
14      Q   So you wanted him to give you an
15  accommodation outside of Camber's normal
16  recruitment process.
17        MR. STERN:  Objection as to form of
18  questions.  It's not accommodation case.
19        THE WITNESS:  Yeah, I --
20        MR. ORTBALS:  Doesn't mean that wasn't
21  what he was asking for, Jeffrey.
22        THE WITNESS:  Tell me again, I'm sorry?

180

1   BY MR. ORTBALS:
2       Q   You can answer the question, sir.
3       A   What is the question again?
4         MR. ORTBALS:  Can you read the back the
5   question please?
6         THE WITNESS:  I want to take my jacket
7   off, you don't mind.
8         THE REPORTER:  Question:  "So you wanted
9   him to give you an accommodation outside of
10  Camber's normal recruitment process."
11        THE WITNESS:  I was saying that -- you
12  know, I have some skills which I can use for
13  Camber, cyber security specifically.  These are
14  priorities for Camber, and so I was actually asking
15  Atif can you help me use those skills in whatever
16  way you see fit for Camber, you know?  But he did
17  not seem to be interested in that, you know, and so
18  that he asked me to write this letter, which he
19  then told HR right away that Ashok has resigned,
20  okay?
21        So -- so that clearly shows that -- when
22  you said accommodate, I'm sorry, I didn't -- I

Transcript of Ashok Pai
Conducted on March 26, 2018

185

1 wrote.

2 **A    I'm sorry?**

3 Q    The two of you had a discussion outside

4 --

5 **A    Right.**

6 Q    -- of the first e-mail you wrote.

7 **A    Right.**

8 Q    Is that right?

9 **A    Right.**

10 Q    And in that discussion, you -- you

11 indicated that your family's situation had become

12 more severe --

13 **A    I didn't use those -- I'm not sure I used**

14 **those words.**

15 Q    -- and you wanted to get back to

16 California.  Isn't that right?

17 **A    He asked me to — he asked me to use**

18 **those words saying that's the reason we can't**

19 **relocate, you know?  So he said that your situation**

20 **even more severe, you're to — you cannot relocate,**

21 **that's what you're telling me is what he said.  So**

22 **I'm saying is I actually took notes on the words he**

186

1 **said, and I tried to keep -- be faithful to those**

2 **words that he put in, you know?  So what I'm saying**

3 **in my urgent -- my -- my previous e-mail here**

4 **doesn't say anything more -- situation more severe**

5 **or anything like that.  All it's saying is**

6 **emphasize the need to me -- and although it's not**

7 **urgent, I need to plan for it, you know?**

8 Q    Well, no, because your first e-mail is

9 not a memorialization of discussion that the two of

10 you had.

11 **A    Yeah.**

12 Q    The second e-mail is a memorialization of

13 a discussion the two of you had.  Is that right?

14 **A    It's not a --**

15    MR. STERN:  Objection as form --

16 objection as form of the question.

17 BY MR. ORTBALS:

18 Q    Well, I mean, the first -- the first two

19 words in the e-mail are, "As discussed."

20 **A    Uh-huh.**

21 Q    Correct?

22 **A    Right, yeah, so --**

187

1 Q    And you're expecting the jury -- you're

2 expecting the jury to believe that you wrote a

3 second e-mail that was completely fabricated solely

4 to please your supervisor.

5 **A    It was not completely fabricated.**

6 Q    Okay.

7 **A    I took notes of these words here that he**

8 **asked me to put in.  For example, he asked me to**

9 **put in, you know, family medical issues, because I**

10 **felt that he's asking me to put those in to**

11 **facilitate -- facilitate his, you know, ability to**

12 **put me somewhere else.  So my family issues have**

13 **become severe, precluding our planned relocation of**

14 **D.C. metro area, even that he wanted me to put in.**

15    **And I thought he's just strengthening the**

16 **argument to help me find a other position, saying**

17 **that I cannot relocate, because I was actually**

18 **surprised by that when he asked me to put in that,**

19 **that I should -- precluding your planned**

20 **relocation.  Then I'm compared to explore the**

21 **possibility of a transfer, even compared to**

22 **explore, he -- he said words which I wrote down,**

188

1 **you know?  And I made up this e-mail using only --**

2 **using pretty much all the words he wrote down,**

3 **including the date, October 31st, you know.**

4    **So what I'm saying is that's why I say it**

5 **was dictated, because he asked me to put this, this**

6 **and this, you know, because what he said, this is**

7 **too general, he wants something very specific, you**

8 **know.  So -- so that's why I'm saying this is**

9 **essentially his words.  The first e-mail is my**

10 **words, you know.**

11 Q    You'd agree though that you wrote in

12 black and white that you had decided to request a

13 transition out of your current project; is that

14 correct?

15 **A    Even that he asked me to put in, because**

16 **he said I had to tell the customer that you'll be**

17 **moving out of the project, okay?  And to me that**

18 **was even a surprise because I even asked the**

19 **question why can't I be -- why can't I work from an**

20 **EOIR office in California even if they don't allow**

21 **telecommute, you know?  EOIR does have offices in**

22 **California, and even if it's 50 miles away, I can**

Transcript of Ashok Pai
Conducted on March 26, 2018

48 (189 to 192)

---

189

1  still go there and work.
2       So many agencies do that actually.  If
3  somebody is in a different state and if there's an
4  agency office there, they allow that person to work
5  at that office, you know.  So that -- that was all
6  my intention was, but I tried to conform to his
7  requirements, the words -- actual words he
8  dictated, to use them in this e-mail.
9     Q   So your testimony is that during your
10 discussion, he understood -- his understanding that
11 he expressed to you was that you were transitioning
12 out of the EOIR project.
13    A   See, I don't know what his understanding
14 was, quite frankly.  All I'm saying is I took some
15 notes from what -- he said that I have to reword
16 this e-mail, okay?  He said it's too general, you
17 are to make it more specific, you are to reword it,
18 okay?  And then he asked me to put in certain
19 phrases, and I tried to be faithful to that, and
20 that's how I came up with the second e-mail.
21      So I even say I'm very grateful for --
22 last sentence, completely mine.  I'm very grateful

---

190

1  for your consideration and support during these
2  difficult times for my family, you know?  So the
3  point is he said that he has to have something
4  specific in this e-mail, and these are the
5  specificity phrases and clauses that he asked me to
6  put in, you know, to make it specific.
7       But it turned out that that specificity
8  was -- was taken as a resignation, you know, which
9  was not my intention at all.  I'm saying it's not
10 urgent, I need to plan for it, you know?  And I'm
11 saying that, you know, John Lord wants new
12 proposals in cyber, and I can help with that.  So
13 I'm talking about helping cyber -- helping Camber
14 any way I can, and so this may -- you know, this
15 may -- in order to do that, but here he's talking
16 about getting me out of there.
17    Q   Sir, I understand what your first e-mail
18 says.
19    A   Uh-huh.
20    Q   Your testimony though was that during
21 your meeting with Atif and your conversation --
22    A   Yeah.

---

191

1     Q   -- he specifically told you --
2     A   Uh-huh.
3     Q   -- that he needed to inform the customer
4  that you were transitioning out of your project; is
5  that correct?
6     A   He said -- okay, he said he has to
7  specifically discuss this with -- with the client,
8  and for that reason, I have to put in some of these
9  words, you know, make it specific.
10    Q   He had to discuss with the client that
11 you were transitioning out of the project.  That
12 was your testimony.  That's what the two of you
13 discussed.
14    A   Okay, first, how do you construe that
15 from -- first -- all I'm saying is --
16    Q   Sir, I have -- we've been through your
17 first e-mail.  We are talking about a discussion
18 the two of you had that is not memorialized in your
19 first e-mail because it happened after your first
20 e-mail.
21    A   Right, right.
22    Q   So I don't want to -- I don't want to

---

192

1  keep going back to your first e-mail because that's
2  not what I'm asking you about.
3     A   Okay, let me explain what I'm saying,
4  okay?
5     Q   No, I need you to answer my question.
6     A   Okay, please, yeah.
7     Q   When you and Atif --
8     A   Uh-huh.
9     Q   -- met --
10    A   Uh-huh.
11    Q   -- after you wrote your first e-mail --
12    A   Uh-huh.
13    Q   He expressed to you that you needed to
14 notify the customer that you were transitioning out
15 of your project, correct?
16    A   Okay, he -- he said -- what he
17 specifically said was that my first e-mail was too
18 general, it has to be reworded, okay?  It has to be
19 specific because he has discussed that with the
20 customer.  And so he may have used the words
21 transitioning out of the project, but that came as
22 a surprise to me, but you know?  So all I'm saying

193

1 is he said that e-mail has to be reworded to be
2 more specific, okay?  And so he told me all these
3 terms that I have to put in, you know?
4         So transitioning out of the project is
5 not something that I had in my earlier e-mail or
6 anything.  So what I'm saying, if that came up --
7 and again, I don't remember the exact words came
8 up, but I was just saying that this is my
9 situation, I want to help Camber, these are things
10 I can do, you know?  So transitioning out of the
11 project was not one of them, okay?  That was
12 something that he interpreted or put in, you know.
13     Q    That's what he interpreted from your
14 conversation.
15     A    Right, right, maybe he did, yeah.
16     Q    And you understood that he was going to
17 bring this information to the customer.
18     A    Yeah, he wanted me to write an e-mail
19 again so that he can discuss it with the customer,
20 yeah.
21         (Deposition Exhibit Number 7 was marked
22 for identification.)

194

1         THE WITNESS:  Thank you.
2 BY MR. ORTBALS:
3     Q    Court reporter's handed you what's been
4 marked Deposition Exhibit Pai 7, and this is an
5 e-mail string that starts with your second
6 September 8th, 2014 e-mail at the bottom; is that
7 right?
8     A    Wait.  Where does it start -- okay, this
9 one here, I had discussed, yeah, that's the same
10 e-mail, yeah.
11     Q    Right.
12     A    That's the same one, yeah.
13     Q    And then the e-mail -- the e-mail
14 directly above that is --
15     A    Uh-huh.
16     Q    -- an e-mail from Atif to --
17     A    Uh-huh.
18     Q    -- Lisa Thompson, copying Adesh Jain.
19     A    Yes.
20     Q    Correct?
21     A    Just half an hour later, yeah, half an
22 hour after this e-mail.

195

1     Q    Forwarding your --
2     A    Uh-huh.
3     Q    -- second transition request e-mail; is
4 that correct?
5     A    Yeah, exactly.  Like I said, the subject
6 transition request was actually dictated by him,
7 okay?  So I'm not asking for a transition.  It is
8 -- actually, I'm trying to stay within his request
9 -- within his orders to change the subject to
10 transition request, you know?  So the transition
11 request subject change, because it's area's
12 changed.
13         See, I'm exploring transfer
14 possibilities.  This is transition request.  So
15 this change was ordered by him.  And also, the
16 wording -- all these phrases here are pretty much,
17 and then he's saying that Ashok returned from
18 California this week and has decided to move back
19 home.  Where does it say that in my first e-mail,
20 that I've decided to move back home?  I'm saying
21 explore possibilities of transfer, okay, explore.
22 And I'm saying it's not urgent, I need to plan for

196

1 it, okay?  And so I'm saying I can continue to work
2 here, but you know, let's decide a plan for that.
3 That's all.  I'm not saying I've decided to move
4 back home, okay?  Realizing that he's unable to
5 continue working -- where did I say I'm unable to
6 continue working?
7     Q    Sir, the only -- you had more than just
8 an e-mail communication.
9     A    Right, right.  All I'm saying is --
10     Q    You had an actual conversation with the
11 man; is that correct?
12     A    Yes, sir, but --
13     Q    And the conversation occurred after your
14 first e-mail.  Your first e-mail did not
15 memorialize that conversation, sir.
16     A    Let me explain something.
17     Q    No.  Answer my question please.
18     A    The first e-mail did not memorialize the
19 -- that is correct.
20     Q    Okay.
21     A    Okay?  So the conversation happened
22 between the two e-mails, which is right, okay?  And

201

1  sure, but maybe you don't want me to answer that --
2  for some reason he doesn't want to -- want me to --
3     Q    Sir --
4     A    -- explain that e-mail.
5     Q    We'll get to whatever -- I'm just trying
6  to understand.
7     A    Yeah.
8     Q    You're talking about a conversation.
9     A    Yeah.
10    Q    I can ask for your independent
11 recollection of a conversation.
12    A    Okay.
13    Q    So what do you recall of the conversation
14 between you and the HR person?
15    A    Okay, I don't know the exact date.  Maybe
16 it's two days later I get this phone call out of
17 the blue, you know.  So it's HR rep, probably Lisa.
18 I'm not exactly sure.  So she says we are
19 scheduling an exit interview.  When do you want it,
20 right off the bat, you know?  So I said exit
21 interview?  Why?  So then she says, you know, you
22 resigned.  So she's surprised that I don't know I

202

1  resigned.  And I say why I resign?  What -- what
2  makes you think I resigned?  And so she says no,
3  you didn't resign?  You sent e-mail saying you're
4  resigning, this e-mail again, the one that he
5  dictated, you know?
6        So I don't understand how this -- this
7  transition happened from my saying that I need a
8  plan, it's not urgent, to -- you know, and I want
9  to contribute to Camber, I want to write new
10 proposals, I want to, you know, do some work in
11 cyber security and write cyber security proposals,
12 all this kind of thing.  I'm just asking this as a,
13 you know, opportunity that I want to explore, that
14 Camber can explore and he can explore and all this.
15 And so this turns into a resignation, you know, in
16 this e-mail.
17       So that's what -- that's what the
18 conversation on the phone was.  I said I'm shocked.
19 No, I've not resigned, you know?  So then there are
20 more e-mail on that.  After that it became e-mail,
21 and then there was e-mail, and finally she says now
22 we understand you did not resign, okay, in that

203

1  e-mail thread, after several -- after this
2  happened, like three or four days of e-mail thread,
3  and then she says now I finally understand you've
4  not resigned.  So this was just a ploy to get me
5  out.  That's all, you know.
6     Q    Except what HR had conveyed to you is
7  that they believed you were resigning; is that
8  correct?
9     A    On the phone call, yes.  They said --
10 they were actually planning the next steps, and
11 that caught me totally by surprise.  I mean, she
12 didn't say that we hear you resigned or do you
13 resign or anything like that.  She simply said your
14 exit interview is scheduled.
15    Q    But nobody told you it was a ploy to get
16 --
17    A    Well, what else would you say this is,
18 because I've not resigned.  I've not given any
19 indication of resigning, and certainly, you know,
20 within half an hour of a letter that he wanted me
21 to write, he's calling -- within half an hour, he's
22 calling Lisa, he's e-mailing Lisa and Adesh Jain

204

1  that I resigned.  I mean, not saying resigned yet.
2  All he's saying is prepare the displacement letter,
3  right?  So what I'm saying is the entire concept of
4  resignation was invented right there, you know?
5  And they tried to terminate me and they couldn't.
6  They could not terminate me.  Now they're trying to
7  say that I resigned, you know.
8     Q    You're talking about back in March when
9  you were still with Avaya?  Is that what you're
10 referring to by they couldn't terminate you?
11    A    Yeah, you saw -- you saw all that, right,
12 the performance improvement plan.  That was -- they
13 tried to terminate me at --
14    Q    But that's what you're referring to, sir?
15    A    That's the one I can think of, yeah.
16    Q    And -- and --
17    A    I don't know of any other instances, but
18 that one is --
19    Q    Atif knew nothing about your son's
20 medical condition at the time of the performance
21 improvement plan.
22    A    Wait a minute.  When was that, the

205

1 termination letter. This performance improvement,
2 right. Oh, that was with regard to the conference,
3 the SharePoint conference. That is what triggered
4 that. Remember? It had nothing to do as far as I
5 know -- unless he knew -- he might have know about
6 disability, I'm not sure, by some other way, maybe
7 medical -- you know, I don't know.
8      But the point is that was purely geared
9 -- because where I was given permission and then
10 the permission's withdrawn after I spent $3,000,
11 and -- and original permission was for five days.
12 I -- I took only two days off of work, and the
13 deliverable there is fabricated.
14    Q   What was the last part of --
15    A   Fabricated. The deliverable was
16 fabricated. There was no deliverable that I knew
17 of at that time.
18    Q   Sir, at the time of the performance
19 improvement plan --
20    A   Uh-huh.
21    Q   -- you had not communicated to Atif
22 anything about your son's medical condition.

206

1    A   Yeah, I don't believe that -- I don't
2 believe I had, yeah.
3    Q   In fact, you testified earlier you were
4 very careful not to.
5    A   Yeah, I was very careful not -- you're
6 right.
7    Q   You hadn't communicated to Nan Li at the
8 time of the performance improvement plan about your
9 son's medical condition, correct?
10    A   Not that I can recall, yes.
11    Q   You hadn't communicated to Lisa Thompson
12 at the time of the performance improvement plan
13 about your son's medical condition.
14    A   Not that I recall, yes.
15    Q   Now, if you go back to Exhibit Pai 6, the
16 first -- the first page --
17    A   Uh-huh.
18    Q   -- is an e-mail that you wrote to Atif on
19 September 18th, 2014.
20    A   Ten days later, yeah, right, right.
21 That's what I'm saying, a lot -- a lot has happened
22 within ten days, because there are some e-mails

207

1 here which are prior to this, yeah, but you're
2 right, I wrote that e-mail on September 18th, yeah.
3    Q   In the first sentence, you say, "I must
4 point out that I have not resigned."
5    A   Exactly, yeah.
6    Q   Is that correct?
7    A   Yes.
8    Q   But then you also recognize that you were
9 seeking to go nearer to the Southern California
10 region; is that right?
11    A   Yeah, I only requested a transfer, yeah.
12 As you wanted a planning horizon, I suggested
13 October 31st, I put that date in, and they said a
14 transition request. And even that wording -- see,
15 I would not have even thought of that transition
16 request word. He dictated that to me too.
17    Q   But sir, you understand the planning
18 horizon to be to let the customer know --
19    A   Yeah, yeah, yeah.
20    Q   -- about you transitioning out of the
21 EOIR program.
22    A   I had no intention of transferring out of

208

1 the EOIR program because he -- he's -- he knows a
2 lot more than me, okay? So he may have some way of
3 keeping me in the EOIR. He may -- he may have way
4 of -- of putting me at different project. All that
5 he has the power. I don't, okay? So I was not
6 suggesting that I have -- I mean, I was not
7 insisting that I would transition out of EOIR.
8 That -- I don't know where you're getting that
9 idea. I've not said that anywhere.
10      I'm only asking what opportunities and
11 possibilities, you know, and -- and I'm even saying
12 that it's not urgent, I can -- just want to plan
13 for it. That's all. So I'm not asking that I want
14 to move right now or even the October 31st date.
15 None of those things I have suggested. I've not
16 suggested any of those things. See here, the
17 second -- this paragraph, Camber Corp., starts with
18 "Camber Corp." The fourth paragraph starts with
19 "Camber Corp.," okay? There I'm clearly saying,
20 you know, what I would like to do for Camber.
21    Q   And that's to work for -- work within
22 cyber security in California; is that correct?

Transcript of Ashok Pai
Conducted on March 26, 2018

55 (217 to 220)

217

1   your people in dashboard, so yeah, sure, let him
2   come over and do a two-week class, you know.
3   That's the kind of thing I'm talking about.
4       Q    So no, you didn't apply for any position
5   as a trainer within Camber?
6       A    No, there was -- I don't think they -- I
7   didn't see any position as a trainer, and if there
8   was a pure trainer, that would be a much lower
9   level than me.  If it was a pure trainer who does
10  nothing but training, that would be much lower.
11  I'm saying I would give a short -- a one-week or
12  two-week training program at a customer location if
13  the customer's interested, you know.
14      Q    So you're talking about changing your
15  duties.
16      A    For a short time, a temporary change of
17  duties, yes.
18      Q    And you have no idea whether Camber had a
19  business need to change your duties in that way.
20      A    These are all suggestions I'm making
21  because I don't know what Camber's business --
22  except for what I heard from the CEO, John Lord,

218

1   you know, that's my only visibility into the
2   business requirements of Camber, you know, business
3   rules of Camber.  I'm just saying what I can do,
4   you know?
5       MR. STERN:  Is this an opportune time --
6       MR. ORTBALS:  Sure.
7       MR. STERN:  -- to take a --
8       MR. ORTBALS:  Yeah, take --
9       MR. STERN:  -- lunch and coffee break?
10      MR. ORTBALS:  Sure.
11      THE WITNESS:  Yeah, lunch, 1:30 already,
12  yeah.
13      THE VIDEOGRAPHER:  We're going off the
14  record.  The time is 1:32 p.m.
15      (Recessed at 1:32 p.m.)
16      (Reconvened at 2:27 p.m.)
17      (Deposition Exhibit Number 8 was marked
18  for identification.)
19      THE VIDEOGRAPHER:  Here begins Disk
20  Number 3 in the videotaped deposition of Ashok Pai.
21  The time on the video monitor is 2:27 p.m., and we
22  are back on the record.

219

1   BY MR. ORTBALS:
2       Q    Okay, we're back on the record following
3   the lunch break.  Mr. Pai, I'll remind you you're
4   still under oath.  The court reporter's handed you
5   what's been marked as Deposition Exhibit Pai 8,
6   which is another e-mail chain, and if you go to the
7   third page of Exhibit 8, at the bottom is the
8   e-mail that you sent to Atif on September 18th
9   stating that you had not resigned; is that right?
10      A    I'm sorry, page --
11      Q    Page 3.
12      A    Page 3, okay.  I don't see a 3 here.
13      Q    It's Bates numbered EEOC406.
14      A    Six, okay, yeah.  Yeah, got it.
15      Q    So kind of the middle of that page, the
16  September 18th e-mail from you to --
17      A    Yeah.
18      Q    -- Atif where you said that you hadn't
19  resigned; is that right?
20      A    Right.  I'm just trying to see what else
21  is there in this.  Okay, just the previous ones,
22  okay.  Okay, so yes, this -- we already discussed

220

1   this e-mail, yeah.
2       Q    And then immediately above that --
3       A    Uh-huh.
4       Q    You forwarded your e-mail to Lisa
5   Thompson in human resources; is that right?
6       A    Forwarded which e-mail again?
7       Q    You forwarded the --
8       A    Transition.
9       Q    -- the -- the e-mail below to Atif about
10  not resigning.
11      A    So this is a forwarding -- yeah, that's
12  right, the e-mail was to Atif, and then it was
13  forwarded to Lisa I think, that's right, yeah.  I
14  mean, did I forward it or did Atif forward it?  I'm
15  not sure.
16      Q    If you look at the bottom of page 405 --
17      A    Uh-huh.
18      Q    Would you agree with me that you
19  forwarded it to Lisa Thompson on September 18th,
20  2014?
21      A    From -- from Lisa Thompson, right?
22      Q    All the way at the -- all the way at the

Transcript of Ashok Pai
Conducted on March 26, 2018

221

1  bottom.
2      A   Oh, yeah, yeah, yeah, right.  So forward
3  the transition request, yes.  Sorry about the
4  confusion, yeah.  I sent the following e-mail
5  earlier this morning.  It makes it clear that I'm
6  not resigned.  Please read through all three
7  e-mails below.  I'm requesting a transfer within
8  the company, as I was told it is possible, yeah.
9      Q   And that's what you -- that's what you
10 wrote to Lisa Thompson; is that right?
11     A   That's right, yeah, yeah, and I attached
12 this other e-mail, forward the e-mail, yeah.
13     Q   And then Lisa wrote back at the bottom of
14 405 --
15     A   Uh-huh.
16     Q   "Hi Ashok.  We can only transfer you to a
17 new position if there is one that has been
18 identified and to which you have applied and been
19 selected.  Is that the case here?  If so, I just
20 need to know what recruiter to work with to get the
21 appropriate information.  Thanks."
22     A   Right.

222

1      Q   Right?
2      A   Yeah.  Yeah, I remember that e-mail,
3  yeah.
4      Q   Okay.  And at the point that Lisa wrote
5  this e-mail to you, you had been working with a
6  recruiter.
7      A   Right, right.
8      Q   Is that right?
9      A   But I've not identified a position.
10 That's the reason I approached Atif, yeah.  So I
11 informed Atif earlier that I'm going to work with
12 recruiters, and then here when I didn't find any
13 positions with recruiters, I asked him if he can
14 find something for me, you know?
15     Q   And Lisa's responding that you need to
16 work through a recruiter; is that right?
17     A   Yeah, we can only transfer you if it has
18 been identified, and to which -- because in
19 positions -- in -- in jobs I worked before, it was
20 not good to work -- I mean directly apply without
21 getting the managers' and bosses' permissions, you
22 know, because you're going against the chain of

223

1  command, and I would speak.  So that was the reason
2  I wanted to, you know, keep -- keep him in the loop
3  basically.  That's it.
4      Q   Sure, and you had kept him in the loop
5  about working with --
6      A   Yeah.
7      Q   -- a recruiter.
8      A   Yeah, yeah.
9      Q   And by him, you're talking about Atif.
10     A   Uh-huh.
11     Q   Okay.
12     A   So again, I mention -- do you want me to
13 read this one or no, the one --
14     Q   Yeah, I mean, if you -- then you
15 responded to Lisa.
16     A   Yeah.
17     Q   Go ahead and read what you responded.
18     A   Yeah, that was never made clear to me,
19 you know, because the idea that the only transfer
20 to position, if it had been identified to which --
21 so not made clear to me.  I believed from earlier
22 conversations that the transfer request has been

224

1  initiated by me, and I did so.  When I sent the
2  transition request, I was never told that it would
3  be treated as a resignation.
4          That's the key point, that I didn't treat
5  that -- I didn't consider that to be a resignation
6  at all.  In the absence of such clarification to
7  me, in the absence of any statement from me that
8  I'm resigning, I don't understand how you can call
9  it resignation.  Again, I hope this our next
10 communications can be clearer.  So I'm asking how
11 do you say it's a resignation, you know?
12     Q   Right.  And was your -- was your
13 forwarding the -- these e-mail -- the e-mail to
14 Lisa and then having this communication, was this
15 after somebody from HR had reached out to you about
16 your exit interview?
17     A   Yes, of course, yeah, because this is
18 18th, so between 8 and 18th, all that conversation
19 happened, which are pretty much all by phone I
20 think, that happened between, yeah.
21     Q   Okay, and then Lisa responds to you.
22     A   Uh-huh.

Transcript of Ashok Pai
Conducted on March 26, 2018

225

1    Q    "Who did you talk to regarding a
2  transfer?  I'm not sure where the confusion lies."
3    **A    Uh-huh.**
4    Q    "If an employee requests removal from
5  their project and provides a specific date, I'm not
6  sure what else we should do other than consider
7  that they will no longer work," slash, "support
8  that project after that date.  You may call it a
9  transition, but it is effectively a resignation
10 from the project."
11   **A    Uh-huh.**
12   Q    "It's not an issue if the employee has
13 secured another position within the company or
14 intends to depart Camber completely."  And then she
15 goes on to basically say that there could be other
16 positions in the company, but it's your
17 responsibility to --
18   **A    Uh-huh.**
19   Q    -- identify them and pursue those; is
20 that right?
21   **A    That's what it says, yeah.**
22   Q    Okay.

226

1    **A    But you see, here the -- the confusion**
2  **though is you may call it a transition, but it's**
3  **effectively a resignation, you know, that is not --**
4  **that's logically not clear.  In fact, I didn't even**
5  **call it a transition.  This was Atif's words,**
6  **transition, you know?  And so I only asked for**
7  **possibilities, you know, to use my skills in cyber**
8  **security and other things, but the whole idea of**
9  **transition and resignation, because it could be**
10 **used in EOIR, within EOIR, you see, because EOIR**
11 **has a great need for cyber security, you know?  So**
12 **all that could have been done, but this is called a**
13 **transition and effective resignation and all that.**
14 **These are words that I did not use.**
15   Q    Well, you did use the word "transition"
16 in the e-mail.
17   **A    Yeah, that was dictated to me --**
18   Q    Right.
19   **A    -- quite frankly.**
20   Q    But you used it in the e-mail that you
21 sent.
22   **A    Yes, but I was asked to use that subject**

227

1  line, you know.
2    Q    But Lisa's explaining to you at least
3  from her perspective why she understood it to be a
4  resignation; is that right?
5    **A    I don't know.  It's -- you know --**
6    Q    I understand that you don't agree that
7  you were resigning.  I think that that's clear.
8    **A    Uh-huh.**
9    Q    But she's at least explaining to you from
10 her perspective why she thought -- why she -- why
11 it is being treated as a resignation; is that
12 right?
13        MR. STERN:  Objection as to form.
14   **A    Yeah, I mean, I've not used the word**
15 **"resignation," so if she jumps to a conclusion like**
16 **that, I would like to know how she came to the**
17 **conclusion, right?**
18   Q    Well, she explains it in the e-mail.
19   **A    Yeah, but the explanation doesn't --**
20 **doesn't satisfy me there because it looks very**
21 **artificial that something I say about possibilities**
22 **and planning and not urgent and all that is a**

228

1  resignation, you know?  It's not clear to me at
2  all.
3    Q    Well, but sir, you're picking apart one
4  portion of one e-mail that you sent to Atif versus
5  a second e-mail that you wrote --
6    **A    Under --**
7    Q    -- that says that you're transitioning
8  out of your project --
9    **A    Under direction, yeah, yeah.**
10   Q    -- effective October 31st.  You -- but
11 you wrote it, sir.
12   **A    Yeah, I wrote, under direction I said,**
13 **yeah, because I was asked to write that.**
14   Q    And then in response to Lisa, you again
15 reiterate that you made it clear that you've not
16 resigned and asked --
17   **A    Yeah.**
18   Q    -- whether you should withdraw your
19 transition request.
20   **A    I'm seeing another e-mail after that,**
21 **yeah.**
22   Q    Right.  And she responds to you that --

229

1 again, saying it's -- it's -- it's your obligation
2 to --
3     **A    Uh-huh.**
4     Q    -- seek a transfer, go through the
5 transfer process.  Is that -- that's what you're
6 looking to do, but then also says nothing
7 additional is needed from you as we now understand
8 --
9     **A    Yeah, see, we now understand you did not**
10 **intend to resign.  See?  She has agreed now.**
11    Q    And did you have any further
12 communication with Lisa Thompson on this subject
13 after this e-mail?
14    **A    I don't recall.  I think I did, but I'm**
15 **not -- I don't recall.  I mean, if you have an**
16 **e-mail, I can discuss that, but I don't have -- and**
17 **I don't have access to this e-mail either, so --**
18    Q    Sure, but you at least don't recall any
19 additional conversation with her after she said --
20    **A    After that, let's see.  This was**
21 **September, right?  Yeah, after that I got an e-mail**
22 **from Deidra Martin saying yes, you can go on FMLA**

230

1 **now, and then three weeks into my FMLA, not even --**
2 **two weeks into my FMLA, I get a letter of**
3 **termination.**
4        (Deposition Exhibit Number 9 was marked
5 for identification.)
6        THE WITNESS:  Thank you.  Maybe to
7 Deborah -- Deidra Martin, yeah.
8 BY MR. ORTBALS:
9    Q    Okay.  The court reporter's handed you
10 what's been marked Deposition Exhibit --
11    **A    Uh-huh.**
12    Q    -- Pai 9, and if you go all the way back
13 -- the whole document's an e-mail string, but if
14 you go all the way back --
15    **A    Uh-huh.**
16    Q    The first e-mail in the string is --
17    **A    Uh-huh.**
18    Q    -- from Deidra Martin to you on September
19 9th, 2014; is that right?
20    **A    Yeah, yeah, right.**
21    Q    And she's reaching out to you in an
22 e-mail saying that she understands that you had an

231

1 illness or injury in your immediate family --
2     **A    Uh-huh.**
3     Q    -- that caused you to miss time away from
4 work, and that unless you were going to take
5 vacation leave for time, you would need to apply
6 for FMLA leave; is that right?
7     **A    Yeah, yeah, that's correct.**
8     Q    And this is -- this e-mail was the first
9 time Deidra Martin had reached out to you about
10 FMLA leave; is that right?
11    **A    Yeah, I believe so.  As far as I**
12 **recollect, yeah.  I don't recall anything prior to**
13 **this.**
14    Q    And Deidra didn't work in -- in Virginia.
15 She was in --
16    **A    Huntsville.**
17    Q    -- headquarters in Huntsville; is that
18 right?
19    **A    Right, right, yeah.**
20    Q    And she provided you some information
21 about --
22    **A    Yeah.**

232

1    Q    -- what you would need to do to get
2 eligible for --
3    **A    Right.**
4    Q    -- FMLA?
5    **A    Right, right.**
6    Q    Is that correct?
7    **A    Right, right.**
8    Q    And then you respond back.
9    **A    Uh-huh.**
10    Q    And I think you testified to this earlier
11 with your question about the fact that you used up
12 FMLA --
13    **A    Yeah.**
14    Q    -- at Avaya, and what that would mean.
15    **A    Yeah, yeah.  I'm saying thanks for**
16 **suggesting FML.  When I was employed -- this is the**
17 **-- what I'm reading, "Thanks for suggesting FML.**
18 **When I was an employee of Avaya, I'd taken FML for**
19 **12 weeks starting November 12th."  So after I**
20 **completed, had returned to work, so since FML is**
21 **prior to employment in Camber, with Camber, should**
22 **I -- would I be eligible now?  I'm asking the**

Transcript of Ashok Pai
Conducted on March 26, 2018

233

1 question --

2    Q    Right.

3    A    -- am I eligible now, because I don't

4 want to take it if I'm not eligible.

5    Q    Did you ever ask Deidra or did she

6 disclose how she came to learn that you had been

7 gone for --

8    A    No, no, this letter came out of the blue.

9    Q    -- an illness?

10    A    This e-mail came out of the blue.

11    Q    So you don't know where she got the

12 information.

13    A    No, I don't, yeah.

14    Q    Okay.  And then Deidra responds to your

15 question about --

16    A    Uh-huh.

17    Q    -- your previous FMLA use with Avaya by

18 stating that you are eligible --

19    A    Yeah.

20    Q    -- and how much time you would have

21 available; is that right?

22    A    Yeah, yeah, we are going to start at a

234

1 12-month period, I'll give you 48 hours, so very

2 very nice for her to do all that, yeah.

3    Q    And then she also sent you a medical

4 certification form; is that right?

5    A    Right, right, she sent me forms, yeah.

6        (Deposition Exhibit Number 10 was marked

7 for identification.)

8        THE WITNESS:  Oh, thank you.

9 BY MR. ORTBALS:

10    Q    And the court reporter's handed you

11 what's been marked Deposition Exhibit Pai 10, and

12 this is a FMLA medical certification form; is that

13 right?

14    A    Yes, yeah.

15    Q    And this form on the last page was signed

16 and dated by a doctor on September 12th, 2014; is

17 that right?

18    A    Right, yeah.

19    Q    But this particular one ended up being

20 rejected by Camber?

21    A    Yeah, yeah, yeah.  What happened there

22 was -- yeah, yeah, what happened was that they said

235

1 if you bring the form to us completed, we will sign

2 it and make a change needed, okay?  So I -- I

3 filled out the form for them, took it there for the

4 completion, and they signed it and gave it back to

5 me, but then I think Deidra Martin said that it

6 needs to be completely filled out by the doctor I

7 think.  So I think it was submitted twice, once I

8 filled it but doctor signed it.  Second time the

9 office filled it and signed it also.

10    Q    So when you -- was it your testimony then

11 that it was your doctor's office that had asked you

12 to fill it out completely and then sign it?

13    A    No, no, no, the -- the -- yeah, okay,

14 first the doctor's office told me to do that.

15    Q    Uh-huh.

16    A    Then Deidra Martin or someone from HR

17 asked me to get the whole thing filled out by the

18 doctor, so they're both -- yeah, that's the other

19 form.

20        (Deposition Exhibit Number 11 was marked

21 for identification.)

22 BY MR. ORTBALS:

236

1    Q    The court reporter's handed --

2    A    Oh, this is -- I don't know what's

3 happening, yeah.

4    Q    The court reporter's handing you what's

5 been marked Deposition Exhibit Pai 11, and this is

6 dated September 24th, 2014 by your doctor.

7    A    Yeah.

8    Q    Is that right?

9    A    Yes.

10    Q    And so this is the medical certification

11 that your doctor filled out, right?

12    A    The -- the front page is same, okay?  The

13 front page same on both.

14    Q    Uh-huh.

15    A    But starting after that, the -- yeah, it

16 says completed by health care provider, so that was

17 the issue.  I completed -- because the doctor has

18 told me, he said fill out everything and then he'll

19 sign it, you know?  So I filled out everything,

20 took it over there, and they signed it, but then

21 Deidra Martin of HR said that even the filling out

22 has to be done by them.  So this is -- the first

Transcript of Ashok Pai
Conducted on March 26, 2018

60 (237 to 240)

---

237

1  page is common to both, but the medical information
2  is actually the doctor's office, doctor's office
3  handwriting here.
4     Q    Okay.  And this second certification,
5  Exhibit 11, you submitted it to Deidra Martin and
6  then your FMLA was approved; is that right?
7     A    Right, exactly, yeah.
8     Q    Did you submit your FMLA certification to
9  anybody at Camber other than Deidra Martin?
10    A    I submitted to HR, and I think it's
11 Deidra Martin.
12    Q    Okay.
13    A    But if I sent it to anybody else, it's
14 probably -- but it's all HR.  I didn't send it to
15 anybody else.  Yeah, only HR.
16    Q    So nobody -- nobody outside of human
17 resources.
18    A    No, not that I can remember, yeah,
19 because it's always -- she was the one requesting
20 it, and she's the one I would send it to, unless
21 she asked me to send it to somebody else in HR,
22 which it would still be HR, yeah.

---

238

1     Q    And after that FMLA leave was approved,
2  did you then start leave and take off of work?
3     A    I'm sorry?
4     Q    Once Deidra Martin approved your FMLA --
5     A    Uh-huh.
6     Q    -- you started the leave and -- and left
7  to go to California; is that right?
8     A    Right, yeah, one or two days after that,
9  yeah.
10    Q    And so when was the -- what was the last
11 date that you were physically --
12    A    Uh-huh.
13    Q    -- at EOIR working?
14    A    Let's see.  This was dated September
15 12th.
16    Q    24th I think.
17    A    September 24th?  Oh, okay, that's
18 possible.  So September 24th, I might have started
19 working there -- I mean, I don't recollect, but
20 it's right somewhere there, yeah, yeah.
21    Q    Whenever you started your FMLA leave --
22    A    Uh-huh.

---

239

1     Q    That was the last time you physically
2  worked at EOIR; is that right?
3         MR. STERN:  Objection to the form of the
4  question.  The witness testified one or two days
5  after.
6     A    Well, I don't agree one or two days
7  either.  A few days after, yeah.
8     Q    I mean, whenever you left for -- whenever
9  you left for your leave --
10    A    Yeah, yeah, yeah.  I didn't come back.
11    Q    -- you didn't come back, right?
12    A    Yeah, because two weeks after that I
13 think or three weeks after that, I got a
14 termination letter, yeah, I did not come back from
15 leave, yeah.  So actually, all my stuff there,
16 except that I had packed for FMLA, but the rest of
17 my stuff was still there, yeah.
18    Q    And while you were on FMLA from Camber,
19 you started up work with MBO Partners again; is
20 that right?
21    A    Same, same, Triple A, they wanted me
22 back, so I went back to the same project, yeah.

---

240

1     Q    And you went back to this other job
2  working full time.
3     A    Yeah, with Triple A, the same job I'd
4  done the previous year, they wanted me back on it,
5  but they were offering me employment, but I didn't
6  want to be employed.  I wanted just to cover the
7  FMLA period, you know, so -- so it was a temporary
8  project, hourly, and I think at the same rate I
9  think, and then the same -- everything was same as
10 previously, yeah, except, you know, two weeks later
11 or three weeks -- two and a half weeks later, I got
12 out of the blue saying you're done, you're fired.
13    Q    Did you approach MBO then about becoming
14 full time employed?
15    A    MBO, I was -- I was actually shocked by
16 the situation obviously and I wanted to see if I
17 could somehow recover from the situation.  I did --
18 I did talk to MBO.  MBO also has a database, but I
19 was not too keen on -- because I didn't want to be
20 a full-time contractor either, you know?  So I
21 really -- let's see.  I'm kind of missing the
22 sequence of events here after that.

---

Transcript of Ashok Pai
Conducted on March 26, 2018

---

241

1          So once the termination letter came, I
2  was in a state of shock quite frankly, so -- and
3  the termination was effective October 31st, so I
4  was unemployed starting November 1st, you know.  So
5  -- yeah, so I continued at Triple A.  I was not
6  totally unemployed actually, so I continued at
7  Triple A until early January again, okay?
8          So after that, that project ended.  Then
9  the management change, so they wanted to move me to
10 a different manager completely, totally different
11 -- not even in my line of work, you know?  Totally
12 different.  So I didn't want to go into that, so I
13 said I'll wait for this one to open up again rather
14 than move to a completely new area and -- and go
15 into an area where I'm not really familiar and all
16 that, you know?
17         So -- so until January -- early January I
18 think I worked with Triple A, but after that, I was
19 -- in fact, they didn't have anything after that
20 because the -- yeah, now I remember.  They were
21 moving the data center to Texas.  They did
22 actually.  So that's the reason it ended in -- in

---

242

1  January.
2          So they actually moved the data center to
3  Dallas, outside Dallas, so — and that's one of the
4  reasons they hired me as a contractor too, because
5  they were slowly moving their people and people
6  were resigning because of that, and so they wanted
7  contractors to fill in, you know?  So I was there
8  temporary, and so when they said they're moving, I
9  had to get out, and I started applying and all
10 that, but I couldn't get anything in my field and
11 everything at that time, so I actually went on
12 unemployment for the first time in my life.
13     Q    When you said they moved the data center,
14 was that Triple A?
15     A    Yeah, Triple A.
16     Q    Did you have the opportunity to relocate
17 to Dallas?
18     A    Not really because they had enough
19 trouble moving their own people and finding people
20 in that area and all that, so they didn't want to,
21 you know, get more new people there, you know,
22 until they -- until the dust settled down on that.

---

243

1  So they wanted the existing people to get it off
2  the ground before they would consider new people,
3  you know, because I was not an employee.  I was a
4  contractor, so they would have to convert me to
5  employee, and they didn't want to do that at that
6  time.
7      Q    Did you notify Camber that you were
8  working full time while you were on FMLA?
9      A    Yeah, I did, of course.
10     Q    Who did you -- who did you inform?
11     A    I don't recall who, but I didn't keep it
12 a secret, so I would think both Nan -- well,
13 actually, my supervisor at that time was Sudhakar,
14 yes, Sudhakar Nallamothu, and so I did inform him,
15 and I'm not sure if I informed Atif or not because
16 I was primarily dealing with Sudhakar, Sudhakar
17 Nallamothu.
18     Q    And what did Sudhakar say in response?
19     A    Sudhakar -- I don't recall, you know.
20 And he was pretty new too at that point, and so I
21 don't think he said much, but he was aware of it at
22 least, yes.  He was aware that I was working, but

---

244

1  that again was temporary thing.  After my FMLA
2  ended, that's it, that subject was supposed to be,
3  yeah.  So my FMLA ended prematurely October 31st.
4          (Deposition Exhibit Number 12 was marked
5  for identification.)
6          THE WITNESS:  Thank you.
7  BY MR. ORTBALS:
8      Q    Court reporter's handed you what's been
9  marked Deposition Exhibit Pai 12.  Have you seen
10 this document before?
11     A    No.
12     Q    This is an e-mail from Howard Myatt to
13 Atif Khalil; is that right?
14     A    Yeah.
15     Q    And Howard Myatt was the EOIR customer;
16 is that correct?
17     A    The contract -- he was handling the
18 contract between the two, yeah.  He's government
19 employee, yeah.
20     Q    Right, he worked for the Department of
21 Justice --
22     A    Correct.

---

245

1    Q    -- and he was responsible for the EOIR
2    contract?
3    A    Yeah, yeah, yeah.
4    Q    And he writes, "Atif, please proceed with
5    replacement of Ashok Pai from the Dot Net team at
6    the government's request," correct?
7    A    Yeah, that's what it says, yeah.
8    Q    And so this is the customer requesting
9    your removal from the project.
10       MR. STERN:  Objection as to form.  That
11   word "removal" is not there.
12   A    Yeah, the word "removed" is not there.
13   Q    This is the customer requesting you be
14   replaced on the project.
15   A    On the team, yeah, because there were
16   several teams, and I was not really a full member
17   of the Dot Net team.  I was like an honorary
18   member.  There's Dot Net, do you see that?  So I
19   was not a full member of that team.  I was a member
20   of the SharePoint team, but I was an honorable
21   member of Dot Net team because I was advising them,
22   so as a result, the removal from Dot Net team does

246

1    not mean removed from the project.
2    Q    From your perspective.
3    A    Exactly.  I can only speak from my
4    perspective, yeah.
5    Q    Were you aware the government had
6    requested your replacement at all?
7    A    I'm sorry?
8    Q    Were you aware that the government had
9    requested your replacement at all?
10   A    I was not aware.  I don't think so at
11   least, yeah.  I mean, after the fact I heard about
12   it, but you know, I didn't see this document until
13   right now.  I saw it just -- this is the first time
14   seeing it.
15   Q    In your experience as a government
16   contractor, is it your expectation that the
17   contractor's going to follow the government's
18   request?
19   A    Contractor typically has to, yeah, but
20   there can be negotiations at that point and stuff
21   like that.  So I don't know the procedure -- I
22   don't know -- I don't know the requirements between

247

1    the contractor and the government.
2    Q    Are you alleging that Howard Myatt had
3    any animus towards you because of your son's --
4    A    No.
5    Q    -- medical condition?
6    A    Not at all.  Not at all.
7    Q    Or because of your age?
8    A    I don't have any -- any reason to say
9    that.
10       (Deposition Exhibit Number 13 was marked
11   for identification.)
12       THE WITNESS:  Oh, thank you.
13 BY MR. ORTBALS:
14   Q    Court reporter's handed you what's been
15   marked Deposition Exhibit Pai 13, and at the bottom
16   of the first page and on to the second page --
17   A    I'm sorry.
18   Q    -- there's an October 17th, 2014 e-mail
19   from Atif to you forwarding the separation letter;
20   is that correct?
21   A    Yes.
22   Q    And this is notifying you that your

248

1    employment is going to be terminated effective
2    October 31st, 2014; is that right?
3    A    Let me see.  Sorry, I hit "sent" by
4    mistake without completing the e-mail, as is your
5    attached letter, not -- unfortunately, employment
6    will terminate.  The client has decided to change
7    the requirements for the position, position being
8    changed, discuss it with you in person to -- okay,
9    yeah, this is just a covering e-mail for the real
10   letter, yeah.
11       (Deposition Exhibit Number 14 was marked
12   for identification.)
13 BY MR. ORTBALS:
14   Q    And Pai Exhibit 14 that you've just been
15   handed, that's the letter that --
16   A    Yes.
17   Q    -- was attached to Pai Exhibit 13?
18   A    That's right, yeah.
19   Q    Correct?
20   A    Correct.
21   Q    And you received both Pai Exhibit 14 and
22   Atif's October 17th cover e-mail --

Transcript of Ashok Pai
Conducted on March 26, 2018

249

1    A    Uh-huh.
2    Q    -- on the 17th?
3    A    Whatever date it says.  Yeah, 17th, yeah,
4 because this letter or picture of this -- the image
5 of this letter was attached to the -- to the sorry
6 I hit "sent" by mistake kind of thing.
7    Q    After receiving the notice that your
8 employment was going to end on October 31st --
9    A    Uh-huh.
10   Q    -- 2014, did you respond to Atif in any
11 way?
12   A    Gosh.  I wonder if I just called him on
13 the phone or sent something.  If I did, you should
14 probably have it, but I don't recall exactly what
15 happened after that, I mean in the immediate part
16 of that, immediate stages of that, yeah.
17   Q    So you can't recall one way or another
18 whether you had a follow-up communication with him
19 or not?
20   A    I do remember this e-mail -- wait a
21 minute.  This one says forward separation letter.
22 I think the letter was forwarded by Lisa Thompson,

250

1 because this is forwarded separation letter.  This
2 is the termination letter, that's for sure, okay?
3 However, whether Atif sent it or Deborah -- I'm
4 sorry, Lisa Thompson sent it is not very clear to
5 me.  I think Atif had just sent the sorry sent by
6 mistake kind of thing, but then Deborah -- sorry,
7 Lisa Thompson is saying forward separation letter.
8          Anyway, after that, Atif is saying please
9 let us now know your plans for the rest of this
10 week.  We haven't heard -- oh, yeah, I think I may
11 have signed it after that, because I was totally
12 shocked and I was trying to gather my wits and see
13 what I can do about this, so -- because -- because
14 I'm only going from the fact that Atif is saying
15 please let us know what your plans for the rest of
16 this week, we haven't heard from you in a couple of
17 weeks.  I hope everything -- but I was also working
18 at Triple A, see, so --
19   Q    Uh-huh.
20   A    I knew that this thing is -- this thing
21 has kind of happened.  So October 27th is ten days
22 after that termination letter, ten days later.  So

251

1 ten days later, Atif is saying please let us know
2 your plans for the rest of this week.  We haven't
3 heard from you in a couple of weeks.  I hope that
4 everything is okay with you and family.  If you're
5 not planning to return to the office this week --
6 so he's still talking about returning to the
7 office.  That's right, because my termination was
8 effective 31st, that's right.
9    Q    Uh-huh.
10   A    You will need to make arrangements to
11 return the government property in your possession,
12 based on -- I'm just reading it out.  If you're not
13 planning to return to the office this week, you
14 will need -- need to make arrangements to return
15 any government property in your possession, so --
16 -- so please let me know when you plan to be back
17 in the D.C. area so we can set up a meeting.  So
18 that's what he sent ten days after the termination
19 letter.
20   Q    Did you end up having a meeting with Atif
21 in D.C. or did you just --
22   A    No, I could not go --

252

1    Q    -- mail back your stuff?
2    A    -- because there's another e-mail after
3 that where I'm saying that sorry I can't come to
4 D.C. right now, I'm sending everything by FedEx,
5 you know.
6    Q    Is that the last communication you had
7 with Atif about the end of your employment?
8    A    I think so, I think so.  Well, he said he
9 received it.  That's probably the last one, yeah.
10   Q    Did you communicate with anybody else at
11 Camber about the end of your employment?
12   A    I don't recall, and even if -- you know,
13 I might have talked to some friends, but I was very
14 careful not to in any way say anything bad about
15 Camber because I don't know the circumstance of
16 this and I don't believe in -- in bad-mouthing
17 anybody, you know?  So I didn't bad-mouth anyone.
18 I simply might have told them that I'm not coming
19 back, because at that point I was really trying to
20 focus on Triple A, because I just wanted a good job
21 with Triple A and at least get -- stay there, but
22 then they were in the process of moving to Texas,

253

1  and they wanted to move into a different department
2  and all kinds of complications, yeah.
3      Q    And you never went to anybody in Camber
4  management indicating that --
5      A    No.
6      Q    -- your termination was discriminatory in
7  some way?
8      A    Not that I can recall at all, not that I
9  can recall.
10     Q    In fact, you never complained about
11 discrimination with regard to any part of your
12 employment at Camber; is that right?
13     A    Including any part of employment with
14 Camber.  Complained to whom?
15     Q    Complained to somebody within Camber.
16     A    Oh, within Camber?  That's a very wide
17 question.  Complained to anybody about anything
18 within Camber.
19     (Whereupon, Mr. Bauer left the deposition.)
20 BY MR. ORTBALS:
21     Q    No, about discrimination within Camber.
22     A    Oh, discrimination within Camber.

254

1      Q    Yeah, discrimination.
2      A    I -- I don't think I ever used the word
3  "discrimination," you know.  I don't believe so.
4      Q    Who within Camber discriminated against
5  you because of your son's disability?
6      A    I'm sorry, beg your pardon?
7      Q    Who within Camber discriminated against
8  you because of your son's disability?
9      A    Who would think?  Is that the question?
10     Q    What Camber employees discriminated
11 against you because of your son's disability?
12     A    Oh, you're -- you're saying names of
13 employees who discriminated against my son --
14 against me because of my son's -- I'm only going by
15 all these actions, you know, so I can't -- I don't
16 want to accuse anybody else because I don't know
17 what they were thinking and what they were saying
18 behind my back or whatever, but I don't want to
19 accuse anybody of that.  All I have to go with is
20 all these events.  That's all.
21     Q    By these events, you mean the events that
22 led to the end of your employment?

255

1      A    Right, yeah, yeah, the -- the performance
2  improvement plan.  I don't know -- see, that was
3  actually before the -- that was purely the
4  SharePoint conference thing, but essentially just
5  this, yeah.  I don't think anything else can be
6  tied to that, but all these things, because the
7  fact that I requested possible transfers, and I
8  said it's not urgent, I just need to plan ahead
9  kind of thing, and that immediately within half an
10 hour or so was made into a resignation, considered
11 a resignation based on words that I'm asked to
12 write.  Other than that, I can't think of anything
13 right now.
14     Q    Who within Camber discriminated against
15 you because of your age?
16     A    Who would think?
17     Q    No, who within Camber.
18     A    Oh, who within Camber discriminated
19 against me because of my age.  I mean, like I said,
20 I don't consider jokes to be discrimination quite
21 frankly.  I mean, some people do, but I don't
22 because, you know, like they say, words can't hurt

256

1  you, right?  What is that -- sticks and bones can
2  break your back, but -- break your bones but words
3  can't hurt you or something?  So that's why I
4  think, you know, I just let it go, even if they
5  meant it wrongly, but I just take it as a joke, but
6  I can't recall anything that specifically was
7  hurtful or harassing because of age, you know.
8      Q    Are you contending your discharge was
9  because of your age?
10     A    I think it's a strong possibility.
11     Q    Based on what?
12     A    Based on the fact that I was the oldest
13 and highest salaried employee, as I was told.  The
14 oldest I'm not totally sure.  I'm just -- it's just
15 an assumption on my part.  But I'm very close to
16 the oldest I think if I'm not the oldest.  So just
17 the fact that I was abruptly terminated in the
18 middle of an FMLA, and then basically just planning
19 -- or just a suggestion I made was considered a
20 resignation, you know.  So again, I don't know if
21 it was age or disability or both.
22     Q    Well, your transfer request had nothing

**257**

1  to do with your age, correct?
2  **A   I don't know.**
3  Q   Well, you didn't -- I mean, you didn't
4  make the transfer request because of your age; is
5  that right?
6  **A   I didn't make the request because of my**
7  **age, no.**
8  Q   There was no discussion about your age in
9  discussing the transfer request.
10  **A   Yeah, I don't recall any discussion about**
11  **the age, yeah, but what they felt about it I don't**
12  **know.  In other words, what was the motivation for**
13  **this strange chain of events where an e-mail I sent**
14  **is -- it is -- they asked me to rewrite it and then**
15  **use that as a resignation letter, you know?  So to**
16  **me, I don't know if it was age or disability or**
17  **what it was, but it was some kind of adverse**
18  **action, you know.**
19  Q   So your evidence is that the sequence of
20  events after you sent your letter requesting a
21  transfer that ended in your termination; is that
22  right?

**258**

1  **A   Uh-huh.**
2     MR. STERN:  Objection as to form
3  regarding evidence.  Mr. Pai is not a party to the
4  case and is not the plaintiff in the case.
5  BY MR. ORTBALS:
6  Q   That's the basis for your belief, is the
7  sequence of events from when you requested a
8  transfer on September 8th, 2014 to the end of your
9  employment, correct?
10  **A   October 31st, yeah, right, right, yeah,**
11  **that's a strange sequence of events, and also the**
12  **fact that I was FMLA at the time, and they could**
13  **have at least have waited until FMLA is completed**
14  **so -- they could have waited 'til the FMLA was**
15  **completed.  So FMLA's 12 weeks.  So they discharged**
16  **me in the third week, or they sent me the letter in**
17  **the third week, so the FMLA had just started.**
18     **So that's why it's such a strange chain**
19  **of events, and I want to know -- I mean, I'm just**
20  **curious why it happened.**
21  Q   What does FMLA have to do with your age?
22  **A   Oh, it talks specifically about age,**

**259**

1  **probably nothing, yeah.  Yeah, all I'm saying is**
2  **the termination was during FMLA, which was the most**
3  **serious thing than not during FMLA, so if they --**
4  **it looks like maybe they thought I was too old to**
5  **fight back.**
6  Q   Did Lisa Thompson ever make any
7  derogatory comments about your son's disability?
8  **A   No, I can't think of any, no.**
9  Q   Did you ever discuss your son's
10  disability with Lisa Thompson?
11  **A   Except for sending the medical documents**
12  **that she requested, I think -- and of course the**
13  **fact that he was in the hospital, he was disabled**
14  **and all that, so those kind of things.  Not -- not**
15  **other than that, no.**
16  Q   Well, you talked about that with Atif.
17  **A   Uh-huh.**
18  Q   And you sent in your FMLA paperwork.  You
19  don't know if that went to Lisa or not; is that
20  right?
21  **A   Beg your pardon?**
22  Q   You don't know -- you don't know if your

**260**

1  FMLA paperwork went to Lisa or not; is that right?
2  **A   Yeah, it probably went to Deborah --**
3  **Deidra Martin actually, yeah.**
4  Q   So did you talk to Lisa Thompson about
5  your son's disability at all?
6  **A   I don't recall.  I don't recall, no.**
7  Q   Did Lisa Thompson ever make any
8  derogatory comments about your age?
9  **A   No.  See, the point though is people may**
10  **not make comments but people may -- their actions**
11  **may speak louder than words, right?**
12  Q   Did -- did you ever talk about your son's
13  disability with Sudhakar?
14  **A   I don't believe that -- I don't believe**
15  **so.  He was really new actually.  He was just there**
16  **for -- we had a brief overlap for couple of months**
17  **I think.  Maybe three or four months, something**
18  **like that.**
19  Q   Did Sudhakar ever make any comments about
20  your age?
21  **A   No.  Again, I don't remember, and if he**
22  **just made humorous comments, I would not even worry**

Transcript of Ashok Pai
Conducted on March 26, 2018

261

1  **about it, so I don't -- I won't even remember that.**
2      Q   Did you ever talk about your son's
3  disability with Adesh Jain?
4      **A   No.  I hardly had a chance to talk to**
5  **him.  He was -- he was not talking much -- I mean,**
6  **he was like a -- he was like a very quiet man too,**
7  **and I would see him like once in three months or**
8  **something, or maybe even less frequently than that.**
9      Q   And Adesh Jain never made any comments
10  about your age?
11      **A   Not that I can recall.**
12      Q   Are there any other reasons that we
13  haven't talked about that cause you to believe that
14  your son's disability had something to do with the
15  end of your employment?
16      **A   Any other reasons.  I'm sorry, can you**
17  **repeat that question?**
18      Q   Is there anything else that happened that
19  we haven't already talked about --
20      **A   Uh-huh.**
21      Q   -- that caused you to believe that your
22  son's disability had something to do with the end

262

1  of your employment?
2      **A   Anything that we haven't talked about.**
3  **See, I don't know it even happened, so I cannot**
4  **think of anything at this moment, but -- so what**
5  **you're saying is whether -- what was the cause and**
6  **effect relationship between the disability and the**
7  **termination, right?**
8      Q   I'm just asking what if -- if we've
9  talked about everything in your personal knowledge.
10      **A   Uh-huh.**
11      Q   You know, I understand that you don't
12  know everything that necessarily happened in a
13  management level --
14      **A   Right.**
15      Q   -- because you're not part of that --
16      **A   Right.**
17      Q   -- discussion necessarily.
18      **A   Uh-huh.**
19      Q   I just want to know if we've covered
20  everything within your knowledge about the reasons
21  why you believe that your son's disability had
22  something to do with the termination of your

263

1  employment.
2      **A   I really don't know how to answer that**
3  **question, because have we covered everything is a**
4  **very, very general statement, and I really don't**
5  **know the answer to that question, because when you**
6  **say have we really covered everything, it's a very**
7  **wide question.**
8      Q   Well, let me -- I mean, you wouldn't
9  identify who you've thought were discriminatory
10  actors, so tell me who it was that discriminated
11  against you.
12      **A   No, I'm simply going from the actions,**
13  **you know.  I'm not going by the words.  Like I**
14  **said, I'd heard some comments several times,**
15  **humorous comments about the age, and I did not hold**
16  **them -- hold it against them, but I'm only going by**
17  **the action that resulted in this termination.  So**
18  **I'm just trying to make sense out of that, and the**
19  **fact is this chain of events started shortly after**
20  **my son's disability was -- was revealed, you know?**
21  **So I'm just trying to make sense out of that.  As**
22  **to who or -- who exactly did what, I don't know,**

264

1  **but the fact was that I was terminated, yeah.**
2      Q   How often did you interact with Atif at
3  Camber?
4      **A   It varied.  He had several meetings where**
5  **he addressed the whole project, and then personal**
6  **meetings were very rare.  I remember we might meet**
7  **in the hallway or something, but where -- where I**
8  **specifically asked to meet with him were very, very**
9  **rare.  So I mean, very, very -- you know, they're**
10  **not on a cycle or anything like that, you know?  So**
11  **once in a way, if it's something changing, some**
12  **announcement he has or something like that, you**
13  **know.**
14      Q   What was your relationship like with
15  Atif?
16      **A   Well, "Atif Khalil" means compassionate**
17  **friend, okay, and always regard him as a**
18  **compassionate friend because he speaks very nicely**
19  **and he's very supportive in his words.  So this**
20  **really came as a shock because of that, you know?**
21  **So my image of him is -- and you know, I don't know**
22  **what led up to this because there was a transition**

Transcript of Ashok Pai
Conducted on March 26, 2018

72 (285 to 288)

285

1     A    Yeah, I believe I did, yeah, yeah.
2     Q    And you wrote this on February 29th,
3  2016.
4     A    Yeah, and the time is 2:12 a.m.
5     Q    Well, were you intending to accurately
6  convey to the EEOC your -- your position?
7     A    I was intending to, but I'm not sure I
8  did.  Yeah, but -- but the next -- next one may
9  throw some light on it, you know.
10    Q    Well, let's --
11    A    This one, yeah, I -- I -- it's a little
12  bit of a mystery why I said all that there, but I
13  think at that point I was kind of worried about the
14  situation, that I was the highest paid and I've
15  been terminated, because from a qualification,
16  certification and experience would not justify the
17  termination, and I believe my performance didn't
18  either, but I was trying to understand why, you
19  know?  So -- so I was just --
20    Q    And why -- why does it matter for
21  purposes of your discrimination claim --
22    A    Uh-huh.

286

1     Q    -- that there was a disagreement between
2  you and Camber about project design in terms of
3  using SharePoint versus Dot Net?
4     A    Well, Camber wanted to use less expensive
5  employees which are young and all that, you see,
6  because usually older employees are more expensive.
7  That's one thing.  Camber wanted to use less
8  expensive employees, because that happened after
9  the transition over to Camber, you know, because
10  other than one incident with the SharePoint
11  conference, I didn't have any problems with -- with
12  Avaya.  Avaya was smooth.
13         After Camber's influence started in
14  January I believe -- actually, started end of 2013
15  but became stronger January onwards and become
16  official March 31st, you know, that was the time
17  they said I can't go to the conference and stuff
18  like that.  So that is this -- that is the
19  beginning, as far as I know, of, you know, these
20  problems, you know.  So I'm just saying that Camber
21  wanted younger, cheaper employees.
22    Q    Well, you don't say anything about

287

1  younger employees.
2     A    Yeah, I said cheaper.
3     Q    You just say less expensive.
4     A    Yeah, less expensive, exactly.  So you're
5  right, I probably should have said younger,
6  cheaper, but I just said less expensive, yeah.
7     Q    Well, you don't have any basis for saying
8  younger other than --
9     A    Cheaper.
10    Q    -- you presume that younger employees are
11  cheaper.
12    A    Right, right, right, that would have been
13  my thought process at the time, but -- yeah.
14    Q    In other words, nobody at Camber ever
15  said we're bringing in less expensive employees
16  because of their age, because they're younger.
17    A    No, I can't recall anybody saying that,
18  but the point is they were planning to do away with
19  some of the more expensive complicated things like
20  SharePoint and try to go with the cheaper stuff,
21  you know?  And you can get very young employees
22  straight out of college to do Dot Net.  That's one

288

1  thing.  SharePoint is harder, you know?  So that's
2  -- that's part of the issue I think.  So yeah, I
3  kind of jumped to a conclusion there perhaps, but I
4  don't know.  Yeah, anyway, and the next -- next
5  section though is about the disability, you know.
6  I had to ask for leave without pay and --
7     Q    Well, the next -- the next section's
8  about your FMLA leave; is that right?
9     A    Full, yeah, yeah, yeah.
10    Q    And I think we've already covered your
11  testimony on all of that.
12    A    Right, right, yeah, yeah, yeah.  Can I
13  break, since we've not started a question yet?
14         MR. ORTBALS:  Yeah, absolutely.
15         THE WITNESS:  Okay, thank you.
16         THE VIDEOGRAPHER:  We're going off the
17  record.  The time is 3:44 p.m.
18         (Recessed at 3:44 p.m.)
19         (Reconvened at 3:51 p.m.)
20         (Deposition Exhibit Number 20 was marked
21  for identification.)
22         THE VIDEOGRAPHER:  Here begins Disk

Transcript of Ashok Pai
Conducted on March 26, 2018

289

1 Number 4 in the videotaped deposition of Ashok Pai.
2 The time on the video monitor is 3:51 p.m., and we
3 are back on the record.
4 BY MR. ORTBALS:
5    Q    Back on the record after a short break.
6 I'll remind you, Mr. Pai, you're still under oath.
7 The court reporter's handed you what's been marked
8 Pai Deposition Exhibit 20, and the first two pages
9 of this exhibit are an April 7th, 2016 response
10 from you to the EEOC investigators, some additional
11 questions that he had; is that correct?
12    A    Yes, yeah.
13    Q    And your responses are on page -- the
14 first two pages of this exhibit in bold?  Yes?
15    A    Yeah, those are my responses, yeah.
16       (Deposition Exhibit Number 21 was marked
17 for identification.)
18 BY MR. ORTBALS:
19    Q    The court reporter's handed you what's
20 been marked Deposition Exhibit Pai 21, and this is
21 another e-mail chain between you and the EEOC
22 investigator; is that correct?

290

1    A    So there is just the extra piece at the
2 beginning.  That's it, right?  Following up on my
3 last e-mail, because everything else is probably
4 the same as this one.
5    Q    It looks like you added in some
6 additional information in some of your responses.
7    A    Oh, yeah, yeah, you're right, yeah, yeah.
8    Q    You designated in a parenthetical more --
9    A    Yeah, more detail, yeah.
10    Q    More detail later?
11    A    Yeah.
12    Q    And it looks like, if you go into your
13 answers where you've added more information, you've
14 dated it in a parenthetical April 10th, 2016?
15    A    Yeah, exactly, yeah, that's it, yeah.
16    Q    One question that I do have is on the
17 second page of Exhibit 21, under the question 2,
18 list the dates you were out of work on leave of any
19 type and why from September 1st to September 23rd,
20 2014, you added dates with respect to your son's
21 hospitalization and your travel to California.  Is
22 that right?

291

1    A    Your son is hospitalized, travel to
2 California, return to work September 8th, six days,
3 I don't believe I took any further leave, yeah,
4 that's right.
5    Q    Do you know what you did to confirm these
6 dates that you wrote in Exhibit 21?
7    A    You're talking about the "On further
8 checking," that paragraph?
9    Q    Right.
10    A    My son was hospitalized on August 28th, I
11 traveled to California on 29th, returned to work on
12 September 8th.  Oh, so you're asking what other
13 checking I did?
14    Q    Yeah, I'm just asking how did you -- how
15 did you determine that these were the dates for
16 this --
17    A    It was mostly by --
18    Q    -- for your son's hospitalization and
19 travel?
20    A    -- talking to my wife, who has a
21 photographic memory.
22    Q    Oh.

292

1    A    She has amazing memory, which gets me in
2 trouble quite a lot, so -- so she knows -- she
3 knows this day.  She can tell you which day of the
4 week it was and everything.  She can go by 44
5 years, yeah.
6    Q    Does your wife literally have a
7 photographic memory or --
8    A    I don't know.  Selectively.  Yeah, she's
9 a financial planner, yeah.
10    Q    So you think that -- that these dates
11 came from your wife.
12    A    For the most part, yes.  I don't know,
13 might have seen the e-mails, but it's hard to see
14 e-mail about when I traveled, you know, because the
15 travels and all I don't document like that, so I
16 think mostly my wife.
17    Q    You're currently employed by MUFG Bank;
18 is that right?
19    A    Yeah, Union Bank, yeah.
20    Q    How did you learn about that job
21 opportunity?
22    A    I was -- they called me actually, yeah.