# EXHIBIT  B

Transcript of Atif Khalil
Conducted on March 27, 2018

1 (1 to 4)

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
 2               EASTERN DISTRICT OF VIRGINIA
 3                   ALEXANDRIA DIVISION
 4
 5   UNITED STATES EQUAL          :
 6   EMPLOYMENT OPPORTUNITY       :
 7   COMMISSION,                  :
 8            Plaintiff,   :  Case No. 17-cv-01084
 9         v.               :
10   CAMBER CORPORATION,          :
11            Defendant.    :
12   - - - - - - - - - - - - - - x
13
14        Oral Deposition of ATIF KHALIL
15            Tysons Corner, Virginia
16            Tuesday, March 27, 2018
17                 9:27 a.m.
18
19
20   Job No.:  179322
21   Pages:  1 - 174
22   Reported By:  Rebecca Stonestreet
```

**Page 2**

```
 1        Oral Deposition of ATIF KHALIL, held at
 2   the offices of:
 3
 4
 5        PLANET DEPOS - TYSONS CORNER
 6           8270 Greensboro Drive
 7           Suite 110
 8           Tysons Corner, Virginia  22102
 9           (888) 433-3767
10
11
12
13
14        Pursuant to notice, before
15   Rebecca Stonestreet, Notary Public in and for the
16   Commonwealth of Virginia.
17
18
19
20
21
22
```

**Page 3**

```
 1              A P P E A R A N C E S
 2
 3   ON BEHALF OF PLAINTIFF:
 4           JEFFREY A. STERN, ESQUIRE
 5           U.S. EQUAL EMPLOYMENT
 6           OPPORTUNITY COMMISSION
 7           Cleveland Field Office
 8           AJC Building
 9           1240 East Ninth Street
10           Suite 3001
11           Cleveland, Ohio  44199
12           (216) 522-7458
13
14   ON BEHALF OF DEFENDANT:
15           ROBERT L. (BOB) ORTBALS, JR., ESQUIRE
16           CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
17           7733 Forsyth Boulevard
18           Suite 1325
19           St. Louis, Missouri  63105
20           (314) 925-7278
21
22
```

**Page 4**

```
 1              C O N T E N T S
 2
 3   EXAMINATION OF ATIF KHALIL          PAGE
 4      By Mr. Stern                       7
 5
 6              E X H I B I T S
 7           (Attached to transcript.)
 8
 9   KHALIL DEPOSITION EXHIBITS          PAGE
10   Exhibit 1   Ashok Pai Chain of Command    25
11   Exhibit 2   Document Bates labeled
12               CAMBER 000099                 38
13   Exhibit 3   E-mail dated 9/8/14 from
14               Ashok Pai to Atif Khalil      52
15   Exhibit 4   E-mail dated 9/8/14 from
16               Ashok Pai to Atif Khalil      58
17   Exhibit 5   E-mail string                 65
18   Exhibit 6   E-mail dated 9/9/14
19               with attachment               69
20   Exhibit 7   E-mail dated 9/16/14
21               with attachment               77
22   Exhibit 8   E-mail string                 84
```

Transcript of Atif Khalil
Conducted on March 27, 2018

5 (17 to 20)

17

1 documents, and then there was this lawsuit
2 document or some legal document.
3    Q  Anything else?
4    A  So e-mails and the lawsuit document.  I
5 don't recall anything else.
6    Q  And then you and Bob talked after that?
7    A  Correct.
8    Q  When was that?
9    A  So we talked a couple of times.  The last
10 conversation was last week.
11    Q  What did you say in these conversations?
12    A  We discussed the details, the e-mails,
13 and, you know, kind of trying to -- since it's
14 been four years or almost four years, trying to
15 recall the events that occurred.
16    Q  Did your recall of the events that
17 occurred, did that recall improve as a result of
18 that conversation?
19    A  I believe so.
20    Q  The e-mails that you just referenced,
21 those were e-mails that you had seen while you
22 were working at Camber?

18

1    A  That's correct.
2    Q  Have there been any documents that you
3 referred to, other than the e-mails, that were
4 after you left Camber?
5    A  No.  Other than the legal -- the lawsuit
6 document - I'm not sure if that's what it's
7 called - I don't think I saw anything else.
8    Q  Had you seen the lawsuit document before?
9    A  No.  I had seen some EEOC letter.  I don't
10 think I saw this detailed document before.
11    Q  When did you leave Camber?
12    A  January 2017.
13    Q  And you had already obtained your current
14 employment?
15    A  Yes.  So I turned in a two-weeks' notice.
16    Q  And you started with Camber in March 2014,
17 with Camber?
18    A  Oh, March 2014 with Camber; prior, Avia.
19    Q  And previously you had worked on the same
20 project at the same facility under Avia?
21    A  That's correct.
22    Q  And had you worked on that project before

19

1 Avia?
2    A  No.
3    Q  How did you get the position with Avia?
4    A  So I was working for Avia for supporting
5 another contract program for the Postal Service,
6 and this opportunity came up and I transferred to
7 this opportunity.
8    Q  And this opportunity was working for Avia
9 on a project at the Department of Justice?
10    A  Correct.  So I was already an Avia
11 employee supporting -- managing some
12 Postal Service contracts, so I moved to the
13 Department of Justice.
14    Q  And the unit of the Department of Justice
15 was the Executive Office of Immigration Review?
16    A  Correct.
17    Q  That's in Falls Church.  Is that --
18    A  Correct.
19    Q  So if then throughout today's deposition I
20 sometimes refer to EOIR, you understand that's
21 EOIR?
22    A  Okay.

20

1    Q  Have you heard that expression before,
2 calling it EOIR?
3    A  No, we always called it E-O-I-R.
4    Q  But you understand if I say EOIR, it's
5 E-O-I-R?
6    A  Okay.
7    Q  Now, you mentioned with the Postal
8 Service, it was to support a project that they
9 had?
10    A  Correct.
11    Q  What was the project at EOIR that you were
12 working on on behalf of Avia when you started on
13 that project?
14    A  So it was a software development project
15 building case management solutions for immigration
16 courts that were managed by EOIR.
17    Q  And approximately how many Avia employees
18 were working under your responsibility on that
19 project?
20    A  So our team was -- the size fluctuated.
21 50 to 60, somewhere in there.  Not all of them
22 were my direct reports.  We had a hierarchy.  But

Transcript of Atif Khalil                    6 (21 to 24)
Conducted on March 27, 2018

---

21

1 total team size on the program was 50 to 60.
2    Q  And in March 2014, the ownership changed
3 from Avia to?
4    A  Camber.
5    Q  Camber.  Still supporting the same project
6 at EOIR?
7    A  Correct.
8    Q  You mentioned some of the team members
9 were direct reports and some were not?
10    A  Correct.
11    Q  Were they all Avia or Camber employees
12 you're referring to, or --
13    A  So we had some subcontractors.
14    Q  What's the difference between Avia or
15 Camber employees and the "some subcontractors"?
16    A  So we were all part of the same team.
17 Avia employees were W-2, full-time, regular
18 employees, and then we had subcontractors that
19 were part of our team that didn't have a direct
20 contract with EOIR, but came through the Avia
21 contract.
22    Q  So you had contractors, but these were

---

22

1 contractors that worked for -- that weren't paid
2 by Avia or Camber, but they worked on the same
3 project.  Is that --
4    A  So we had -- so we hired employees.  We
5 had some relationships with staffing agencies,
6 companies that did like a temp to perm, so they
7 would find us candidates that would work for --
8 you know, join our team, work on our project, but
9 they would be the staffing firm's employee.  If I
10 recall correctly, they were like six month temp to
11 perm.  So for the first six months they were their
12 employee, and then they would convert to Avia or
13 Camber employees.
14    Q  Did the staffing firms that you just
15 discussed, did they provide you - and by "you," I
16 mean Avia or Camber on the EOIR project -
17 candidates just for these contract or temp to
18 perm, or did they also provide candidates for
19 hire; as you described, W-2 employment?
20    A  Some may have provided candidates for
21 hire.  Some candidates didn't want to go through
22 that process of being a temp to perm, so we would

---

23

1 hire them directly.  So it was kind of a mix.
2    Q  Compare and contrast the role of a Camber
3 recruiter compared to these staffing agencies that
4 you just discussed.  How were they alike and how
5 were they different?
6    A  They did the same job, it's just -- you
7 know, they all reach out to potential candidates,
8 engage, and then identify and present them to us.
9 Pretty much the same job.
10    Q  Now, what role, if any, did you have in
11 getting either a staffing agency or a recruiter
12 involved when you had a need for staff, whether
13 W-2 employees or these subcontractors?  What was
14 your role in getting the recruiter or the staffing
15 agencies involved?
16    A  So I would, you know, initiate the job
17 requirements, and if I recall correctly, our
18 process was to prefer letting our internal
19 recruiters identify employees.  So we always did
20 that first, and then if that didn't get us the
21 results, didn't get us the candidate that we were
22 looking for, then we would kind of expand our

---

24

1 search by reaching out to some of these staffing
2 agencies.
3    Q  And how would you become informed that the
4 internal recruiter efforts were not working out
5 and that there was a need to go to a staffing
6 agency?  How would you learn that?
7    A  Timing.  So I would send them requirements
8 and wait, you know, a day, two days, a week,
9 two weeks.  And likely we would get some
10 candidates that we would screen, and if we felt
11 like we weren't finding the right candidate that
12 met the requirements, then we would expand the
13 search and reach out to other -- these agencies.
14    Q  What did you call the position that you
15 had on the EOIR project?
16    A  Program manager.
17    Q  And what positions were immediately under
18 you on that project?
19    A  Project managers, software development
20 manager, quality assurance manager, operations
21 manager.
22    Q  Those managers would report to you

---

Transcript of Atif Khalil

Conducted on March 27, 2018

7 (25 to 28)

25

1  directly?

2  **A  Correct.**

3      MR. STERN: I'm going to be handing to the

4  court reporter to label document Pai 000517.  I

5  guess we'll call this Khalil Deposition Exhibit 1.

6      A copy to counsel.

7      (KHALIL Exhibit 1 was marked for

8  identification and attached to the transcript.)

9      Q  Mr. Khalil, have you looked at the

10 document labeled Exhibit 1 to your deposition?

11 Let me know when you're done reading and then

12 we'll talk about it briefly.

13 **A  Okay.**

14     Q  Have you ever seen document Exhibit 1 to

15 your deposition before this morning?

16 **A  No.**

17     Q  Let's start at the top of it, "Ashok Pai

18 Chain of Command."  Who was or is Ashok Pai?

19 **A  I don't know how to answer that.**

20     Q  Let's start it this way.  When is the

21 first time you met Mr. Pai?

22 **A  During the interview process, when he came**

26

1  **to us as a candidate.**

2      Q  The "us," meaning Avia?

3  **A  Yes.**

4      Q  You were there at the interview?

5  **A  I don't recall exactly.**

6      Q  Do you recall if there was an interview

7  board of multiple people of which you were one?

8  **A  So we typically did group interviews.  So**

9  **we had a lot of candidates come through, and I was**

10 **part of most of the interviews.**

11     Q  Sitting here today, do you have any reason

12 to doubt that you interviewed Mr. Pai?

13 **A  No.**

14     Q  And what was the outcome of Mr. Pai's

15 application and the interview?

16 **A  He succeeded, so that must have been why**

17 **we hired him.**

18     Q  And Mr. Pai continued to work on the EOIR

19 project under Avia, and continued, starting

20 March 2014, when Camber became the owner on that

21 project?

22 **A  Correct.**

27

1      Q  Let's return to the first part of this,

2  the top that we were discussing.  And it says,

3  under "Chain of Command" there, "through Pai's

4  employment to October 31st, 2014."  That's when

5  Mr. Pai's employment with Camber ended?

6  **A  Correct.**

7      Q  The first name at the top of that

8  immediately following list is Michael Paige,

9  Senior VP.  Who is Michael Paige?

10 **A  Our senior vice president.**

11     Q  And the "our," you mean Camber?

12 **A  Avia and Camber.**

13     Q  And the name immediately under Mr. Paige

14 is?

15 **A  So I can't recall if Michael Paige came to**

16 **Camber, but he was definitely there for Avia.  I**

17 **can't recall if he -- because he did transition**

18 **out at some point.  I can't recall if he**

19 **transitioned out when Camber acquired or sometime**

20 **after that.**

21     Q  And under his name, again at the top of

22 this exhibit, is Adesh Jain, VP?

28

1  **A  Correct.**

2      Q  That's the same Adesh that we discussed

3  before?

4  **A  Correct.**

5      Q  And you are listed as center director

6  underneath Mr. Jain?

7  **A  Except my first name is spelled**

8  **incorrectly. A-T-I-F instead of L.**

9      Q  Oh, on the document it says A-T-I-L --

10 **A  Correct.**

11     Q  -- and not A-T-I-F.  I understand.

12     You were the center director?

13 **A  Yes, my title was center director, but my**

14 **function on the EOIR program was program director.**

15     Q  In your mind, is there any difference in

16 your work as center director or program manager?

17 **A  No.**

18     Q  And then who is listed right under you?

19 **A  Sudhakar Nallamothu.**

20     Q  And was his title or job at that time -

21 meaning through October 31st, 2014, we're still

22 talking the top of the exhibit - technical project

Transcript of Atif Khalil
Conducted on March 27, 2018

41

1  document was represented as persons who did so,
2  but you would know.
3  **A   Sure.  So just go down the list in the**
4  **second column?**
5  Q   Yes.  Are any of those people on that list
6  unknown to you, didn't work at EOIR?
7  **A   So I do recognize most names.  A couple of**
8  **names that I can't recall.**
9  Q   What's the first one you don't recall?
10 **A   Sergey Goryestov.**
11 Q   Okay.  That's towards the bottom there,
12 left-hand column, employee number 8421?
13 **A   Yeah.  And it's likely — it's quite**
14 **possible that I just forgot.  And the only other**
15 **name I think is the second to the last, Kelly**
16 **Steigerwald.  It's quite possible that I just**
17 **forgot their name, forgot them; they weren't there**
18 **for too long or something.**
19 Q   Is there anyone that you recall being on
20 the project whose name is not on this list, the
21 backside of that one?
22 **A   I couldn't tell you off the top of my**

42

1  **head.**
2  Q   Is there anything on this document, this
3  exhibit, that informs whether any of these
4  individuals are W-2 employees or the
5  subcontractors you had described generally?
6  **A   Not that I can think of.**
7  Q   Let's try it this way.  Is there any name
8  example - you don't even have to look at the chart
9  on this one - of a subcontractor employee that you
10 had generally mentioned earlier?
11 **A   I would have to go back and look at my —**
12 **you know, the org chart or something to...I can't**
13 **recall a specific name.  There were so many people**
14 **over so many years.**
15 Q   The column to the right of the second
16 salary column towards the middle there, there's
17 something called GLC.  Do you know what that is?
18 **A   Labor category.  I don't readily recognize**
19 **the information there.**
20 Q   Other than Sergey Goryestov and
21 Kelly Steigerwald that you had mentioned you
22 didn't recall, is there anything on the list, any

43

1  employees that you don't recall other than those
2  two?
3  **A   So Daniel Kovarik, like towards — the**
4  **sixth or so from the bottom.  I think I recognize**
5  **everybody else.  And it's quite possible that I**
6  **know them, I've just forgotten their names.**
7  Q   Understood.  A couple of columns to the
8  right of the "Supervisor" column is a column,
9  header "Type," populated, it looks like, by Rs and
10 a couple of Ps.  Do you know what R and P mean?
11 **A   No.**
12 Q   Now, Mr. Pai that we have been discussing
13 is towards the top here.  It looks like, what,
14 about ten names down, nine or ten?
15 **A   Uh-huh.**
16 Q   Yes?
17 **A   Yes.**
18 Q   Employee ID 8197 on the left side?
19 **A   Uh-huh.  Yes.**
20 Q   Surname Pai, Ashok K.?
21 **A   Correct.**
22 Q   His hire date is listed 3/31/14, yes?

44

1  **A   Yes.**
2  Q   And that was the effective date of
3  Camber's acquiring this project?
4  **A   Correct.  Correct.**
5  Q   Term date, two columns over, October 31st,
6  2014.
7  **A   Correct.**
8  Q   Correct?
9     And the supervisor column,
10 Paige/Jain/Khalil/Nallamo, and it's the same as
11 what he had on the top of Exhibit 1?
12 **A   Correct.**
13 Q   Gender, male.  M for male?
14 **A   Correct.**
15 Q   R, you don't know what the type is?
16 **A   No.**
17 Q   And the description column, it says
18 "Software/Systems Architect."  Do you agree or
19 disagree that that's a description of what Mr. Pai
20 was doing?
21 **A   Agree.**
22 Q   A few columns over, populated by numbers

Transcript of Atif Khalil
Conducted on March 27, 2018

45

1 with a dollar sign in front of it, first column
2 says "Salary at Hire," next column says "Current
3 Salary." Do you agree that $170,019.20 was salary
4 at hire for Mr. Pai?
5    **A Agree.**
6    Q And the same salary was his figure out the
7 door on his last day?
8    **A Agree.**
9    Q Was there any employee under your program
10 management or directorship -- that covers Avia and
11 Camber on this project. Was there anyone whose
12 salary at hire was more than 170,000?
13   **A Not -- I don't recall everybody's salaries**
14 **off the top of my head.**
15   Q Did you have any discussions with Mr. Pai,
16 including a remark by you, the gist of which that
17 he was making more than you?
18   **A I don't recall.**
19   Q Ever tell anyone that Mr. Pai was making
20 more than you?
21   **A Not that I recall. I usually don't**
22 **discuss people's salaries.**

46

1    Q You were Avia's top official, center
2 director or program manager, on this project for
3 Avia. Right?
4    **A Correct.**
5    Q Did you make the decision to hire Mr. Pai?
6    **A That's correct.**
7    Q How was the decision to hire him at the
8 170,000 figure, how was that made?
9    **A Just part of our routine process. We**
10 **screen, interview, identify the candidate as a**
11 **good fit, and we discuss salary, and basically**
12 **receive some paperwork and hire the candidate.**
13   Q Was there anyone above you as center
14 director/program manager on the EOIR project with
15 whom you discussed how much to offer Mr. Pai?
16   **A So my routine process was to present**
17 **profitability and share some numbers with Adesh,**
18 **and he would approve and we would move forward.**
19 **But we basically did the right thing for the**
20 **program to succeed.**
21   Q That was general practice that you just
22 told me about, or is that a recollection that you

47

1 have concerning Mr. Pai's hire?
2    **A General practice.**
3    Q Sitting here today, do you have any reason
4 to doubt whether you did or didn't follow your
5 general practice in connection with Mr. Pai's hire
6 at 170,000?
7    **A No.**
8    Q Any discussion, whether face to face, on
9 the telephone, e-mail, voicemail, messaging,
10 video, any communication at all with Mr. Jain
11 regarding Mr. Pai's compensation, either at time
12 of hire or thereafter?
13   **A Time of hire, as I said, I must have**
14 **discussed and gotten his approval agreement that**
15 **he wanted to hire Mr. Pai. I don't recall -- once**
16 **we made the decision and moved forward, I don't**
17 **recall having it come up specifically later on.**
18   Q What about generally later on? You said
19 you didn't recall specifically. What about
20 generally?
21   **A So we went through, you know, annual**
22 **reviews, so we may have reviewed it. I can't**

48

1 **recall how many annual reviews he went through.**
2 **Things along those lines.**
3    Q "He," Mr. Pai?
4    **A Mr. Pai.**
5    Q Reviews of Mr. Pai?
6    **A Correct.**
7    Q What was Mr. Jain's participation in
8 annual reviews of your subordinate team members?
9    **A So he was the approving authority, so he**
10 **had a much larger group that he oversaw. And so I**
11 **would manage, you know, my team's reviews, and we**
12 **usually would have some guidelines in terms of**
13 **salary revisions, and I would work on them within**
14 **those guidelines and present them to Adesh.**
15   Q How did you present those to Adesh?
16   **A Mostly via spreadsheets, via e-mail.**
17   Q And you had previously mentioned you
18 setting of the hire-at figure, as a general
19 matter, a review of profitability?
20   **A Uh-huh.**
21   Q Yes?
22   **A Yes.**

Transcript of Atif Khalil
Conducted on March 27, 2018

49

1  Q  That considered what the bill rate would
2  be to the customer?
3  **A  Correct.**
4  Q  Yes?
5     And compared that to what, among other
6  things, the pay rate to the employee?
7  **A  Correct.**
8  Q  Were there other things that went into
9  that comparison other than the bill rate to the
10 customer and the pay rate to the employee?  What
11 else went into profitability?
12 **A  The overall program profitability.**
13 Q  Other than these annual review
14 spreadsheets that you discussed, any other type of
15 document -- and that's a broad question.  It could
16 be something printed, it might be an XLS
17 spreadsheet or some other form of spreadsheet.
18 Other than the one for the annual review, was
19 profitability regarding Mr. Pai's work reported or
20 discussed with Mr. Jain by you, other than these
21 annual review spreadsheets?
22 **A  So no.  And so the annual reviews didn't**

50

1  **focus so much on the profitability, because we**
2  **focused on that at the time of hire.  And then we**
3  **tracked the overall program profitability in our**
4  **management reporting at the program level, not at**
5  **the individual level, and that was about it.**
6     **But during the subsequent annual reviews,**
7  **we didn't look at each individual employee and**
8  **their profitability.  That was only done at the**
9  **time of hire.**
10 Q  Any communication after Mr. Pai's hire
11 regarding his compensation or profitability for
12 his position up through October 31st, 2014?
13 **A  Not that I recall.  And I just didn't**
14 **focus on that granular level.  My focus was mainly**
15 **to run a successful program for the client.**
16 Q  Other than you and Mr. Jain, who else at
17 Camber would have participated in the
18 program-level profitability assessment after
19 Mr. Pai's hire through October 31st, 2014?  Who
20 were all the players in the profitability that you
21 mentioned is programmatic level, not the granular
22 level?

51

1  **A  Correct.**
2  Q  Okay.  Who all involved?
3  **A  My direct stakeholder was Adesh, and**
4  **assume he rolled it up and presented it to his**
5  **management.  But nothing directly.  I didn't have**
6  **another stakeholder that I directly discussed or**
7  **had to answer to.**
8  Q  During Mr. Pai's tenure with Camber, did
9  you receive any feedback on profitability of the
10 center you were directing?  And that's a very
11 broad question.  I understand it could be good
12 work, very good profitability, or let's improve
13 this, or too much cost.
14 **A  No.  So my recollection was it was always**
15 **within the acceptable threshold, and I don't**
16 **recall any event where somebody said, "Great job,**
17 **here's a bonus for you;" or somebody said, "Hey,**
18 **you're not meeting the minimum, do something about**
19 **it." Nothing along those lines.  I recall within**
20 **that period it was within range, so that wasn't a**
21 **focus.**
22    MR. STERN:  Unless there's an objection, I

52

1  would like to take about ten minutes now.  Does
2  that work for everyone?
3     MR. ORTBALS:  Sounds great.
4     (Recess taken at 10:40 a.m.)
5  Q  Mr. Khalil, I'll remind you you're still
6  under the affirmation of perjury that you accepted
7  at the beginning of the deposition.
8  **A  Okay.**
9  Q  That doesn't stop when there's a break.
10 **A  Okay.**
11 Q  It picks right up.
12    MR. STERN:  All right.  We're going to
13 talk about some e-mails next.  So the first one
14 I'll hand the reporter to mark, I guess this will
15 be 3, is EEOC document 21.
16    The record can reflect I'm handing one to
17 counsel.
18    (KHALIL Exhibit 3 was marked for
19 identification and attached to the transcript.)
20 Q  Let me know when you've read it and we'll
21 talk about this.
22 **A  Okay.**

Transcript of Atif Khalil

Conducted on March 27, 2018

53

1    Q  Exhibit 3 to your deposition is an e-mail
2  from Ashok Pai at EOIR to you, Monday,
3  September 8th, 2014, 9:33 a.m.; Subject:
4  Exploring transfer possibilities.
5    **A  Okay.**
6    Q  Is this one of the e-mails that you
7  reviewed recently?
8    **A  I believe so, yeah.**
9    Q  Your office at EOIR was at the same
10  facility that Mr. Pai was working?
11   **A  Yes.**
12   Q  Same floor?
13   **A  Yep.**
14   Q  He wrote he came over a couple of times to
15  your office that morning.  That's September 8th,
16  yes?
17   **A  Yes.**
18   Q  He writes next: "My son's hospitalization
19  has emphasized the need for me to be nearer to my
20  family, and although it's not urgent, I need to
21  plan for it."
22      Yes?

54

1    **A  Yes.**
2    Q  Was your reading of this e-mail on the
3  morning of September 8th, was that the first time
4  you had learned about Ashok Pai's son's
5  hospitalization?
6    **A  So I can't recall exactly, but I know that**
7  **it was right around that time.  Shortly before**
8  **this e-mail, I had not known his son's condition**
9  **for a long time.**
10   Q  You just told me you hadn't known about
11  the son's condition, and then you mentioned "for a
12  long time."  Was there some earlier time before
13  September 8th when you had learned about his son's
14  condition?
15   **A  So my recollection is that when he talked**
16  **about transfer was the first time he told me about**
17  **his son's condition.  So he may have – the way**
18  **this e-mail reads, you know, I kind of read that**
19  **maybe I had known about his son's – he may have**
20  **mentioned his son's hospitalization to me, but not**
21  **the details.  My recollection is that when I met**
22  **with him face to face is when I first learned**

55

1    **about his son's condition, when we were discussing**
2    **his transfer out of the EOIR program.**
3    Q  Now, you characterized that.  You said
4  discussing his going out of the program?
5    **A  Transferring out of the program.**
6    Q  Does the first sentence in this exhibit,
7  immediately following, "Hi Atif, came over a
8  couple of times to explore possibility of
9  transferring within Camber," does that mention the
10  program at all?
11   **A  No.  So that is my assumption, that**
12  **program was local to that location, so there was**
13  **no transfer possibilities within Camber and within**
14  **the program.  It would have to be out of the**
15  **program.**
16   Q  But that's not what Mr. Pai wrote in that
17  sentence of this exhibit to your deposition.
18   **A  Okay.**
19   Q  Did -- let me take a look at Exhibit 1
20  here.
21      Did Sudhakar ever indicate to you that he
22  had received a phone call from Mr. Pai where his

56

1  son's condition was mentioned?
2    **A  Not that I recall.**
3    Q  Did you ever receive a phone call from
4  Mr. Pai about his -- where he mentioned his son's
5  hospitalization?
6    **A  I can't recall.**
7    Q  Did anyone on your project share with you
8  that they had received a phone call from Mr. Pai
9  about his son's hospitalization?
10   **A  So we had a large team, lots of**
11  **conversations happening.  I cannot recall**
12  **specifically.**
13   Q  What about in general?
14   **A  I mean, you know, we had people calling in**
15  **sick, or, you know, requesting scheduled leave,**
16  **unscheduled leave.  It's just a lot of -- I just**
17  **don't recall the specific...**
18   Q  Returning back to this exhibit, the e-mail
19  of September 8th at 9:33 a.m. to you, Mr. Pai goes
20  on to discuss his taking courses in areas of
21  information security, completing two
22  certifications.  That's the third paragraph.  Next

Transcript of Atif Khalil
Conducted on March 27, 2018

15 (57 to 60)

57

1  he narrates he tried before hard to find jobs in
2  security.
3        Towards the bottom, he narrates, "Times
4  have changed.  There's a huge emphasis in cyber
5  security."  He mentions the CEO, John Lord -- that
6  was the CEO of Camber at the time.  Correct?
7      **A  Yes.**
8      Q  -- came here in March.
9        Did you attend any conference, meeting,
10  speech by Mr. Lord where he made major points of a
11  new proposal in cyber security at that time?
12    **A  I must have attended, but I don't recall**
13  **that being the focus of that talk.**
14    Q  Mr. Pai's e-mail in this exhibit ends:  So
15  I want to explore the possibility of supporting
16  cyber security proposals for Camber and being able
17  to reunite with his family.  Yes?
18    **A  Yes.**
19    Q  Now, what steps, if any, did you take to
20  explore possibilities of Mr. Pai supporting cyber
21  security proposals for Camber?
22    **A  I could not take any steps.  This was not**

58

1  **within my purview to take any steps or offer him**
2  **any opportunities along these lines.**
3    Q  After you read this e-mail when you
4  received it on September 8th, what did you do?
5    **A  So my recollection is that we had a**
6  **conversation.  I don't know if I read the e-mail**
7  **before -- he must have caught me.  We were in a**
8  **busy environment, meetings.**
9    Q  Conversation with Mr. Pai?
10    **A  Correct.**
11    Q  That same morning?
12    **A  Yes.**
13    MR. STERN:  The next e-mail should be
14  labeled, I guess, Exhibit 4.
15        (KHALIL Exhibit 4 was marked for
16  identification and attached to the transcript.)
17    MR. STERN:  Copy to counsel of EEOC 23.
18    Q  You've finished reading this exhibit, yes?
19    **A  Uh-huh.  Yes.**
20    Q  Was Exhibit 4 to your deposition one of
21  the e-mails you reviewed that have been provided
22  to you by Bob?

59

1    **A  Yes.**
2    Q  Exhibit 4 to your deposition is an e-mail
3  to you from Ashok, also on Monday, September 8th,
4  10:32 a.m.  Correct?
5    **A  Correct.**
6    Q  And it has the same salutation, "Hi Atif,"
7  as the earlier e-mail, and the text says, "as
8  discussed."
9        So fair to say that this is an e-mail
10  following your discussion with Mr. Pai that
11  morning that you just told me about?
12    **A  Correct.**
13    Q  Now, the subject of the e-mail in
14  Exhibit 4 to your deposition is listed "Transition
15  Request."  Yes?
16    **A  Yes.**
17    Q  And the subject in Exhibit 3 to your
18  deposition, Mr. Pai's earlier e-mail to you -
19  59 minutes earlier - the subject was "Exploring
20  Transfer Possibilities."  Correct?
21    **A  Correct.**
22    Q  Did you discuss with Mr. Pai use of the

60

1  word or phrase "transition request" in an e-mail
2  to follow your meeting?
3    **A  Not that I recall specifically.**
4    Q  What about generally?
5    **A  Okay.**
6    Q  Okay.  Is that an affirmative answer, a
7  yes answer?
8    **A  Can you repeat the question, please?**
9    Q  Yes.  Did you discuss in the meeting with
10  Mr. Pai following his first e-mail, Exhibit 3 to
11  your deposition, inclusion of the word or the
12  phrase "transition request" in a following e-mail,
13  Exhibit 4 to your deposition?
14    **A  I don't recall.**
15    Q  In that meeting preceding Exhibit 4 to
16  your deposition, and following Exhibit 3 to your
17  deposition, did you discuss with Mr. Pai that he
18  needed to submit to you another e-mail?
19    **A  Yes.  So my recollection is that I**
20  **requested a date.**
21    Q  A date?
22    **A  Correct.**

Transcript of Atif Khalil
Conducted on March 27, 2018

16 (61 to 64)

61

1    Q  Is there any other specific that you
2  requested from Mr. Pai in the meeting for a
3  following e-mail?
4    A  No.  So my recollection is that he had
5  made up his mind to leave the EOIR program, and my
6  action at that point was to notify the client.
7  And I could not go to the client without a
8  specific date, so I could not go to them and say,
9  you know, Ashok may be leaving in a week or a
10 year.
11    I requested for him to think about it and
12 propose a date.  So that is something that I
13 recall so that I could go to the client and say:
14 Here's our plan; Ashok will be leaving by that
15 date and here's our backfill plan.
16    Q  Did you tell Mr. Pai, in substance, that
17 his follow-up e-mail with a date needed to
18 reference a planned relocation to the D.C. metro
19 area?
20    A  No.
21    And I was kind of surprised by reading
22 that now.  My recollection is that he was not

62

1  planning to relocate to the D.C. metro area.  His
2  home was in California.
3    Q  Before your expression of surprise upon
4  reading that in Exhibit 4 to your deposition, had
5  there been any discussion about Mr. Pai relocating
6  to the D.C. metro area?
7    A  Not that I recall.  My recollection is
8  that he was commuting back and forth, but his home
9  was in California, his family was in California.
10   Q  During your meeting between these two
11 e-mails, when you meet with Mr. Pai, did you, in
12 substance, tell him to indicate October 31st,
13 2014, as the date?
14   A  I don't recall a specific date, but I do
15 recall that I asked him to -- that I would need a
16 date to follow up with his request.
17   Q  And the meaning of "follow up with his
18 request," what follow up?
19   A  With the client.
20   Q  EOIR?
21   A  Correct.
22   Q  Mr. Myatt?

63

1    A  Howard Myatt was our COTR.
2    Q  Contracting officer technical
3  representative?
4    A  Correct.
5    Q  Did you have any discussion - again,
6  that's a broad question that includes
7  face to face, telephone, typewritten in an e-mail,
8  text messaging, faxing, video conference, any way
9  of communicating - with anyone at Camber between
10 the time of your receipt of Exhibit 3 to your
11 deposition - that's the 9:33 a.m. e-mail from
12 Mr. Pai, came over a couple of times to your
13 office - and your receipt of Exhibit 4 to your
14 deposition, Mr. Pai's "Hi Atif" e-mail 10:32 a.m.?
15 So during that 59 minutes, any communication
16 between you and anyone else at Camber about
17 Mr. Pai?
18    A  Not that I recall.  And I wouldn't until I
19 had confirmed with him -- you know, the earlier
20 e-mail is not specific enough for me to take any
21 action on, either with the client or with Camber.
22    Q  Did you confer with anyone at Camber

64

1  between these two e-mails about Mr. Pai?
2    A  I do not recall.
3    Q  Now, Mr. Pai ends his 2:32 [sic] a.m.
4  e-mail to you - that's Exhibit 4 to your
5  deposition - he's "grateful for your consideration
6  and support during these difficult times for my
7  family," his family.
8    And is it your testimony here that the
9  earliest you knew of difficult times for his
10 family was Exhibit 3 to your deposition, "My son's
11 hospitalization emphasized the need"?
12    A  I think you said 2:32 a.m.  It's 10:32.
13    Q  10:32, yes.
14    A  So I had known about his wife, and I
15 recall for months prior to this, these dates, I
16 recall that his wife was a cancer survivor and she
17 was having some issues with her arm.  And so
18 that's what I recall, you know, and just talking
19 to him in general as coworkers, supporting him and
20 what he needed to do for his family.
21    My recollection is that when we actually
22 had the face-to-face meeting in between these two

Transcript of Atif Khalil

Conducted on March 27, 2018

65

1 e-mails is when he shared more details with me
2 regarding his son's condition. I had not known
3 about that. I may have known about his son's
4 hospitalization, if he was out prior to that date,
5 but not his condition or the details. I recall
6 that that's the first time he shared those details
7 with me. But I had known about his wife prior to
8 that.
9      MR. STERN: The next document is a two
10 page e-mail collection. I guess that will be
11 Exhibit 5? With a copy to counsel. That's EEOC
12 pages 25 and 26.
13      (KHALIL Exhibit 5 was marked for
14 identification and attached to the transcript.)
15   Q  Had an opportunity to read Number 5 here?
16   A  Yes.
17   Q  Is the e-mail string depicted in Exhibit 5
18 to your deposition one of the e-mails that you
19 reviewed previously, having received it from Bob?
20   A  Yes.
21   Q  This is an e-mail string at the top from
22 Lisa Thompson to you, with a copy to Mr. Jain.

66

1   A  Yes.
2   Q  Yes?
3      Who is Lisa Thompson?
4   A  She was our HR representative.
5   Q  She was local?
6   A  Yes. Not to the EOIR office, but to the
7 Camber...
8   Q  Local where?
9   A  Fair Lakes, Fairfax.
10   Q  A few exits down the road?
11   A  Correct. We were at the client site. We
12 were at the EOIR client site.
13   Q  So the top of this string is from
14 Lisa Thompson, the local HR person, to you, copied
15 to Mr. Jain, regarding transition request,
16 Ashok Pai, Monday, September 8th - so this is the
17 same day - 11:42 a.m. Correct?
18   A  Correct.
19   Q  And she is responding to your e-mail right
20 below which you sent to her at 11:08 a.m. the same
21 day?
22   A  Correct.

67

1   Q  Correct?
2      To which you had forwarded the Exhibit 4
3 e-mail from Ashok to you?
4   A  Correct.
5   Q  You asked a question of Lisa in this
6 e-mail string. Correct?
7   A  Correct.
8   Q  You recited, "He returned from California
9 that week and has decided to move back home,
10 realizing he's unable to continue working on the
11 East Coast."
12      True?
13   A  True.
14   Q  "Please see his e-mail below." And you
15 attached it. Correct?
16   A  Correct.
17   Q  "Is this sufficient for the displacement
18 letter? I will move forward with creating a req
19 and identify a replacement as soon as I hear back
20 from you."
21      Correct?
22   A  Correct.

68

1   Q  You did not write to Lisa in your e-mail
2 to her at 11:08 a.m., depicted on the first page
3 of this exhibit, that Mr. Pai had resigned?
4   A  Correct.
5   Q  You did not write that he had quit?
6   A  Correct.
7   Q  Lisa responded at the top: "Thanks Atif.
8 This is sufficient for resignation purposes and we
9 will have it effective 10/31/14." If anything
10 changes, let her know. "Thanks."
11   A  Correct.
12   Q  Did you have any discussion with anyone at
13 Camber between the time you sent your e-mail to
14 Lisa, 11:08 a.m., and the time she responded,
15 11:42 a.m., concerning Mr. Pai?
16   A  Not that I recall.
17   Q  Did you have any discussion with anyone at
18 Camber between the time you received Exhibit 4 to
19 your deposition, which is the bottom of this
20 e-mail string from Mr. Pai, and the time you sent
21 it on to Lisa at 11:08 a.m.?
22   A  Not that I recall.

Transcript of Atif Khalil
Conducted on March 27, 2018

69

1    Q  What did you do after receipt of Lisa's
2  e-mail in this exhibit, "This is sufficient for
3  resignation purposes"?  What did you do?
4    **A  Notified the client of the transition**
5  **plan, and moved forward, as I mentioned, creating**
6  **a requisition.  So my goal was to satisfy the**
7  **client requirements, and my action was to backfill**
8  **the position.**
9    Q  Did you confer with anyone at Camber
10  before taking that to the client, as you just
11  described?
12    **A  Not that I recall.  Not that I can tell**
13  **from this e-mail exchange.**
14    MR. STERN:  The next one will be
15  Exhibit 6.  I'll ask that you mark this as 6.
16    (KHALIL Exhibit 6 was marked for
17  identification and attached to the transcript.)
18    MR. STERN:  Copy to counsel.
19    Q  Have you had an opportunity to look at the
20  two pages of Exhibit 6 to your deposition?
21    **A  Yes.**
22    Q  Was this e-mail and the PM 090914DCIO

70

1  document following, was that one of the e-mails
2  you had reviewed?
3    **A  I don't recall, actually.**
4    Q  Now, you had previously testified that
5  your next step after receiving Lisa's e-mail,
6  "Thanks Atif, this is sufficient for resignation
7  purposes," with the effective date 10/31/14, you
8  testified the next step that you recall was taking
9  it to the customer.  Right?
10    **A  Correct.**
11    Q  Exhibit 6 to your deposition is your
12  e-mail of September 9th at 1:13 p.m. to the
13  customer, including, as a second page, an agenda
14  for today's program review meeting.  Correct?
15    **A  Correct.**
16    Q  And the agenda item is a .DOC form,
17  according to the attachments list at the top of
18  the first page of this exhibit?
19    **A  Correct.**
20    Q  And the other documents that are not
21  included, one was an XLS, that's a spreadsheet,
22  FY14 budget?

71

1    **A  Correct.**
2    Q  And what is the third item?  It says
3  "DOJ EOIR ORG Structure FY14 V18 VSD."  What is a
4  VSD file?
5    **A  A Visio file.  It's like a graphics file.**
6    Q  Graphics.  Got it.  Understood.
7    **A  Visio is a Microsoft tool just like Word**
8  **or Excel.**
9    Q  As a general matter, were the program
10  review meetings on the EOIR project, were those --
11  those were weekly?
12    **A  Those were weekly meetings, yes.**
13    Q  And were they set on like the same day
14  each week in time, for example, Tuesday afternoons
15  at 2 o'clock?
16    **A  That's correct.  I don't know if they're**
17  **at 2 o'clock, but Tuesday afternoons, yeah.**
18    Q  And you attended those meetings?
19    **A  That's correct.**
20    Q  And in September 2014 Mr. Myatt attended
21  those meetings?
22    **A  That's correct.**

72

1    Q  Anyone else?
2    **A  So Kate Ahn and David Fruehwald, in**
3  **general, attended these meetings.  Some days some**
4  **people were out or...**
5    Q  Anyone else?
6    **A  That's it.**
7    Q  Now, this particular e-mail, where you set
8  the agenda, is dated Tuesday, September 9th at
9  1:13 p.m.  Was it your practice to send the
10  agendas on the same day of the meeting or the day
11  before or two days before?
12    **A  Mostly the same day, depending on my**
13  **schedule.  Because I wanted it to be -- it's a**
14  **weekly meeting.  I wanted it to cover**
15  **up-to-the-minute kind of items.**
16    Q  Did anyone assist you in preparing the
17  DCIO document that you would attach as an agenda
18  before these meetings?
19    **A  No.  I maintained this document.**
20    Q  "This document" in this instance, the
21  second page?
22    **A  The second page.**

Transcript of Atif Khalil
Conducted on March 27, 2018

73

1    Q  Turning to the second page of Exhibit 6,
2  is this a DCIO PM weekly that you prepared?
3    **A  Yes, that's correct.**
4    Q  Do you know what the reference or
5  abbreviation DCIO stood for?
6    **A  Yes.  It's deputy chief information**
7  **officer.**
8    Q  And the PM?
9    **A  Program management weekly.**
10    Q  And the deputy chief information officer?
11    **A  Information officer.**
12    Q  Who was that with respect to the three
13  recipients, Kate Ahn, Howard Myatt, and
14  David Fruehwald?  I think you said Mr. Myatt was
15  the coder?
16    **A  Right.  Kate Ahn was the deputy chief**
17  **information officer, and she was Howard Myatt's**
18  **boss.**
19    Q  Was the DCIO PM format or template, was
20  that something unique to Kate Ahn, or were there
21  other DCIOs on this project from time to time?
22    **A  No.  It's a format that kind of evolved.**

74

1  **I must have inherited it from my predecessor.  So**
2  **it was a standard template week after week that I**
3  **updated and used it as the agenda to review the**
4  **pertinent status items on a weekly basis.**
5    Q  At the bottom, underneath where it says,
6  "Confidential Business Information," it has your
7  name - correctly spelled, I see, Atif with a
8  terminal F there, Khalil - and then it has a date,
9  in this instance for this particular printing is
10  3/22/2018.  The document lists the attachments
11  list on the first page, indicates it's a .DOC
12  document.  Yes?
13    **A  Yes.**
14    Q  That's a Microsoft Word document?
15    **A  Correct.**
16    Q  The date feature in the footer of these
17  DCIOs, that was set to automatically update upon
18  view, and in this case printing?
19    **A  It appears so, yeah.**
20    Q  Do you have any doubt about that?
21    **A  No.**
22    Q  All right.  Looking at the top of the

75

1  second page of this document, the DCIO, the first
2  filled-in bullet point under the staffing topic
3  lists resignations, plural, hyphen, Ashok Pai,
4  10/31/14.  This was your bringing Mr. Pai's
5  transition to the attention of the customer?
6    **A  That's correct.**
7    Q  Was this document the first instance of
8  any document that you wrote stating that, in
9  essence, Mr. Pai resigned?
10    **A  I believe so.**
11    **So the first part, like resignations,**
12  **departures, on-board, upcoming absences, were part**
13  **of the standard template, and I just filled in the**
14  **names week by week.**
15    Q  You chose to insert Ashok Pai with his
16  parenthetical "end date" in the resignations
17  bullet as opposed to the departures bullet?
18    **A  So the way it worked is when somebody was**
19  **planning on leaving, they went in resignations,**
20  **and when somebody left that week or the prior**
21  **week, they came under departures.**
22    Q  And my understanding from your earlier

76

1  testimony, that you had testified that you needed
2  a date from Mr. Pai because you had to take the
3  date to the customer?
4    **A  That's correct.**
5    Q  Because why?
6    **A  So, you know, we were working for the**
7  **client and we had, you know, a team doing software**
8  **development work.  We had projects, maintenance**
9  **tasks.  So without a date, we cannot plan.  So I**
10  **can't say I have a team member that may be leaving**
11  **in six months.  You know, that's not an actionable**
12  **item.**
13    **So when I say "here's our plan," then I**
14  **also, along the same lines, propose a backfill**
15  **plan.  And the on-boarding process took a couple**
16  **of months because of the DOJ clearance process, so**
17  **I tried to time it -- having a vacancy on the**
18  **program was not a good thing because work wasn't**
19  **getting done for the customer.**
20    Q  And then the third bullet point in the
21  recruitment/hiring/on-boarding activities, you
22  wrote:  Ashok's backfill .NET/SP Dev.  It's .NET,

Transcript of Atif Khalil
Conducted on March 27, 2018

77

1  the SP is SharePoint?

2      **A  Correct.**

3      Q  Developer, is that what DEV is?

4      **A  Uh-huh.**

5      Q  Any discussion that you had with EOIR

6  about backfilling for Ashok Pai before you

7  e-mailed this DCIO on September 9th at 1:13 p.m.?

8      **A  Not that I recall.  You know, I work with**

9  **the client very closely, on a daily basis, and**

10 **this was the next day.  So I don't recall if I had**

11 **a special conversation.  These personnel, as you**

12 **see with many other names, this was a routine**

13 **process that happened with people leaving, coming,**

14 **et cetera.**

15     MR. STERN:  Here's the next e-mail and

16 DCIO document.  This will be Exhibit Number 7.

17     (KHALIL Exhibit 7 was marked for

18 identification and attached to the transcript.)

19     MR. STERN:  Copy to counsel.

20     **A  Okay.**

21     Q  You read both pages?

22     **A  Yes.**

78

1      Q  Exhibit 7 to your deposition is your

2  e-mail to Kate Ahn, Howard Myatt, David Fruehwald,

3  copy to Deborah Curtis, parenthetical, it says for

4  her EOIR CTR.

5      Who is Deborah Curtis?  What does CTR

6  refer to?

7      **A  A Contractor.  So all of our -- so**

8  **Deborah Curtis was our executive administrator on**

9  **the program, so she -- the reason I copied her is**

10 **that she actually printed out these documents for**

11 **us to review at the meeting.**

12     Q  By "contractor," you mean a contract

13 worker for Camber or a contract worker direct with

14 EOIR?

15     **A  So Deborah Curtis was an employee of**

16 **Camber, and we were all contracted to EOIR.  I'm**

17 **not sure why my e-mail doesn't say CTR.  Usually**

18 **the government personnel would just say EOIR and**

19 **any contractor would say CTR.**

20     Q  So she was printing the material

21 distributed in this, and having, what, handouts at

22 the meeting.  Is that...

79

1      **A  That's correct.**

2      Q  And Exhibit 7 is your e-mail Tuesday,

3  September 16th, 9:02 a.m.  So that's a week later.

4  Correct?

5      **A  Yes.**

6      Q  Same three types of attachments.  The

7  organizational structure FY14.  What's the

8  reference V18.  Is that version 18?

9      **A  Version 18.**

10     Q  Got it.

11     **A  So I updated these -- whenever I made**

12 **significant changes, I updated.**

13     Q  And VSD was the graphics thing you had

14 mentioned, the Visio?

15     **A  Yes.**

16     Q  And the PM now is attached to Exhibit 7,

17 the number is 091614.  And that was the date of

18 the meeting for which that was the agenda?

19     **A  Correct.**

20     Q  Also as a Microsoft Word document?

21     **A  Correct.**

22     Q  Together with that budget, a different

80

1  version 20 as an XLS spreadsheet.  Right?

2      **A  Correct.**

3      Q  And the program review meeting was the

4  same day, September 16th, according to the e-mail?

5      **A  That's correct.**

6      Q  The second page is a DCIO PM weekly for

7  that meeting.  Correct?

8      **A  Yes.**

9      Q  Which you prepared?

10     **A  Yes.**

11     Q  The earlier reference to resignation of

12 Mr. Pai, that's no longer in the staffing

13 resignations item.  It says none.  It's not in the

14 departure item.  Correct?

15     **A  Correct.**

16     Q  There's no on-boarding that week?

17     **A  Correct.**

18     Q  And the reference in the recruiting,

19 hiring, on-board activities regarding Mr. Pai is

20 the same .NET SharePoint developer Ashok's

21 backfill, status interviewing candidates?

22     **A  Correct.**

Transcript of Atif Khalil

21 (81 to 84)

Conducted on March 27, 2018

81

1    Q  Do you recall if the candidates were being
2  interviewed at that time, or is this a proposal to
3  interview them in the future, or did it reflect
4  interviews already ongoing?
5    **A  So, in general, that was the process**
6  **between -- you know, within that week I must have**
7  **created a req. Now I can't recall exactly if we**
8  **had candidates starting to flow in already, but in**
9  **general I would just tell the client that, you**
10 **know, we have the req open -- the biggest piece**
11 **was opening the requisition, and now the req is**
12 **open, and now we are interviewing candidates. It**
13 **was a fluid process.**
14   Q  And returning to the preceding exhibit
15 Number 6 there, the second page, the DCIO for the
16 September 9th meeting, the recruitment, hiring,
17 on-boarding activities, the reference to
18 .Net SP/Dev, Ashok's backfill, topic bullet point,
19 opening req?
20   **A  Correct.**
21   Q  That was discussed on September 9th?
22   **A  Correct.**

82

1    Q  Did any of the EOIR attendees at that
2  meeting say anything about what was being
3  requisitioned?
4    **A  So we probably discussed what was the**
5  **program need at the time, and what were the**
6  **high-level requirements.**
7    Q  You say "probably." You don't recall?
8    **A  I don't recall the specifics, but that's**
9  **what we usually did.**
10   Q  Did you share a proposed requisition
11 document with EOIR before utilizing it?
12   **A  I don't think so. I don't recall sharing**
13 **specific requisition documents with the**
14 **government. I discussed verbally, you know, what**
15 **their expectations were, and followed through. I**
16 **mean, that was our job, to gather their**
17 **requirements and execute on them.**
18   Q  You have no recollection of gathering
19 EOIR's requirements for that requisition.
20 Correct?
21   **A  So in general, we understood what the**
22 **requirements were for that team. I don't recall**

83

1  **specifically.**
2    Q  Generally, that's referring to what you
3  believe your practice was?
4    **A  Yes.**
5    Q  And no recollection of it in this
6  instance?
7    **A  So one detail I do recall is that we**
8  **transitioned from when we hired Ashok a couple of**
9  **years ago; at that point the program needs were**
10 **more for SharePoint work, and during that two**
11 **years or multiple years, the requirements had**
12 **shifted to more .NET skill set. So that was an**
13 **ongoing thing, is that we were kind of reducing**
14 **our SharePoint skill set and increasing our .NET**
15 **skill set.**
16   Q  You referenced "we." That's Camber. Yes?
17   **A  And EOIR.**
18   Q  Is there any document that you received
19 from EOIR so stating?
20   **A  Not that I recall. I think we likely had**
21 **the statement of work that listed all of these**
22 **requirements, and as we had conversations and**

84

1  **meetings with them, we kind of fine-tuned what the**
2  **needs were and how they were evolving.**
3    Q  Now, the statement of work, the SOW, that
4  was issued to Avia when the contract had been in
5  place originally. Correct?
6    **A  That's correct.**
7    Q  To your knowledge, was the SOW ever
8  changed?
9    **A  It was a couple of times.**
10   Q  Was it ever changed with respect to the
11 requirements for the position held by Mr. Pai?
12   **A  It wasn't that granular. So it had**
13 **high-level requirements but not down to that level**
14 **of detail.**
15     MR. STERN:  Next I guess will be 8.
16     (KHALIL Exhibit 8 was marked for
17 identification and attached to the transcript.)
18     MR. STERN:  Copy to counsel.
19   Q  That's an e-mail string, Bates number
20 Pai61, 62, 63. Three pages, so let me know when
21 you've had time to read it and we'll talk about
22 that one next.

Transcript of Atif Khalil
Conducted on March 27, 2018

22 (85 to 88)

85

1       A  Okay.
2       Q  And Exhibit 8 is an e-mail string from
3  Mr. Pai to you, Subject: "Transition Request," he
4  sent to you Thursday, September 18th, 12:25 p.m.
5  Yes?
6       A  Yes.
7       Q  And pages 2 and 3 of this exhibit are
8  earlier e-mails that Mr. Pai attached to this from
9  September 8th at 10:32 a.m., and the same day at
10  9:33 a.m. that we've previously discussed?
11      A  Correct.
12      Q  In Mr. Pai's e-mail to you, Exhibit 8,
13  first page: "Hi, Atif, as a couple of Camber team
14  members stated this, I must point out that I have
15  not resigned."
16      Is there any earlier document from Mr. Pai
17  that used the word "resign" or "resigned"?
18      A  None that I've seen.
19      Q  The first full paragraph, couple of lines
20  down, he writes: "I only requested a transfer
21  nearer to the Southern California region.  As you
22  wanted a planning horizon, and graciously

86

1  suggested October 31, 2014, I put that date in my
2  transition request and said I would definitely
3  continue to do my best to serve the client and
4  Camber Corporation before and after the
5  transition."
6      Does that refresh a recollection as to
7  whether you suggested October 31st, 2014, to
8  Mr. Pai in your meeting of the morning of
9  September 8th?
10      A  I honestly don't...
11      Q  Don't recall?
12      A  I don't recall.
13      Q  I'll direct your attention a little bit
14  lower in the e-mail.  The paragraph says: "If
15  it's not possible to justify current salary when
16  nonbillable, my pay could be temporarily reduced
17  when not on FMLA, as in Southern California, my
18  expenses are much less."
19      He recites he could contribute by creating
20  our delivery training programs, helping with
21  business development, proposal writing, cyber
22  security and SharePoint migrations.  Has

87

1  experience in RFP responses, technical estimating
2  and related business development activities at
3  former employers.
4      Did you do anything in response to
5  Mr. Pai's suggestions?
6      A  So this was -- I believe I told him that I
7  was not the right person to discuss this with.  I
8  had no purview or authority to hire nonbillable
9  resources.  My authority was managing that
10  program, and all of the positions on that program
11  were billable positions at the Falls Church site.
12  Anything outside, I recall recommending that he
13  look at the Camber open positions and explore
14  opportunities.  Everything was posted on our
15  website.
16      I could not authorize him to do any of the
17  work that he mentioned there.
18      Q  That's the gist of what you told Mr. Pai?
19      A  Correct.
20      Q  And you believe that telling was in the
21  morning meeting between Mr. Pai's first "Hi, Atif"
22  e-mail, and the second one?

88

1      A  On September...
2      Q  8th.
3      A  8th, correct.
4      Q  I believe you just told me that you told
5  Mr. Pai to go to the website because everything
6  was there.  Is that the gist of...
7      A  Yeah, all our open positions were on our
8  website.
9      Q  In order to be an open position on the
10  website, is it fair to think that only positions
11  in programs that had been bought and paid for
12  would be open?
13      A  No.  So we had -- so we had positions that
14  were for programs like EOIR, which was an ongoing
15  awarded, funded contract.  We had contingent
16  positions for work that we were bidding for, and
17  then we had nonbillable overhead positions; for
18  instance, Adesh Jain's position was not a client
19  billable position.  It was an overhead position.
20  We had recruiters, we had proposal managers, we
21  had others.  So anything that the company needed,
22  we opened up; that's how we found candidates to

Transcript of Atif Khalil
Conducted on March 27, 2018

89

1  hire.
2      Q  Now, by "open," is that non-Camber
3  employees could access that?
4      A  Right.  Public.  So, I mean, that's how we
5  found candidates within or outside of Camber.
6      Q  So with respect to the September 18th,
7  2014, e-mail from Mr. Pai to you, depicted in the
8  first page of Exhibit 8 to your deposition, you
9  did not respond to Mr. Pai regarding the matters,
10  "if it's not possible to justify my current
11  salary," and so forth, that we just discussed?
12      A  So I see that as, you know, nothing that I
13  could do anything about or I had the authority to
14  take action on.  So whenever somebody said they
15  had plans to do stuff outside of EOIR, my scope
16  ended.  I could not authorize anyone to be hired
17  or change their salary, anything along those
18  lines.
19      Q  And the gist of it is that that's your
20  belief that you told him that ten days before?
21      A  Correct.
22      Q  So you don't believe you retold him that

90

1  following the September 18th e-mail?
2      A  I may have.  I don't recall.
3          (KHALIL Exhibit 9 was marked for
4  identification and attached to the transcript.)
5      Q  Let me know when you've read Exhibit 9.
6      MR. STERN:  A copy to counsel.  That's Pai
7  pages 65 through 68.
8      A  Okay.
9      Q  Was this one of the e-mails that you had
10  previously reviewed?
11      A  I believe so.
12      Q  Exhibit 9 to your deposition is an e-mail
13  string starting at the top of the first page from
14  Lisa Thompson, the local HR person on the EOIR
15  project?
16      A  For Avia and Camber.
17      Q  To you, with a copy to Mr. Jain, "Subject:
18  Transition Request," sent to you Thursday,
19  September 18th, the same day that you received the
20  preceding e-mail in Exhibit 8 to your deposition.
21  She sent a response to you at 1:22 p.m., Exhibit 9
22  to your deposition?

91

1      A  Correct.
2      Q  She's responding to your e-mail to her the
3  same day slightly above the middle of the first
4  page that you sent to her at 12:41.
5      A  Correct.
6      Q  In that e-mail you wrote to Lisa, "See
7  Ashok's e-mail below."  That e-mail below is the
8  same as Exhibit 8 to your deposition?
9      A  Correct.
10      Q  You wrote: "He plans to leave the project
11  effective October 31st, but wants to remain a
12  Camber employee supporting nonbillable work from
13  California."
14          That's the first sentence.  Right?
15      A  Correct.
16      Q  And you wrote: "As far as I know, that's
17  not an option we are offering him."
18          How did you know that, that Camber was not
19  offering Mr. Pai that option?
20      A  So I didn't think we had a California
21  location, I didn't think that we were hiring any
22  nonbillable folks to do that type of work, and I

92

1  had not heard from anyone reach out to me or
2  anything along those lines where he had found an
3  opportunity matching his desires.
4      Q  Had you discussed or communicated with
5  anyone at Camber -- before you wrote the e-mail of
6  yours to Lisa on September 18th, 12:41 p.m., had
7  you conferred with anyone at Camber about not
8  offering that option to Mr. Pai?
9      A  I may have discussed it with Adesh.  He
10  was my supervisor, and I discussed a lot of
11  program details with him.  I don't recall if I
12  discussed it with anyone else.
13      Q  Was there anything you did to inform
14  yourself that that was not an option being offered
15  to him?
16      A  I did not reach out.  So other than Adesh,
17  I wouldn't have any other interface.  Like I
18  wouldn't call up somebody else within Camber and
19  say, I would like to talk to you about this need
20  or this question.
21      MR. STERN:  We have a ways to go.  Shall
22  we continue or take a break?

Transcript of Atif Khalil
Conducted on March 27, 2018

93

1    THE WITNESS: I'm good with continuing.
2    (Recess taken at 11:59 a.m.)
3    (KHALIL Exhibit 10 was marked for
4    identification and attached to the transcript.)
5    Q   Reminding you you're still under oath.
6    **A   Yes.**
7    Q   Let me know when you've read it.
8    MR. STERN: And the record can reflect I'm
9    handing a copy to counsel, EEOC 404 to 408.
10   **A   Okay.**
11   Q   Is this e-mail string depicted in Exhibit
12   ten to your deposition one of the e-mails you have
13   recently reviewed?
14   **A   I do not recall.**
15   Q   Exhibit ten to your deposition is an
16   e-mail string starting with Mr. Pai's forwarding
17   of the e-mail from Exhibit 9 to your deposition,
18   Mr. Pai's, "Hi, Atif, a couple of Camber team
19   members stated this. I must point out I have not
20   resigned," which is on page 406, lower right-hand
21   corner of Exhibit ten to your deposition, which he
22   forwarded to Lisa Thompson, right, at the top of

94

1    page 406 of Exhibit ten?
2    **A   Yes. Yes.**
3    Q   To which she responded, at the bottom of
4    405, the same day, at 2:41 p.m., September 18th.
5    Yes?
6    **A   Yes.**
7    Q   To which he responded that same afternoon,
8    a few minutes later, towards the top of 405, to
9    which she responded at the bottom of 404, the same
10   afternoon.
11   **A   Okay.**
12   Q   Copies to you. You're listed as a cc
13   recipient. Yes?
14   **A   Correct.**
15   Q   To which he responded immediately above
16   that, on page 404, first page of Exhibit ten,
17   September 18th at 4:30 p.m., also a copy to you,
18   to which she responded the next morning at
19   9:03 a.m., at the top of page 404, also copied to
20   you. Correct?
21   **A   Correct.**
22   Q   On the first page of Exhibit ten,

95

1    page 404, Mr. Pai writes to Lisa -- this is his
2    4:30 p.m. e-mail.
3    **A   Okay.**
4    Q   "I'm working on a software development
5    issue for EOIR now. I apologize for my delayed
6    response." And he says, "I made it clear, I
7    definitely have not resigned. Should I withdraw
8    my transition request? Why was this process not
9    made clear when I sent the e-mail September 8?"
10   To which she responds the next morning,
11   she doesn't know why "there's confusion over the
12   fact that the employee is responsible for finding
13   and pursuing a new opportunity if they wish to
14   move from their current role. I did not realize
15   we needed to clarify the matter. It's always been
16   the employee's responsibility."
17   Fair to say that's your understanding?
18   **A   Correct.**
19   Q   "Nothing additional is needed from you,"
20   she writes to Ashok, "as we now understand you did
21   not intent [sic] to resign your current role
22   effective October 31st unless you found another

96

1    role within Camber prior to that date."
2    Did you confer with anyone at Camber on
3    September 18th or 19th regarding Mr. Pai's
4    statement that he's not resigned?
5    **A   Nothing specifically. But, I mean, I've**
6    **had conversations with Lisa.**
7    Q   Anything else in general?
8    **A   So my recollection of this discussion is**
9    **kind of a change of plan, change of heart from**
10   **Ashok from the earlier September 8th discussion,**
11   **September 8th. And I do not understand or agree**
12   **with confusion, because I believe his options were**
13   **made clear to him. So I saw this as a change of**
14   **plans on his part.**
15   Q   No other discussion you can recall with
16   anyone at Camber on September 18th or 19 about
17   Mr. Pai?
18   **A   So I know that at some point they -- I**
19   **communicated with HR regarding the change of**
20   **requirements and how we were planning to backfill**
21   **that position. I can't recall exactly which date**
22   **and time that occurred. So that was leading from**

Transcript of Atif Khalil
Conducted on March 27, 2018

101

1    Q  So handwritten notes were discarded by
2  you?
3    **A  Uh-huh.**
4    Q  Affirmative, yes?
5    **A  Yes.**
6    Q  Deborah Curtis did not participate in
7  those meetings?
8    **A  That's correct.**
9    Q  Did you observe anyone who was
10  participating making notes?
11  **A  No.**
12   Q  Turning to the second page of Exhibit 11
13  to your deposition, don't see any resignations as
14  an agenda item, no departures, no on-boarding.
15  Correct?
16  **A  Correct.**
17   Q  We're were still seeing .NET/SP Dev
18  (Ashok's backfill), interviewing candidates?
19  **A  Correct.**
20   Q  Do you recall any discussion on that
21  bullet point at that meeting?
22  **A  No.  I must have given them the status**

102

1  **that it's still ongoing.  When I have a**
2  **substantial update for them where we've identified**
3  **a candidate or made a decision, then we will**
4  **communicate that back to them.**
5     (KHALIL Exhibit 12 was marked for
6  identification and attached to the transcript.)
7     MR. STERN:  Copy to counsel of Exhibit 12.
8  **A  Okay.**
9    Q  Exhibit 12 is your cover e-mail to EOIR
10  regarding the weekly program meeting for
11  September 30, 2014, which you sent the same day at
12  11:50 a.m.  Correct?
13  **A  Correct.**
14   Q  And it included, as page 2, the referenced
15  attachment, PM September 30, 2014, DCIO document.
16  Correct?
17  **A  Correct.**
18   Q  Under the staffing topic you list a
19  Dipak Mistry as a resignation.
20  **A  Correct.**
21   Q  No departures, no on-boarding, some
22  upcoming absences of key personnel.

103

1    **A  Correct.**
2    Q  Training.  Then there's a topic that says,
3  "Risks/Issues, Ashok's departure on 10/31/14."
4     How was that a risk or an issue?  You had
5  previously reported he had resigned.  How is that
6  an issue?
7    **A  This must have been a follow-up from**
8  **Lisa's e-mail conversation September 19th or so.**
9  **So I do recall going back to them and letting them**
10  **know that Ashok wanted to change his mind and no**
11  **longer depart on October 31st.**
12   Q  Did any of the EOIR attendees at that
13  meeting say anything in response to that report?
14  **A  So in general their reaction was that they**
15  **did not want to offer this option to Ashok to**
16  **remain on the project, and they wanted us to**
17  **proceed with replacing him on the program.**
18   Q  Who was the "they"?
19  **A  Howard Myatt was the authoritative person,**
20  **and then Kate and David Fruehwald were also there.**
21   Q  And under the
22  recruitment/hiring/on-boarding activities with

104

1  respect to Ashok, it continues to show .NET/SP Dev
2  (Ashok's backfill) interviewing candidates at that
3  time?
4    **A  Correct.**
5     (KHALIL Exhibit 13 was marked for
6  identification and attached to the transcript.)
7     MR. STERN:  A copy of 13, EEOC pages 163
8  to 165, to counsel.
9    **A  Okay.**
10   Q  Was the Exhibit 13 e-mail string one of
11  the e-mails you reviewed recently?
12  **A  Yes.**
13   Q  Did the one you reviewed recently have the
14  handwritten material on the first page?
15  **A  No.**
16   Q  Do you recognize that handwriting?
17  **A  No.**
18   Q  Not your handwriting?
19  **A  No.**
20   Q  Exhibit 13 to your deposition is an e-mail
21  string beginning with your e-mail of October 1st,
22  9:55 on page EEOC 164 of this deposition, towards

Transcript of Atif Khalil

Conducted on March 27, 2018

---

105

1  the bottom.  That's towards the bottom of the
2  second page.
3    **A  Okay.**
4    Q  "Lisa, please see request below from
5  government to replace Ashok Pai.  I would like to
6  proceed with the 10/31/14 separation.  Can we
7  prepare a letter for Ashok?"
8      Attached to that is an e-mail of the same
9  day, October 1st, at 9:42 that morning, from
10 Mr. Myatt to you, copy to David Fruehwald;
11 Subject:  Replacement of Ashok Pai.  "Atif, please
12 proceed with replacement of Ashok Pai from the
13 .NET team at the government's request."
14     When you received Mr. Myatt's e-mail, did
15 you confer or discuss with anyone at Camber before
16 you forwarded it to Lisa about 12 minutes later?
17   **A  Not that I recall.**
18   Q  Does not mention removal of Mr. Pai from
19 the .NET team, does it?
20   **A  Replacement.**
21   Q  The word "remove" or "removal" is nowhere
22 in this e-mail.  Correct?

---

106

1    **A  Correct.**
2    Q  Was the .NET team the entire EOIR project
3  at that time?
4    **A  No, we had multiple teams.**
5    Q  Mr. Myatt's e-mail does not mention
6  removing Mr. Pai from the EOIR project, does it?
7    **A  So removing would mean removing and not**
8  **backfilling; replacing means removing and**
9  **backfilling.  That's how I read it.**
10   Q  The word "remove" or "removal" is not in
11 Mr. Myatt's e-mail?
12   **A  Clearly not.**
13   Q  "EOIR" is not in the single sentence that
14 he writes in his e-mail?
15   **A  I'm sorry, say that again.**
16   Q  The word or phrase "EOIR" is not in that
17 sentence either, is it?
18   **A  No.  "Government" implies EOIR.**
19   Q  Mr. Myatt's e-mail does not state changing
20 requirements for the position, does it?
21   **A  It does not.  But that's the conversation**
22 **that happened prior to this.**

---

107

1    Q  And notes of that conversation, if any,
2  were disposed of by you.  Correct?
3    **A  Yeah.  The general notes.**
4    Q  Were disposed by you?
5    **A  Correct.**
6    Q  So you forwarded Mr. Myatt's e-mail.
7  13 minutes after you received it, you forward it
8  to Lisa.  Correct?
9    **A  Correct.**
10   Q  Lisa responds to you the same day at
11 10:09 a.m. by forwarding to you an e-mail she had
12 received from Deborah Whitten four minutes before.
13 Correct?
14   **A  Correct.**
15   Q  Who is Deborah Whitten?
16   **A  So she was on the HR team.**
17   Q  She was above Lisa.  Right?
18   **A  That's my recollection, yeah.**
19   Q  And Deborah's question to Lisa was:  "At
20 one point you said the customer was changing the
21 requirements for the position.  Is that the case,
22 and if so, can we get something in writing from

---

108

1  them?"
2      Lisa forwarded that question to you.
3  Correct?
4    **A  Correct.**
5    Q  Your response that morning back to Lisa
6  about an hour and ten minutes later, right,
7  11:20 a.m. same day:  "Lisa, based on your
8  feedback on Friday."
9      What is the feedback on Friday that you're
10 referring to when you wrote that on Wednesday,
11 October 1st?
12   **A  I'm assuming it's the sentence in quotes.**
13   Q  Is the quote then something you got from
14 an e-mail or is the quote something that you wrote
15 based on notes of some non-mail event?
16   **A  I don't recall.**
17   Q  Was there verbal communication on that
18 Friday with you and Lisa and perhaps others?
19   **A  Four years ago, I do not recall.**
20   Q  You wrote to Lisa, in quotes -- and this
21 is quoting Lisa?  Is that the gist of...
22   **A  That's what it reads like, sounds like at**

---

Transcript of Atif Khalil
Conducted on March 27, 2018

109

1 this time.
2    Q  And read like; that's also what you wrote
3 like.  Correct?  You wrote it?
4    A  Yes.  Obviously I see that I wrote it
5 here.
6    Q  "In order to move forward with
7 termination, it will need to be client request due
8 to changing requirements for the job for which he
9 is not qualified, or the client specifically
10 requests that he is removed."
11       That's what Lisa told you to do, either
12 verbally and you wrote it, or copied and pasted
13 from some document?
14    A  Correct.
15    Q  And your response is, "I went with the
16 option to specifically request his removal by
17 name," period.  "The changing requirements can
18 still be an issue.  We are changing the position
19 from senior SharePoint developer to mid level .NET
20 developer at a much lower rate/salary.  He can
21 still argue he qualifies for that job and will
22 take a pay cut.  Removal by name is a cleaner

110

1 option.  It's not good for us to engage the client
2 in this issue extensively.  They expect us to
3 handle our own issues."
4       That's what you wrote.  Correct?
5    A  Correct.
6    Q  You don't recall the source of the quote.
7 Could have been from a document, could have been
8 verbal?
9    A  Correct.  Can I provide some context
10 behind this?
11    Q  And the "this" being what?
12    A  Just this was part of my management of the
13 program and management of the client relations.
14 Ashok, if I recall correctly, he was on the
15 program for a couple of years, and based on my
16 recollection, since the beginning, there were
17 struggles regarding his performance.  So he was
18 traveling back and forth between California and
19 D.C. and taking unscheduled leave, often showing
20 up or not showing up -- showing up late on Mondays
21 because he would travel back on the weekend, or
22 call in and say the flight got delayed or what

111

1 have you.  Would take redeye flights.  I often saw
2 him sleeping in the office at his desk.  So there
3 were performance issues.
4       And we managed our team, our team's
5 performance collectively, but the client was
6 co-located with us and they worked with our team
7 members individually and were aware of how
8 everybody was performing.
9       So this background -- and we had at one
10 point put him on a Performance Improvement Plan.
11 He had taken, on top of these travel related,
12 FMLA, which we had communicated to the client he
13 had taken an unapproved leave to attend a
14 conference.  So all of that kind of led up to
15 these events that we are talking about here.
16       So that's the background on why we needed
17 to manage the situation, and couldn't go back and
18 forth with the customer, because they would just
19 get frustrated and expect us to manage our team.
20    Q  Your e-mail in this Exhibit 13 does not
21 state those things.  Correct?  It doesn't state
22 anything about performance plan, doesn't state

112

1 anything about sleeping in the office, doesn't say
2 anything about showing up late on Mondays.  That's
3 nowhere to be found in this e-mail.  Correct?
4    A  That's the intention of the last sentence,
5 "It is not good for us to engage the client with
6 this issue extensively."  So this issue is --
7 that's the history behind this issue.
8    Q  Those words are not in this e-mail, are
9 they?
10    A  Okay.  Not.
11    Q  In the top portion of the first page of
12 Exhibit 13 to your deposition is an e-mail from
13 your supervisor, the vice president, Adesh Jain,
14 to Deborah Whitten?
15    A  Correct.
16    Q  Subject is replacement of Ashok Pai.
17 Correct?
18    A  Correct.
19    Q  And he writes that letter the same day,
20 October 1st.  He writes that a couple of hours
21 after your e-mail responding to Lisa.  Correct?
22    A  Correct.

Transcript of Atif Khalil
Conducted on March 27, 2018

121

1    A  So as I would walk around, we all worked
2  in a shared environment with cubicles; if I see
3  him sleeping in his chair, I assume that his
4  neighbors who are getting up to get coffee or
5  walking around would see him as well.
6    Q  You believe it is probable and likely?
7    A  Correct.
8    Q  Anything else?
9    A  That's it.
10    Q  Next will be Exhibit 14.
11        (KHALIL Exhibit 14 was marked for
12  identification and attached to the transcript.)
13       MR. STERN:  Copy to counsel.
14    A  Okay.
15    Q  Document 14, Exhibit 14 to your
16  deposition, is an e-mail string consisting of
17  Deborah Whitten asking a follow-up question to the
18  e-mail we had previously described, which was your
19  narrative back to Lisa: "As requested, here are
20  differences in the position."
21    A  Correct.
22    Q  And Deborah Whitten asked in her e-mail

122

1  Wednesday, October 1st, 2014, at 3:46 p.m., in the
2  center of page 158 of this exhibit: "Just to
3  clarify, the customer is changing the position
4  requirements to a junior level position.
5  Correct?"
6        That was her question?
7    A  Correct.
8    Q  And your answer was: "Yes, that's
9  correct."
10       True?
11    A  Yes.
12    Q  And the only document you received from
13  EOIR that you had presented to Lisa and to
14  Ms. Whitten was the Howard Myatt one-sentence
15  e-mail, "Please proceed with replacement of Ashok
16  Pai from the .NET team at government's request"?
17    A  Correct.
18    Q  The narrative of your e-mail of that same
19  day, October 1st at 2:33 p.m., bottom half of the
20  first page of this exhibit, EEOC document 158 in
21  the lower right-hand corner: "Lisa, as requested,
22  here are some differences in Ashok's position and

123

1  the new req we have open for replacement."
2        And then you list seven bullet points.
3  True?
4    A  Eighth bullet point is on the next page.
5    Q  You did not put quote marks around that
6  material.  Correct?
7    A  Correct.
8    Q  You did not copy and paste the content
9  from any communication you got by e-mail or other
10  document from EOIR?
11    A  Correct.
12    Q  And you don't know of any document
13  reflecting that EOIR agreed with these bullet
14  points that you've listed to Lisa in your e-mail
15  of October 1st at 2:33 p.m.?
16    A  No.
17       MR. STERN:  Shall we plow on, or is this a
18  suitable time for a lunch break?
19       THE WITNESS:  I'm fine with proceeding.
20       MR. STERN:  I need about 5 minutes to
21  stand up and get some water.
22       (Recess taken at 12:59 p.m.)

124

1        (KHALIL Exhibit 15 was marked for
2  identification and attached to the transcript.)
3    Q  Let me know when you've read it and we'll
4  talk about Exhibit 15.
5    A  Okay.
6    Q  Exhibit 15 is an e-mail from you to EOIR,
7  weekly program review, for the meeting of
8  October 7th, 2014.
9    A  Correct.
10    Q  Which you sent that same day at
11  10:52 a.m.?
12    A  Correct.
13    Q  It has four attachments listed, including
14  the PM for 100714 DCIO, and two budget
15  spreadsheets and one of those VSDs.  Correct?
16    A  Correct.
17    Q  Turning to the second page of Exhibit 15,
18  this is a DCIO PM weekly for that meeting that you
19  prepared.  Correct?
20    A  Yes.
21    Q  The preceding DCIO's risk issue regarding
22  Mr. Pai's October 31st departure is not present in

Transcript of Atif Khalil
Conducted on March 27, 2018

**125**

1 this one?
2 **A Correct.**
3 Q And the update on recruitment, hiring,
4 on-boarding for that .NET/SP Dev (Ashok's
5 backfill), still interviewing candidates. Right?
6 **A Correct.**
7 Q Exhibit 16.
8 (KHALIL Exhibit 16 was marked for
9 identification and attached to the transcript.)
10 Q Exhibit 16 is your Tuesday, October 14,
11 2014, DCIO agenda for that meeting. Correct?
12 **A Correct. Yes.**
13 Q And it's identical with respect to
14 Ashok's backfill, the preceding one. Still
15 noting, interviewing candidates. Correct?
16 **A Correct.**
17 Q And identifying no risks or issues for
18 discussion that week. Right?
19 **A Correct.**
20 Q 17.
21 (KHALIL Exhibit 17 was marked for
22 identification and attached to the transcript.)

**126**

1 MR. STERN: Copy to counsel.
2 **A Okay.**
3 Q Exhibit 17 to your deposition is your
4 agenda and supporting documents for the
5 October 21st, 2014, meeting.
6 **A Yes.**
7 Q And the second page of that is now called
8 DSD PM weekly. What does the DSD stand for
9 compared to the DCIO that was used previously?
10 **A So Kate's title change from deputy CIO to**
11 **director of software development.**
12 Q Did that entail any change in her role
13 with respect to these weekly meetings?
14 **A No. Just the title change.**
15 Q Just the title change?
16 **A Uh-huh.**
17 Q No risks or issues identified. Correct?
18 **A Correct.**
19 Q And the Ashok backfill, still interviewing
20 candidates .Net/SP developer?
21 **A Correct.**
22 Q Now, under the recruitment, hiring, and

**127**

1 on-boarding, it indicates another .NET/SP gov
2 backfill in process at that time, interviewing
3 candidates as well?
4 **A Correct.**
5 Q The next one, 18.
6 (KHALIL Exhibit 18 was marked for
7 identification and attached to the transcript.)
8 MR. STERN: Copy to counsel, EEOC document
9 161 to 162.
10 **A Okay.**
11 Q Is Exhibit 18 to your deposition one of
12 the e-mails that you've recently reviewed?
13 **A Yes.**
14 Q Exhibit 18 to your deposition is a
15 two-page e-mail string, beginning with your e-mail
16 to Mr. Pai, copy to Sudhakar at the bottom of the
17 first page of the exhibit, Friday, October 17th,
18 2014, at 10:42 a.m.; subject: Separation letter.
19 **A Correct.**
20 Q Which you had started to send on the --
21 **A And then I hit "send" by mistake.**
22 Q On the bottom of page 162 there --

**128**

1 **A Yeah.**
2 Q -- a few minutes earlier.
3 **A Correct.**
4 Q And then the one we were earlier
5 discussing at 10:42 a.m., bottom of page 161, top
6 of page 162, you e-mailed Mr. Pai a termination
7 letter. Correct?
8 **A Correct.**
9 Q And you wrote, among other things, to
10 Mr. Pai: "Unfortunately, your employment with
11 Camber will be terminated effective 10/31/14. The
12 client has decided to change the requirements for
13 your position. The position is being changed to a
14 mid level net developer," period. And you asked
15 to discuss this in person.
16 **A Uh-huh.**
17 Q The top of the e-mail string on the first
18 page of this exhibit is Lisa Thompson's forwarding
19 of your e-mail of the termination letter,
20 forwarding that to Deborah Whitten on October 27th
21 at 10:30 a.m.?
22 **A Correct.**

Transcript of Atif Khalil
Conducted on March 27, 2018

129

1    Q  You then followed up at the top of the
2  first page there with another e-mail that was
3  forwarded.  This one was sent by you to Ashok:
4  "Let us know your plans for the rest of the week.
5  Haven't heard from you.  You're asked to return
6  the DOJ laptop and PIV card.  Please let us know."
7        Did you receive any response to your
8  e-mail to Mr. Pai, what are your plans next week,
9  and the laptop and the PIV?
10   **A  So I recall that he shipped the laptop and**
11 **the PIV card.  I don't recall if he called me or**
12 **e-mailed me or what happened, but I do recall**
13 **receiving the equipment back in a box that we had**
14 **to turn back in to DOJ.**
15   Q  No recall of whether he responded either
16 by e-mail or voicemail?
17   **A  Unless we have the e-mail, I don't recall.**
18 **And obviously in the ten days, October 17th and**
19 **27th, there was no response.  That's why I said we**
20 **haven't heard from you.**
21        (KHALIL Exhibit 19 was marked for
22 identification and attached to the transcript.)

130

1        MR. STERN:  Copy to counsel, EEOC document
2  438.
3    **A  Okay.**
4    Q  Is this Exhibit 19 to your deposition the
5  termination letter that you forwarded by e-mail on
6  October 17th to Mr. Pai?
7    **A  Yes.**
8    Q  And the "Sincerely" signature there is
9  attributed to Michael Paige, senior vice president
10 and manager, Government Solution Group.
11       Had you communicated with Mr. Paige in any
12 way regarding Mr. Pai?
13   **A  No, I don't think so.**
14   Q  Was Mr. Paige's letter to Ashok, where he
15 writes, "I regret to inform you that your
16 employment with Camber Corporation will be
17 terminated effective October 31st, 2014, due to
18 the customer changing the requirements for your
19 position," period, was that correct or incorrect?
20   **A  That was correct.  So that's leading from**
21 **the e-mails we have seen with HR.**
22   Q  This termination letter does not mention

131

1  Mr. Pai's performance, does it?
2    **A  No.**
3    Q  This termination letter does not mention
4  Mr. Pai's sleeping in the cube, does it?
5    **A  No.**
6    Q  This termination letter does not mention
7  Mr. Pai's absences or lateness on Mondays?
8    **A  No.**
9    Q  The next sentence goes on to say:
10 "Although we have no apparent ongoing task in
11 which we would be able to gainfully utilize your
12 skills, we encourage you to visit the career
13 site."
14       You previously testified you did not do
15 anything to inform yourself of whether there were
16 any other tasks Mr. Pai could do, other than
17 perhaps a discussion with Adesh?
18   **A  And recommending to him the same thing,**
19 **which he visit our site, the career site, and look**
20 **for opportunities.  That was our standard**
21 **protocol.**
22   Q  Did Mr. Paige or anyone at Camber inform

132

1  you whether there had been any effort to inform
2  themselves of whether Camber did or did not have
3  an apparent ongoing task that they could utilize
4  Mr. Pai in?
5    **A  I'm not sure if I understood the question.**
6    Q  Yeah, let me have it read back so I can
7  hear it myself.
8        (The reporter read the record as follows:
9        "Did Mr. Paige or anyone at Camber inform
10 you whether there had been any effort to inform
11 themselves of whether Camber did or did not have
12 an apparent ongoing task that they could utilize
13 Mr. Pai in?")
14   Q  Let me try it this way.  You previously
15 testified that you didn't do anything to inform
16 yourself whether there were any of the tasks
17 available in accord with what Mr. Pai had asked
18 for when he talked about cyber security, business
19 development, training, and such.  He described
20 generally nonbillable.  You did not do anything to
21 inform yourself whether that existed, other than
22 possibly talking with Mr. Jain?

133

1    A  You know, so the process was that the
2  person - in this case, Mr. Pai - would take the
3  initiative, visit the career site, explore
4  opportunities, and then they would follow up on
5  that. I didn't proactively go out and ask
6  people -- as you see, many people resigned and
7  departed from my program. I did not go out and
8  look for matching opportunities for them.
9    Q  The answer to the question, then, is no?
10   A  Correct.
11   Q  Did Mr. Paige or anyone else at Camber
12 tell you that they had proactively looked to see
13 if there was any apparent ongoing tasks that could
14 use Mr. Pai's skills?
15   A  They did not tell me. And as I said, I do
16 not recall communicating with Michael Paige.
17   Q  And the "they" is fairly broad, as anyone
18 at Camber, not just Mr. Paige.
19   A  My management chain and human resources
20 department.
21   Q  They didn't tell you they had looked to
22 see if there were any ongoing tasks?

134

1    A  They didn't tell me either way, if they
2  had or had not.
3    (KHALIL Exhibit 20 was marked for
4  identification and attached to the transcript.)
5    MR. STERN: Copy to counsel.
6    Q  Exhibit 20 to your deposition is your
7  agenda and supporting docs for the October 28th
8  program review meeting?
9    A  Correct.
10   Q  And the second page of that exhibit is the
11 DSM [sic] PM weekly that you prepared for that
12 meeting. Correct?
13   A  Uh-huh.
14   Q  Yes?
15   A  DSD.
16   Q  The new title of the individual, DSD.
17   A  Uh-huh.
18   Q  Got it. I understand. You prepared that
19 second page. Correct?
20   A  That's correct.
21   Q  And the staffing bullet points for
22 October 28th includes, now under departures,

135

1  Ashok Pai, 10/31/14. Correct?
2    A  Correct.
3    Q  No longer includes Ashok Pai 10/31/14 as a
4  resignation. Correct?
5    A  Correct.
6    Q  And under the recruitment, hiring, and
7  on-boarding activity, the Ashok's backfill remains
8  the same, .NET/SP Dev, interviewing candidates.
9  True?
10   A  True.
11   Q  Likewise, for the Robert backfill, same
12 position -- well, same bullet point .NET/SP Dev,
13 interviewing candidates for that one, too?
14   A  Yes.
15   Q  Now, immediately above that - we're still
16 in the recruitment, hiring, and on-board
17 activities - this one lists with respect to Hang's
18 backfill and a selection of Emita and Srini's
19 backfill for .NET Dev, and a selection for that,
20 Bhavana, if I'm pronouncing that correctly. It
21 lists, following each of those individuals' names,
22 some abbreviations with some dollar signs next to

136

1  it.
2    So let me direct your attention to the
3  first one, the Hang backfill, ISE2 68.43. What
4  does ISE mean?
5    A  These are like our labor categories and
6  the hourly rates associated with them.
7    Q  Hourly rates, you mean billed to the
8  customer?
9    A  Billed to the customer.
10   Q  And ISE2 and ISE3, while they have
11 different rates, is there any other difference
12 implied to you by ISE2 versus ISE3?
13   A  So these are the tiers we had. So ISE2,
14 ISE3 would be a higher tier.
15   Q  And what are the factors that go into
16 categorizing higher tier from a lower tier on
17 these ISE's?
18   A  Education, number of years of experience,
19 skill set.
20   Q  And looking at the Srini backfill and the
21 Bhavana selected, talks about, in one case, ISA3
22 and another case ISA1. Is there some particular

Transcript of Atif Khalil
Conducted on March 27, 2018

137

1  nomenclature that ISA is an abbreviation for
2  compared to ISE?
3      A  Yeah.  I don't want to speculate, but, you
4  know, it's like systems analyst versus systems
5  engineer, something along those lines.  But I
6  don't know the specific off the top of my head.
7  Like information systems analyst, information
8  systems engineer, some nomenclature like that.
9      Q  And then there's an EOIR security block
10  with a couple of bullet points there.  One of
11  them -- actually, both of them relate to the names
12  of the persons who are listed as selected.  Yes?
13      A  Yes.
14      Q  And so after selection, how does that
15  person get populated into the EOIR security topic?
16  What's the relationship between selection and ISA
17  security -- excuse me.  EOIR security.
18      A  The way we on-board?  We identify a
19  selected, candidate, make sure that they accepted
20  our offer, and then we submitted them to EOIR
21  security for the clearance.  We could not bring
22  them on board until they were cleared by EOIR

138

1  security, and I pull these dates down.
2      So we selected the candidates, and now
3  they've been submitted, so this is my way of
4  tracking that, hey, the process has started.  Or
5  they were submitted on October 14th, and so the
6  customer repeatedly sees that.
7      And as I mentioned, this process typically
8  took about six weeks or so, and then they would
9  come on board.
10      (KHALIL Exhibit 21 was marked for
11  identification and attached to the transcript.)
12      A  Okay.
13      Q  Exhibit 21 is your agenda and supporting
14  documents to EOIR for the Tuesday, November 4th,
15  2014, meeting?
16      A  Correct.
17      Q  And you prepared the page 2, the DSM PM
18  weekly agenda?
19      A  Correct.
20      Q  The staffing departures topic lists
21  Ashok Pai, 10/31/14.  What was discussed on
22  November 4th about Ashok's departure the week

139

1  before?
2      A  I would assume this was not much of a
3  discussion, just the notification that he's
4  departed effective that date.
5      Q  And the ongoing recruitment, hiring
6  activities for that .NET/SP Dev (Ashok's
7  backfill), still interviewing candidates.
8  Correct?
9      A  Uh-huh.  Correct.
10      Q  Any discussion about that that you recall?
11      A  Nothing specifically.  Sometimes, you
12  know, we would say we've got a couple of promising
13  candidates that are in the queue or something
14  along those lines.
15      Q  That's general but not specific to the
16  Ashok backfill document in this DSM PM weekly?
17      A  That's all I can say.  I don't recall the
18  discussions.
19      (KHALIL Exhibit 22 was marked for
20  identification and attached to the transcript.)
21      A  Okay.
22      Q  Exhibit 22 is your e-mail and an attached

140

1  agenda statement for the December 16th, 2014,
2  program review meeting.  Yes?
3      A  Yes.
4      Q  You prepared page 2 of the DSM PM weekly
5  for that meeting?
6      A  Yes.
7      Q  Under recruitment, hiring, and on-boarding
8  activities, you reported, with respect to the
9  .NET/SP Dev (Ashok's backfill), the bullet point,
10  Saritha Prathipati selected ISA3.  Correct?
11      A  Correct.
12      Q  And you've testified that that reporting
13  of a selection reflected that that person had been
14  offered and had accepted an offer?
15      A  That's correct.
16      Q  And we see you reported EOIR security:
17  Saritha Prathipati to security 11/12/14.  Correct?
18      A  Yes.
19      Q  Any discussion about that selection at
20  that meeting?
21      A  I kind of typically introduced the
22  candidate to the client as to what their skill set

Transcript of Atif Khalil
Conducted on March 27, 2018

153

1 agencies yesterday to submit for candidates."
2      Does that jog your memory about this?
3    **A** Not really. I mean, this is like a
4 **comment that he entered that I probably didn't see**
5 **or pay attention to.**
6    Q And on 3/30/15, the last update reported
7 in the comment section on this, it states: "Offer
8 extended to Peter Chu today. Moving on to hold
9 until he gets his clearance."
10   **A** Okay.
11   Q If Peter Chu were the backfill for
12 Mr. Pai, does this inform that that was a senior
13 net position?
14   **A** Not necessarily. As you see, it's, again,
15 **as I mentioned, a very fluid situation with lots**
16 **of people leaving and lots of people coming in.**
17 **So we can't custom design a candidate. And at any**
18 **time we had multiple requisitions open, so we were**
19 **getting a variety of candidates.**
20      **And so, again, depending on who came in**
21 **when, with what background and skill set, it would**
22 **get plugged in to different openings we had. So**

154

1 **it's Eddie/iPlace was an agency, plus nine other**
2 **agencies, so we had a lot of activity in this area**
3 **where we had constant flow of candidates coming**
4 **in, and requisitions that we had opened.**
5 **Recruiters may or may not pay attention to these**
6 **requisitions and send us a candidate that they**
7 **think we would like or could use.**
8    Q So the outside agencies -- I know we
9 talked about the internal and the outside, you
10 called them staffing agencies earlier this
11 morning. Yes? Remember that discussion?
12   **A** Right. Yes.
13   Q Would the requisitions that you would want
14 to be sent out to those outside agencies, would
15 that be done by sending them requisitions?
16 Mechanically, how is it that the outside agencies
17 would be knowing what to look for?
18   **A** So they would find it on our website. And
19 **this comment reminded me. So Eddie was our**
20 **internal recruiter. We had an internal recruiting**
21 **team. I recall that initially I was working**
22 **directly with the agencies, and at some point we**

155

1 **changed the process so Eddie became the point of**
2 **contact. So he would then coordinate with these**
3 **agencies and kind of be the middle man instead of**
4 **having us work with them directly.**
5      **So we ran everything through our**
6 **recruiters and our recruiting group. So I'm not**
7 **sure what Eddie shared with them. But this job**
8 **description was public because it was posted on**
9 **our career site so they could easily go in and**
10 **find it.**
11   Q The agency might have come to you, so to
12 speak. They could log in and find those openings?
13   **A** Sure.
14   Q Okay. Now, when a requisition is
15 created - for example, the information in the
16 requisition information block at the top of the
17 second page of Exhibit 27, title, office location,
18 so forth - does that have to be entered manually,
19 one by one, by whoever is drafting the
20 requisition, or is there a process by which
21 material can be copied and pasted?
22   **A It's mostly copied and pasted. So I think**

156

1 **there was an option to, like, take a previous**
2 **requisition and copy it and then update it as**
3 **needed.**
4    Q Was a requisition for a junior .NET
5 developer ever posted for the Ashok Pai backfill
6 vacancy?
7    **A I believe so.**
8    Q And that's based on what?
9    **A Just the e-mails we've seen.**
10   Q Do you know if it was posted?
11   **A I do not have access to the system. I**
12 **don't recall exactly.**
13      **There's one other distinction in the**
14 **context of these requisitions, the SharePoint**
15 **skill set as opposed to the .NET skill set.**
16   Q You're pointing to what page, what part?
17   **A So if you look at 324, the required**
18 **qualifications, focusing on the .NET skill set,**
19 **and desired qualifications. So desired**
20 **qualifications states experience with SharePoint**
21 **technology.**
22      **So basically, over the years, on the EOIR**

157

1  program, we shifted away from, when we hired
2  Ashok, we were doing work in SharePoint, and then
3  the focus shifted to more .NET development. So as
4  we evolved, all of our requisition changed from
5  SharePoint being a required qualification to a
6  desired, and .NET became required.
7      Q  And what's the relationship between this
8  senior net developer requisition and the backfill
9  of the Pai position? You said you believed it had
10 been posted as a junior net developer.
11     A  So I see this as like a sample .NET
12 developer requisition, and the difference between
13 senior and junior, or mid level, would be the
14 number of years of experience and maybe some of
15 the required qualifications would be lighter.
16     Q  What is your work address and work phone
17 number?
18     A  Today?
19     Q  Today, yes.
20     A  Address is 3865 Wilson Boulevard,
21 Suite 700, Arlington, Virginia, 22203. And the
22 work phone number is (571) 224-9361.

158

1      Q  And your residential address is the same
2  location where the subpoena was served. Yes?
3      A  Correct.
4      Q  Do you have any plans to be out of state,
5  out of Virginia, in June, July, and August of this
6  year?
7      A  I may have vacation. Nothing defined at
8  this time.
9      Q  Any plans to move out of Virginia in June,
10 July, or August of this year?
11     A  No.
12     Q  You indicated you had not had your
13 deposition taken before today. Correct?
14     A  That's correct.
15     Q  Have you ever testified in court under
16 oath or penalty of perjury?
17     A  I've been -- you know, for traffic
18 tickets, I've gone to court a couple of times. I
19 was on a jury one time.
20     Q  You didn't testify when you were a juror?
21     A  No, I don't think so.
22     Q  So your court experience was sitting

159

1  potentially in the jury box and the traffic.
2      A  Yeah.
3      Q  Nothing else?
4      A  No.
5      Q  Do you have any relatives or close friends
6  who are or were employed at Avia or Camber?
7      A  No relatives. I have friends.
8      Q  Anyone you regard as a close friend who
9  was employed at Camber or Avia?
10     A  I guess "close" is a subjective term. But
11 yeah, I have some friends that I'm still in touch
12 with that were employed at Avia and Camber, and
13 they're no longer there, actually.
14     Q  Have you talked to any of them about
15 Mr. Pai.
16     A  No.
17     Q  This case?
18     A  No.
19     Q  Your deposition?
20     A  No.
21     Q  Did they tell you anything about Mr. Pai?
22     A  No. So Mr. Pai -- you know, our team at

160

1  EOIR was local to the Falls Church location, so
2  nobody outside of that knows the team or knows the
3  individuals there. So it's kind of disconnected
4  when you're at a client site.
5      Q  Now, were there any e-mails that you have
6  reviewed recently that you didn't see amongst the
7  exhibits today?
8      A  No. I think some of this stuff I had not
9  seen, but I think most of the e-mails -- I mean, I
10 didn't see the overall -- is it the lawsuit
11 document? I had seen that e-mail. We didn't look
12 at it today.
13     Q  Now, with respect to Mr. Myatt's e-mail to
14 you on October 1st that we've already discussed,
15 "Please proceed with replacement of Ashok Pai from
16 the .NET team at government's request," did you
17 ask him for that e-mail?
18     A  So I recall my conversation leading up to
19 it was that, you know, as I mentioned, over the
20 last couple of years we had issues with his
21 attendance and performance, and then I
22 communicated to the client that he had decided to

Transcript of Atif Khalil
Conducted on March 27, 2018

161

1  move out to California and we were going to -- he
2  essentially resigned and he was going to move out
3  of the program.
4      And then I think the two weeks later that
5  he had change of heart, change of plans, and my
6  understanding was that the government was not open
7  to a change at that point. They wanted him
8  replaced.
9      And as I was getting the items from HR, as
10 we saw in an e-mail, this was one of the options,
11 where I requested that if he's able to send me an
12 e-mail, that that would make things -- allow me to
13 proceed.
14     Q  And how soon after you asked him for that
15 did you receive the October 1st e-mail?
16     A  So if I recall correctly, so this is
17 Wednesday, so I think I discussed it with him on a
18 Tuesday weekly meeting and then the following day
19 he sent me the e-mail. This is Wednesday, the
20 date of that e-mail?
21     Q  His e-mail, yeah, Wednesday, October 1st,
22 2014, at 9:42 a.m.

162

1      A  So I must have talked to him about the
2  subject the day before at the Tuesday weekly
3  program review meeting.
4      Q  So it's your testimony that Mr. Myatt's
5  October 1st e-mail to you that morning resulted
6  from your weekly meeting Tuesday, September 30th,
7  a day before?
8      A  As best as I can recall.
9      Q  And is it your testimony, then, that that
10 request that you conveyed on the Wednesday to
11 Mr. Myatt was based, among other things, on
12 guidance you had gotten from HR?
13     A  Yes.
14     Q  And was that guidance from HR, was that
15 anything other than the quoted sentence or so that
16 you sent back to Lisa saying, "feedback from
17 September" -- from the Friday before?
18     A  That was it.
19     Q  That was it.
20     Now, with respect to the March 2014
21 Performance Improvement Plan placed upon Mr. Pai
22 while you were all employed under Avia at that

163

1  time --
2      A  Correct.
3      Q  -- was that something that had been
4  discussed with EOIR before that was instituted?
5      A  So generally we didn't discuss specific
6  Performance Improvement Plans, but if it was --
7  you know, the attendance issue would be visible to
8  them. So it may not have been discussed very,
9  very specifically, we didn't share the document
10 with them, but we may have told them that we're
11 proceeding to that level where we're issuing a
12 written plan.
13     Q  You said "we may." Do you recall if you
14 did?
15     A  I don't recall.
16     Q  Now, before the performance plan was put
17 on Mr. Pai, you and Mr. Jain had recommended that
18 he be terminated for cause. Yes?
19     A  I don't recall exactly. It may have been
20 because of the unapproved leave.
21     Q  Did you come to an understanding of how
22 the recommendation to terminate Mr. Pai for cause

164

1  regarding that leave thing, how that ended up in a
2  Performance Improvement Plan instead?
3      A  I don't recall exactly. But we must have
4  agreed to move forward with that plan instead of
5  termination.
6      Q  Was EOIR informed by you that Mr. Pai was
7  going to be terminated at that time?
8      A  I would not think so. Because once you
9  move to that step, it's difficult to convince them
10 to come back. And so I probably did not. So the
11 maximum I would have done is just notified that
12 we're putting him on a written plan so that
13 incident doesn't occur again.
14     Q  Did EOIR express any frustration or
15 concern about Mr. Pai being absent from work while
16 attending the SharePoint conference in 2014?
17     A  I don't recall specifically. But in
18 general, I do recall that his attendance was a
19 point of frustration for the client.
20     Q  Was his absence due to attending the
21 SharePoint conference a point of frustration
22 expressed to you by EOIR?