# EXHIBIT C

**Page 1**

```
IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
         ALEXANDRIA DIVISION

- - - - - - - - - - - - -x
UNITED STATES EQUAL          :
EMPLOYMENT OPPORTUNITY       :
COMMISSION,                  : Civil Action No.
         Plaintiff,          : 1:17-cv-1084
    v.                       : (AJT/JFA)
CAMBER CORPORATION,
         Defendant.
- - - - - - - - - - - - -x

         Deposition of HOWARD MYATT
              McLean, Virginia
          Wednesday, March 28, 2018
                 9:25 a.m.


Job No.: 179323
Pages: 1 - 117
Reported By: Janice Jones, RPR, CLR
```

**Page 2**

```
Deposition of HOWARD MYATT, held at the offices of:


    Planet Depos - Tysons Corner
    8720 Greensboro Drive
    Suite 110
    McLean, Virginia 22102
    888.433.3767



Pursuant to notice, before Janice Jones, RPR, CLR,
Notary Public in and for the Commonwealth of Virginia.
```

**Page 3**

```
         A P P E A R A N C E S
ON BEHALF OF PLAINTIFF:
    ROBERT STERN, ESQUIRE
    EQUAL EMPLOYMENT OPPORTUNITY
    COMMISSION - PHILADELPHIA
    801 Market Street - Suite 1300
    Philadelphia, Pennsylvania 19107
    215.440.2868

ON BEHALF OF DEFENDANT:
    ROBERT ORTBALS, JR., ESQUIRE
    CONSTANGY BROOKS, SMITH & PROPHETE, LLP
    7733 Forsyth Boulevard - Suite 1325
    St. Louis, Missouri 63105
    314.925.7270
```

**Page 4**

```
    A P P E A R A N C E S   C O N T I N U E D
ON BEHALF OF EXECUTIVE OFFICE FOR IMMIGRATION REVIEW:
    MARIA N. COLEMAN, ESQUIRE
    OFFICE OF THE GENERAL COUNSEL
    EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
    ASSOCIATE GENERAL COUNSEL
    EMPLOYEE AND LABOR RELATIONS UNIT
    5107 Leesburg Pike
    Falls Church, Virginia 22041
    703.756.8426
```

Page 5

INDEX

| | Page |
|---|---|
| By Mr. Stern | 7 |
| By Mr. Ortbals | 110 |

EXHIBITS

| | | Page |
|---|---|---|
| Exhibit 1 | Subpoena to Produce Documents Information, or Objects or to Permit Inspection of Premises in A Civil Action | 6 |
| Exhibit 2 | Letter - March 23, 2018 U.S. Department of Justice | 6 |
| Exhibit 3 | Schedule B | 6 |
| Exhibit 4 | E-mail Chain - September 9, 2014 | 6 |
| Exhibit 5 | E-mail - October 1, 2014 | 6 |
| Exhibit 6 | Letter - October 17, 2014 | 6 |
| Exhibit 7 | Statement of Work | 6 |

Page 6

PROCEEDINGS
THEREUPON,
     HOWARD MYATT,
called as a witness on behalf of the Plaintiff and, after first having been duly sworn or affirmed, was examined and testified as follows:
     (Thereupon, Deposition Myatt Exhibit Numbers 1 through 7 were marked for identification.)
     DIRECT EXAMINATION
BY MR. STERN:
     Q   Good morning. Could you please state your name and business address for the record?
     **A   Howard Myatt, and business address would be 5170 (sic), Leesburg Pike, Falls Church, Virginia.**
     Q   I'm Jeffrey Stern. I'm the attorney for plaintiff, EEOC, in this case.
     You are working for what employer? Who is your employer?
     **A   I work for the Office of Information Technology for the Executive Office of Immigration Review -- for Immigration Review, sorry.**
     Q   And your workstation was the business

Page 7

address you just recited?
     **A   Correct.**
     Q   With respect to Camber Corporation, the defendant in this case, what position do you have?
     **A   I was the contracting officer representative for that contract, and I am the applications development chief for OIT.**
     Q   That is sometimes called or referred to as COTR, C-O-T-R?
     **A   It used to be. They changed the name a few years back.**
     Q   What is the acronym now?
     **A   Contracting officer representative. They just got rid of the "technical."**
     Q   Did you have any role on that contract under a predecessor company?
     **A   Camber bought out Avaya and inherited Avaya's contract and contract team.**
     Q   You were COTR for the contract when it was under Avaya, too?
     **A   Correct.**
     Q   When did you start being the COTR on the

Page 8

Avaya contract?
     **A   The middle of 2011.**
     Q   You remained the COTR -- what is that acronym?
     **A   COR.**
     Q   COR, until when?
     **A   Until the contract concluded, which would have been July 30, 2016.**
     Q   What was the gist of the contract service that had been provided by Camber?
     **A   Camber was providing IT services on site for the purposes of maintaining, modifying and building new applications for the Executive Office for Immigration Review.**
     Q   Was that the same and also true with respect to Avaya?
     **A   Yes, it was. Same -- same statement of work.**
     Q   You indicated the contract with Camber expired in January 2017?
     **A   2016, sir.**
     Q   2016. Was there a successor contract for

**Page 13**

1  talk about the content of Exhibit 4 to your deposition.
2   A   Okay, sir.
3   Q   You have seen all of the documents
4  collected in Exhibit 4 to your deposition before
5  looking at them today?
6   A   Yes, sir.
7   Q   Is Exhibit 4 to your deposition the
8  collection of documents responsive to the Items 1, 2, 3
9  at the bottom of Page 1 of Exhibit 2 to your
10 deposition, the collection of DCIOs?
11  A   Yes, sir, I believe they are.
12  Q   The collection of DCIOs in Exhibit 4 to
13 your deposition, was received by you from Atif?
14  A   Atif.
15  Q   Atif Khalil?
16  A   Atif Khalil, yes.
17  Q   Who was Atif Khalil with regard to the
18 Camber and Avaya project?
19  A   Atif was the program manager employed by
20 Camber, so he would be the highest ranking Camber/Avaya
21 employee on premise.
22  Q   Was he the program manager during the whole

**Page 14**

1  period, Avaya through the end of the Camber contract?
2   A   No. There were several predecessors prior
3  to Atif. One of them's first name was Robin. I cannot
4  remember his last name. Prior to that, they had
5  another program manager in there. But that was before
6  I took over as COR.
7   Q   That would be before 2011?
8   A   Yes.
9   Q   The entire time that you were COR on this
10 project of -- during Avaya and Camber, was there any
11 other PM than Mr. Khalil?
12  A   For the first six or seven months that I
13 was there, Robin was the PM, and then Avaya replaced
14 him.
15  Q   You had mentioned that there was an
16 alternate COTR or COR for you designated in the
17 Statement of Work?
18  A   It would actually be designated in the
19 contracting document.
20  Q   Designated in the contracting document.
21      During Mr. Khalil's tenure as the PM -- is
22 that a proper reference?

**Page 15**

1   A   Program manager, yes.
2   Q   Program manager for the contractor, was
3  there any designated alternate program manager?
4   A   No.
5   Q   Directing your attention to the top page of
6  Exhibit 4 to your deposition --
7   A   (Indicating.)
8   Q   -- that is the first responsive DCIO that
9  you collected, responsive to the subpoena?
10  A   Yeah.
11  Q   All right. And it's an e-mail from Khalil
12 to you and others?
13  A   Correct.
14  Q   And the subject says, "Weekly Program
15 Review Meeting (09/09/14).
16     What was a "Weekly Program Review Meeting"
17 on this project?
18  A   That would be myself, the alternate COR
19 Dave Fruehwald, the at the time Deputy CIO for software
20 development, Kate Ahn, and Atif getting together for
21 about a half an hour to discuss anything relevant to
22 the project and what its potential impacts might be.

**Page 16**

1   Q   Were these meetings on a fixed day every
2  week or vary from day to day?
3   A   Typically, we held them Tuesday afternoons.
4  It tended to move around to accommodate Kate's
5  schedule.
6   Q   You mentioned Kate as Deputy CIO or what is
7  CIO?
8   A   Deputy chief information officer.
9   Q   Again, returning to the top page of
10 Exhibit 4, the first e-mail, it says, "Date, Tuesday,
11 September 9th."
12      So Tuesday was the routine day for --
13  A   At that point in time. Now we hold them on
14 Wednesdays.
15  Q   All right. The timestamp says, "1:13 p.m."
16 on that day?
17  A   Yes, sir.
18  Q   That was sent and received by you before
19 that day's meeting. Is that correct?
20  A   That's correct.
21  Q   So the meeting would have been after 1:13
22 p.m.?

**Page 17**

1  A  Typically, we held them about 3:00 p.m.
2  Q  There are three attachments listed on
3  the --
4  A  Yes, sir.
5  Q  -- e-mail on Page 1 to Exhibit 4. One is
6  an IT budget. It says, "FY," fiscal year 2014?
7  A  Correct.
8  Q  Then the next one says, "v20."
9     What is the "v"?
10 A  That was, I believe, the organization chart
11 for the contractor.
12 Q  Directing your attention to the three
13 attachments listed on that page, the one I am
14 discussing, it says, "xls."
15    That is the spreadsheet?
16 A  Yes, that would be the budget spreadsheet.
17 Q  The bottom item says, "DOJ EOIR org."
18    Do you understand when I say, EOIR org," I
19 mean E-O-I-R?
20 A  EOIR, just like the character.
21 Q  From the book?
22 A  Yes.

**Page 18**

1  Q  Understand. "EOIR ORG STRUCTURE, FY 18."
2  A  That would be the org chart. That would be
3  a Vizio diagram.
4  Q  A graphic?
5  A  Yes.
6  Q  And the middle one, what is that?
7  A  The one that begins with "DCIO-PM" would be
8  the agenda for the meeting. That would be the items
9  that Atif planned to make us aware of.
10 Q  Then the second page of this exhibit --
11 A  (Indicating.)
12 Q  -- that was the PM for 09/09/14 DCIO that
13 you have just referenced?
14 A  Yes, sir.
15 Q  There were a variety of topics that were
16 listed with little circles, and then bullet points
17 underneath various ones.
18 A  Yes.
19 Q  The first one says, "FY Budget ver 20."
20    Is that version 20, the first bullet item
21 under administration?
22 A  Yes.

**Page 19**

1  Q  Same thing for the next item that is "Org
2  Chart Version 18"?
3  A  Yes.
4  Q  That is referencing those attachments?
5  A  That referencing the two other attachments,
6  yes, sir.
7  Q  Then the "Staffing" topic is populated by a
8  number of filled-in bullet points. Yes?
9  A  Yes, sir.
10 Q  This is the first instance of a DCIO that
11 you found that mentioned Ashok Pai?
12 A  Yes, it is.
13 Q  Who was Ashok Pai?
14 A  He was a DotNetSharePoint developer
15 employed by Camber on this contract.
16 Q  What does that mean?
17    What is the DotNetSharePoint? What are
18 those things?
19 A  SharePoint is a document management and
20 content management platform that is marketed by
21 Microsoft. EOIR uses this as one of its application
22 platforms.

**Page 20**

1     DotNet is a software development framework
2  also marketed by Microsoft. We use that for building
3  custom applications.
4  Q  Was the description you just gave regarding
5  Ashok Pai's position, was that true during your entire
6  tenure as a PM until he separated?
7  A  Yes, sir. That was the development team he
8  was on.
9  Q  Returning to the "Staffing," first bullet
10 point Exhibit --
11 A  (Indicating.)
12 Q  -- 4, Page 2 of your deposition, the topic
13 there says, "Resignations - Ashok Pai," and there is a
14 parenthetical, "(10/31/14)."
15    That was a topic that was brought to your
16 attention in the DCIO PM weekly?
17 A  Yes, sir.
18 Q  Was the resignation of Ashok Pai that is
19 bullet-pointed, was this brought to your attention
20 before then?
21 A  No, this was the first notice we had that
22 he had resigned.

**Page 21**

1  Q   Was that discussed during that week's
2  weekly meeting?
3  A   Almost certainly, but I really can't
4  remember what the discussion was. It was four years
5  ago.
6  Q   No recollection of anything that the Camber
7  PM said during that meeting about Ashok Pai?
8  A   No, sir.
9  Q   No recollection of anything the EOIR
10 representative said at that meeting about Ashok Pai?
11 A   No, sir. I --
12 Q   Next bullet point, "Departures."
13 Mr. Khalil indicated "None." Is that correct?
14 A   Correct.
15 Q   All right. One person is mentioned in the
16 on boarding bullet point?
17 A   Yes, sir.
18 Q   Various upcoming absences, key personnel
19 are listed. Yes?
20 A   Yes, sir.
21 Q   No remarks about training?
22 A   None.

**Page 22**

1  Q   No "Risks/Issues" discussion?
2  A   None on this meeting.
3  Q   No populated bullet point for "Requests" or
4  "General"?
5  A   No, sir.
6  Q   Directing your attention -- what is the
7  next item on this list?
8  A   That would be a
9  "Requirement/Hiring/on-Boarding Activities."
10     This would be where Atif would indicate new
11 people that he was either attempting to on-board or
12 proposing to on-board.
13 Q   As a general matter, when Atif was
14 proposing to on-board someone and he would discuss it
15 at one of these meetings, what was the role that EOIR
16 had after hearing what his proposal to on-board someone
17 would be?
18 A   As the COR, they put together a package of
19 security documents that I have to take over to the
20 physical security office to initiate a background
21 check, because they cannot on-board that person until
22 they -- technically, they are supposed to get a

**Page 23**

1  clearance from OMB, but it takes about two years, so
2  what happens is once OMB opens an investigation, our
3  physical security office runs a background check on
4  them and a financial check on them and then issues a
5  waiver that allows us to on-board them until the
6  investigation at OMB finishes.
7      At which point then the contractor can
8  bring them on board.
9  Q   Any substantive discussion of persons
10 proposed to be on-boarded by the PM?
11     By "substantive," I mean qualifications,
12 what they would do, pros and cons regarding the
13 individual.
14 A   Typically, we would have a discussion about
15 the skill set. At any given time as you can see from
16 going through here, we would have a fair amount of
17 turnover on the contracts. So there would be three,
18 four, five positions open.
19     If you look at the Statement of Work, if we
20 don't have a fixed team size for any of the skill sets,
21 it can fluctuate depending on how much work we have for
22 the Cold Fusion team, the COGNOS team, the SharePoint

**Page 24**

1  DotNet team.
2      So the contractor and the government has a
3  lot of flexibility. The government can say, "We are
4  not going to be doing that much DotNet work. We can
5  shrink that team down and use the money" -- because
6  what we are really managing is the money -- "to
7  increase the size of the Cold Fusion team or in
8  reverse, we anticipate a lot of DotNet development over
9  the next couple of months to a year. We need to
10 increase the size of that team," and as long as the
11 money doesn't change, it really does not have to
12 involve the contracting officer.
13 Q   Returning briefly to that topic,
14 "Recruitment."
15 A   (Indicating.)
16 Q   I'm sorry. I didn't mean to interrupt.
17 Was there --
18 A   No, that's okay. No, I was done.
19 Q   It may be presumptuous of me, but I assume
20 you -- have ever testified before?
21 A   No, sir.
22 Q   In a deposition or in court?

**25**

1  A   In court, yes.
2  Q   Testimony in a deposition is similar to
3  that in court except there is no judge here to rule on
4  objections, if any are made.
5       There is no jury here to listen to what you
6  have to say, but the question-and-answer format is the
7  same. You appear to understand that from our
8  discussion. Is that correct?
9       Do you understand the lawyer asks the
10 question and the witness answers?
11 A   Yes, sir.
12 Q   You also understand that if you can't hear
13 the question, you need to let me know so that we can
14 have the reporter read it back?
15 A   Yes, sir.
16 Q   And that I assume you have heard every
17 question unless you tell me you didn't?
18 A   Yes, sir.
19 Q   Same thing for understanding. I will
20 assume you understand a question unless you tell me you
21 did not understand it?
22 A   Yes, sir.

**26**

1  Q   I wonder if I could have my last
2  substantive question before we went into the experience
3  of testifying?
4       (Thereupon, the requested testimony was
5  read back as above recorded.)
6  BY MR. STERN:
7  Q   As populated on Page 2 of Exhibit 4 of your
8  deposition, you had mentioned EOIRs for your interest
9  as the COR or COTR on the money question?
10 A   Yes.
11 Q   With respect to recruitment, on-boarding or
12 hiring activities on this project?
13 A   Yes, sir.
14 Q   The first one lists a -- it says, "Tester
15 (Hang's backfill)."
16      What was a "Tester"?
17 A   So this would be a software tester. So
18 after the developers have finished coding up a
19 particular change to the software program, a tester
20 will go in there and verify that it works correctly.
21 Q   Then the parenthetical next to the word
22 tester is "Hangs Backfill."

**27**

1       I assume Hang is a name or surname of an
2  individual who had separated?
3  A   Yes, sir.
4  Q   What is backfill? What does that mean?
5  A   In this case since we still needed that
6  amount of testing capacity, we would have requested
7  that they bring in another tester to replace the one
8  that had left.
9  Q   Following that parenthetical, it says,
10 "ISE2."
11      What is that acronym? What is ISE
12 referring to?
13 A   That would be the labor category. So the
14 ISE2 is, I believe, information systems engineer.
15 Q   So that was the labor category of the
16 position to be backfilled after Hang.
17      Is that the first name or surname there?
18 A   Honestly, I can't remember.
19 Q   Backfill of the Hang position?
20 A   Yes.
21 Q   In that instance following "ISE2," it says,
22 "$68.43" after a dollar sign.

**28**

1       What is the relationship of $68.43 to the
2  ISE2?
3  A   That would be the labor rate for that
4  particular labor category.
5  Q   Labor category and hourly rate. That is
6  the rate to be billed by the contractor to the
7  government for this Hang backfill work?
8  A   That would be correct.
9  Q   Then underneath that there is a filled-in
10 bullet point, "Emita Choudhury selected ISE3, $81.48,
11 six plus year of testing experience."
12      What is your understanding of what that
13 meant on this DCIO PM?
14 A   So the replacement had more experience,
15 which would qualify for a higher labor category.
16 Q   ISE3, the $81.48 rate is a higher labor
17 category?
18 A   Than an ISE2, yes.
19 Q   Khalil justified that with the six plus
20 years of testing experience in EOIR?
21 A   Correct.
22 Q   The next bullet point, "DotNet DEV, Srini's

**Page 29**

backfill. Interviewing candidates."
Q   What is "DotNet DEV"? What does that mean?
A   That would be somebody who is developing applications using Microsoft's DotNet framework and the language of choice we use is called C#.
Q   Srini, like Hang, is someone who had previously done that work and had left?
A   Correct.
Q   Status report underneath that is what?
A   Are you referring to the "interviewing candidates," sir?
Q   Yes. That immediately follows --
A   Yes.
Q   -- the DotNet DEV, Srini's backfill bullet point?
A   Yes.
Q   What is that topic about?
A   That would indicate that Camber would currently be out interviewing and looking for a replacement.
Q   What is the third bullet point in the DCIO for the September 9th weekly meeting, Page 2 of this

**Page 30**

exhibit?
A   You would be referring to the "DotNet/SharePoint DEV Ashok's backfill"?
Q   Correct.
A   Yes.
Q   Compare and contrast the position "DotNet/SP DEV" to the DotNet DEV position for Srini's backfill.
A   DotNet/SharePoint would have the same skill sets as a DotNet developer with the addition of knowledge of the SharePoint platform.
Q   The DotNet/SP DEV, that was to backfill Ashok is that the way you pronounce it?
A   I think it was Ashok or Ashok. I can't remember 100 percent.
Q   It's Mr. Pai?
A   Mr. Pai.
Q   That was to backfill Mr. Pai?
A   Correct.
Q   Whom you understood had resigned?
A   Yes, sir.
Q   And the bullet point underneath that is

**Page 31**

populated, "Opening req."
Q   What is that about?
A   That would indicate that Camber was opening a recruitment to go look for a new candidate.
Q   No discussion remarks under the "EOIR Security" bullet point on this agenda item?
A   No, sir.
Q   Nor on "Programming"?
A   None.
Q   Any discussion at the September 9th PM weekly meeting about the opening req or Ashok's backfill DotNet/SP DEV that we have been talking about?
A   Probably. I don't remember the discussion, but it would have been talked about because it's on the agenda.
Q   Turning to the third page of this exhibit, it's another e-mail from Atif to you and others. This time it is about agenda for the weekly program review for the following week, September 16, 2014?
A   Yes, sir.
Q   The page following is, in fact, the DCIO PM weekly agenda items for that meeting?

**Page 32**

A   Yes, sir.
Q   That you received from Khalil?
A   Yes, sir.
Q   There is only one reference to Ashok on this DCIO PM weekly, Page 3?
A   That is correct.
Q   Again, that is under the same "Recruiting/Hiring/On-boarding Activities"?
A   Yes, sir.
Q   The status remains "interviewing candidates"?
A   Yes, sir.
Q   Do you recall any discussion of that at the weekly meeting --
A   Beyond the -- no. No. I do not.
Q   There is no reference -- in either of the Ashok backfill bullet points that we have discussed so far, there is no reference to the labor category or dollar rate for the Ashok backfill?
A   No, sir.
Q   The September 16, 2014 DCIO that we are talking about right now, what is the bullet point

61

1 let me know when you are ready to discuss those
2 "Contract or other provisions."
3    A   Okay. I am ready to answer your question,
4 sir.
5    Q   Is Exhibit 7 to your deposition the
6 collection of contract or other provisions described in
7 Point Number four at the bottom of Page 2 of the
8 attorney's cover letter?
9    A   Yes. That is the Statement of Work for
10 this contract.
11    Q   Item Number 4 in the letter, which is the
12 same as an item in the attachment to the subpoena,
13 mentions Statement of Work regarding place of
14 performance, exceptions or changes thereto.
15    What provision or pages, if any, in this
16 collection --
17    A   Hang on a second. I believe that would be
18 Section 5.2 which outlines the place of performance.
19 It's on Page 67 of the Statement of Work.
20    Q   The place of performance provision in
21 substance says that the principal places of performance
22 is EOIR located at and then the Falls Church address?

62

1    A   Correct. That would be EOIR headquarters.
2    Q   Or the contractor's facility located at
3 TBD, to be determined?
4    A   Correct.
5    Q   Then 5.2.1 lists EOIR's current immigration
6 courts?
7    A   Yes, sir.
8    Q   It looks like there is, what, 59 of those?
9    A   At that time, yes.
10    Q   It would vary from time to time?
11    A   Correct.
12    Q   Is there any provision in this exhibit
13 regarding exceptions or changes to place of
14 performance?
15    A   No, sir.
16    Q   I believe you had mentioned or referred
17 when we were discussing the ISA and ISE labor
18 classifications that there was some reference in the
19 contract or other provisions to that?
20    A   Yes, sir, there is. That would be in
21 Avaya's proposal, which is the second document you have
22 here.

63

1    Q   The second document is the proposal
2 beginning on, following on the footer, Page 79?
3    A   Correct.
4    Q   Then beginning with Avaya's solutions going
5 on from there.
6    Where is that?
7    A   I believe the labor categories start on
8 Page 13 of the proposal.
9    Q   And labor rates associated with those are
10 on Page 15?
11    A   Yes, sir, they are. Those would be the
12 rates that were in effect for the base year -- oh,
13 excuse me. They also have -- they also have the option
14 years on here, too.
15    Q   Those option years run through
16 November 30th of 2012?
17    A   That would be correct, sir.
18    Q   I think you had referenced earlier when we
19 were discussing some of the entries on agendas or ISEs,
20 I believe you described them as Information Systems
21 Engineers, ISE?
22    A   ISE is systems engineers. ISA would be

64

1 systems analysts.
2    Q   On the labor rates, Page 15, I believe of
3 the Avaya proposal document --
4    A   (Indicating.)
5    Q   -- there is Information System Analyst 1, 2
6 and 3 listed?
7    A   Yes, sir.
8    Q   And there are four grades of ISEs,
9 Information Systems Engineers?
10    A   Yes, sir.
11    Q   In the labor category sheet for minimum
12 general experience, functional responsibility and
13 minimum education, those are depicted starting on Page
14 13 of the Avaya proposal?
15    A   Yes, sir, they are.
16    Q   And row number four, Information Systems
17 Analyst 3, row number five, Information Systems Analyst
18 2, and row number six, Information Systems Analyst 1
19 are all depicted on Page 13?
20    A   Correct, sir.
21    Q   The agenda items characterize the person
22 selected to backfill Ashok's position as ISA3. Yes?

**65**

1   A   Let me verify.
2   Q   It's referenced as Saritha.
3   A   Yeah. I just want to make sure I get it
4   right. ISA3 and ISE3 are easy to confuse.
5   Q   Sure.
6   A   Yes, sir. It was an ISA3.
7   Q   Returning to the attorney's cover letter,
8   Exhibit 2 to your deposition on Page 2, Exhibit 7, it
9   was responsive to Item Number 4, the contract or other
10  provisions regarding place of performance?
11  A   Yes.
12  Q   And is it also responsive to Item 5,
13  contract or other provisions regarding labor categories
14  applicable to the work performed by Ashok Pai?
15  A   Yes, sir, it is.
16  Q   Including ISA3 and ISA2?
17  A   Yes, sir.
18  Q   Directing your attention to a document
19  labeled Exhibit 3, "Schedule B, Declaration Certifying
20  Authenticity of Records," it's a two-page document on
21  two sides on one sheet of paper.
22      Take a look at it, and we will talk about

**66**

1   it briefly.
2   A   Yes, sir.
3   Q   That is your signature on the bottom of the
4   second page?
5   A   Yes, sir, it is.
6   Q   All right. Declaring that you have
7   produced all records in your custody and control
8   responsive to Plaintiff's request?
9   A   Yes, sir.
10  Q   The records were made at or near the time
11  of the occurrence of the matters set forth and so
12  forth?
13  A   Yes, sir.
14  Q   Dated March 23, 2018. Yes?
15  A   Yes, sir.
16  Q   Last Friday?
17  A   Last Friday.
18  Q   Next I'm going to direct your attention to
19  a single-page document labeled Exhibit 5 Myatt with an
20  EEOC production number 32 in the lower right-hand
21  corner.
22      Let me know when you are ready to discuss,

**67**

1   and we will talk about that briefly.
2   A   Okay.
3   Q   Have you seen the e-mail depicted in this
4   exhibit before I handed it to you today?
5   A   As part of this proceeding, no.
6   Q   All right. It is, though, an e-mail that
7   you sent to Atif with a copy to your alternate COR --
8   A   David Fruehwald.
9   Q   -- David Fruehwald on the "Subject:
10  Replacement of Ashok Pai on Wednesday, October 1, 2014"
11  at approximately 9:41 a.m?
12  A   Yes, sir.
13  Q   And your salutation on it says, "Atif"?
14  A   Yes, sir.
15  Q   That is Atif Khalil. Yes?
16  A   Yes, sir.
17  Q   PM for Camber at that time?
18  A   Correct, sir.
19  Q   "Please proceed with replacement of Ashok
20  Pai from the DotNet team at the government's request,"
21  period?
22  A   (Indicating.)

**68**

1   Q   Yes?
2   A   Yes, sir.
3   Q   All right. Had Atif discussed with you
4   making this request?
5   A   I really don't recall. Maybe.
6   Q   Do you recall why you wrote this e-mail on
7   that day?
8   A   Not 100 percent. I believe they requested
9   confirmation that we were going to backfill the
10  position.
11  Q   "They" meaning Camber?
12  A   That would be Camber, yes, sir.
13  Q   You had previously described in general
14  terms the documentary procedure that would have to be
15  followed at EOIR to request removal of an employee.
16  A   Correct, sir.
17  Q   This exhibit is not an example of a request
18  to remove an employee?
19  A   No, sir. This was October 1st after we had
20  already been informed that Ashok had resigned.
21  Q   Do you know whose idea it was to have this
22  written?

**Page 73**

1 reviewed prior to this meeting. Technically, the
2 budget sheets, which breaks out individual labor
3 categories for each individual.
4    Q   When did you review those invoices or
5 budget sheets?
6    A   Prior to sending them to satisfy the
7 subpoenas.
8    Q   Prior to sending them internally within
9 DOJ?
10    A   Yes, sir.
11    Q   All right. So you don't know whether those
12 were ultimately then produced under the subpoena. Is
13 that right?
14    A   That would be correct, sir.
15    Q   It's up to -- DOJ Legal ultimately handles
16 the production of those documents in response to a
17 subpoena. Is that right?
18    A   Yes, sir.
19    Q   ISA P -- I'm sorry. An ISA3 bills less to
20 the government than a program manager.
21    Does that look right?
22    A   Hang on. Let me check. Yes, sir. That

**Page 74**

1 would be correct.
2    Q   So would you expect an employee billing
3 less -- at a less hourly rate to be paid less than a
4 program manager?
5    A   That sounds reasonable, but you have no
6 idea what Camber pays their employees. I just know
7 what they bill the government.
8    Q   Did Mr. Pai's duties primarily focus on
9 performing SharePoint architecture work?
10    MR. STERN: Objection to the form of the
11 question.
12 BY MR. ORTBALS:
13    Q   You can answer the question, sir?
14    MS. COLEMAN: Do you understand it?
15    A   Could you clarify that just a little bit?
16 You mean his duties on this particular contract and
17 project working for the government?
18 BY MR. ORTBALS:
19    Q   Correct.
20    A   He was engaged as a software developer
21 working on both DotNet and SharePoint applications.
22    Q   Did he have a particular focus between

**Page 75**

1 SharePoint or DotNet?
2    A   More than on the C# DotNet coding but the
3 app he was working on was sitting on top of a
4 SharePoint platform.
5    Q   Within the course of the program with EOIR,
6 did the app being developed ever change in focus from
7 primarily SharePoint-based to more DotNet-based?
8    MR. STERN: Objection to the form.
9    A   Yes, but I can't remember exactly when that
10 shift happened.
11 BY MR. ORTBALS:
12    Q   During the course of that shift, did you
13 have discussions with Atif Khalil about the need for
14 more DotNet experience as opposed to SharePoint
15 experience?
16    A   I don't remember a specific discussion, but
17 it is highly probable that we did.
18    Q   It wouldn't be unusual for you and Atif to
19 have discussion about the changing needs of the makeup
20 of the team?
21    A   Requirements discussions are ongoing, yes.
22    Q   As the requirements change, the needs of

**Page 76**

1 the project change?
2    A   Correct.
3    Q   Would it be unusual in any way for the
4 contractor, in this case Atif Khalil, to make
5 recommendations to you as to how the contractor felt it
6 could best fulfill the needs of the projects?
7    MR. STERN: Objection to the form of the
8 question, compound.
9    A   Could you narrow that down a little bit?
10 BY MR. ORTBALS:
11    Q   Well, I mean, let's stick with the idea of
12 the focus of the project kind of shifting from
13 SharePoint to DotNet.
14    Would it be unusual in any way for Atif to
15 bring you proposed recommendations about how to help
16 make that shift happen?
17    A   By "recommendations," do you mean in the
18 form of staffing changes?
19    Q   Correct. Or skill sets needed for the
20 makeup of the team in relation to skill set?
21    MR. STERN: Objection as to form.
22    A   That would -- that would happen

**Page 81**

1 the status reports.
2 Q Well, there was a status report on
3 "Risks/Issues" regarding Ashok Pai's departure. Right?
4 A Yes, sir, there was.
5 Q And that would be the September 30, 2014
6 status report?
7 A Yes, sir.
8 Q I believe you testified earlier that you
9 believed that that "Risks/Issue" discussion was about
10 the Attorney Discipline Project that Ashok was working
11 on. Is that correct?
12 A Correct.
13 Q Do you have an actual recollection of that
14 discussion?
15 MR. STERN: Objection as to form. You may
16 answer the question.
17 A Not really. I'm piecing it together from
18 what that particular developer was working on at the
19 time.
20 BY MR. ORTBALS:
21 Q So you know he was working on the Attorney
22 Discipline Project around the time of his resignation?

**Page 82**

1 A Correct.
2 Q You don't, however, know what the specific
3 risk issue was that was discussed with you on September
4 the 30th of 2014?
5 A I do not remember what was discussed at
6 that meeting, no, sir.
7 Q If Atif Khalil testified that he discussed
8 with you that Ashok was trying to change his plans and
9 not resign, you don't have any memory of that one way
10 or another?
11 MR. STERN: Objection as to form.
12 A I do not recall any conversation of that
13 nature, sir.
14 BY MR. ORTBALS:
15 Q All right. Are you saying that it didn't
16 happen?
17 A I'm saying I don't recall it, and I don't
18 have a record of it.
19 Q But it's possible that that was the risk
20 issue that was discussed in this September 30, 2014
21 meeting?
22 MR. STERN: Objection as to form.

**Page 83**

1 A I do not know.
2 BY MR. ORTBALS:
3 Q And you don't know because you don't know
4 what was discussed in that regard?
5 MR. STERN: Objection as to form.
6 A Once again, it's a meeting from four years
7 ago. I do not recall the exact conversation.
8 BY MR. ORTBALS:
9 Q I think you mentioned earlier that there
10 were three teams within the EOIR project.
11 Is that correct?
12 A Technically, there were more than that.
13 There were three development teams.
14 Q Three development teams that Camber was
15 responsible for?
16 A Correct.
17 Q And then you mentioned one was
18 DotNet/SharePoint. Is that correct?
19 A Yes.
20 Q The other one was Cold Fusion?
21 A Correct.
22 Q What was the other one?

**Page 84**

1 A COGNOS.
2 Q COGNOS. All right.
3 Ashok was on the DotNet/SharePoint team?
4 A Correct.
5 Q So when you sent the e-mail that is
6 Exhibit 5 about proceeding with the replacement of
7 Ashok Pai from the DotNet team at the government's
8 request, that is a reference to the DotNet/SharePoint
9 team. Is that correct?
10 A That would be correct.
11 Q They are not two separate teams?
12 A They are a combined team.
13 Q All right.
14 A Two skill sets, but many of the people on
15 there have both skill sets.
16 Q So from your view, there is no distinction
17 when you are requesting a replacement from the DotNet
18 team versus DotNet/SharePoint?
19 A Yes. We are looking for a particular skill
20 set there.
21 Q Was it your expectation after sending the
22 e-mail that Mr. Pai was not going to remain on the

**Page 85**

1  DotNet team?
2  MR. STERN: Objection as to form.
3  A  Well, we had been informed he had resigned,
4  so I guess the answer would be yes.
5  BY MR. ORTBALS:
6  Q  I mean, you did not expect -- you did not
7  expect to have him replaced if he was going to remain
8  there. Is that right?
9  A  I'm not sure what the question is there,
10 sir.
11 Q  Well, I guess because I'm still not clear
12 on -- the gentleman had already resigned. Is that
13 correct?
14 MR. STERN: Objection as to form.
15 BY MR. ORTBALS:
16 Q  You had already been informed --
17 A  We had been informed on September 9th that
18 he had handed in his resignation.
19 Q  You had also been informed that Camber was
20 opening a requisition and starting the backfill
21 process. Is that correct?
22 A  That is correct.

**Page 86**

1  Q  So from being informed of those two things,
2  you had already been informed that Ashok Pai's
3  replacement was underway. Is that correct?
4  A  We had been informed that Camber was
5  looking for a replacement. Correct.
6  Q  In other words, this was not a scenario
7  where a decision had been made to downsize the position
8  or not backfill it?
9  MR. STERN: Objection as to form.
10 A  I'm not sure what you mean by "downsizing."
11 Can you elaborate?
12 BY MR. ORTBALS:
13 Q  The position had not been eliminated from
14 the program. It was going to be backfilled?
15 A  Yes. We still had a requirement for DotNet
16 SharePoint development.
17 Q  All right. I think, as we have seen today,
18 generally speaking, these weekly meeting agenda items
19 are where Camber informed you as to progress on
20 staffing and backfilling open positions.
21 Is that correct?
22 A  Typically, along with other things that

**Page 87**

1  impact the contract, including dollar -- dollar level
2  expenditures so that we don't overburn or under burn.
3  Q  So if Camber was already in the process of
4  backfilling Mr. Pai's position and they were keeping
5  you apprised of that, what was the need to send the
6  e-mail on October 1st directing the replacement?
7  MR. STERN: Objection as to form.
8  A  I'm not really sure. I just -- I do not
9  remember the reason for sending the e-mail.
10 BY MR. ORTBALS:
11 Q  Is that an e-mail that you would have sent
12 in the normal process of backfilling somebody's
13 position?
14 A  Occasionally, yes.
15 Q  What have been the reasons in the past that
16 you have sent an e-mail similar to Exhibit 5 to the
17 contractor?
18 A  Usually, it would be the PM requesting that
19 he wanted something indicating that we still wanted
20 that position -- that we still had the requirement.
21 Q  When you sent the e-mail, Exhibit 5, were
22 you intending to discriminate against Mr. Pai based on

**Page 88**

1  his age in any way?
2  A  No, sir.
3  Q  When you sent the e-mail, Exhibit 5, were
4  you intending on discriminating against Mr. Pai based
5  on his son's disability?
6  A  No, sir.
7  Q  Did you know anything about Mr. Pai's son?
8  A  Not a lot. We had a request from Atif to
9  allow Mr. Pai to telework once or twice a week in order
10 to accommodate a family medical issue, and we approved
11 that request.
12 Q  When was that request made?
13 A  I don't have an exact record of it. It
14 would have been prior to his resignation in September.
15 So sometime that summer, probably.
16 Q  Sometime in the summer of 2014?
17 A  Correct.
18 Q  It is your understanding that that was made
19 with respect to Mr. Pai's son's condition?
20 A  Yes, sir.
21 Q  Not his wife's medical condition?
22 A  I was not aware his wife had a medical

**Page 89**

1 condition.
2 Q    Who brought -- and it was Atif that brought
3 the request to allow him, Mr. Pai, to telework.
4      Is that correct?
5 A    Correct.
6 Q    And the telework, that was viewed from you
7 as accommodation. Is that right?
8      MR. STERN: Objection as to form.
9 BY MR. ORTBALS:
10 Q   Let me ask it this way: The folks from
11 Camber that were working on the EOIR project were
12 working in person in Falls Church?
13 A   On site at Falls Church, correct.
14 Q   They generally were not permitted to
15 telework?
16 A   Typically, no. But we have done telework
17 arrangements for specific cases. We had a DVA that
18 broke her ankle and couldn't drive for a couple of
19 months, so we allowed her to work from home.
20     We had -- we had done it for a couple of
21 ladies that were pregnant, during their pregnancies.
22 Q   So you provided those as accommodations to

**Page 90**

1 allow them to continue working?
2      MR. STERN: Objection as to form.
3 A    Contingent upon them still being able to
4 perform their duties as required, yes.
5 BY MR. ORTBALS:
6 Q    When their medical conditions or their
7 pregnancies were completed, they came back and
8 physically worked at EOIR. Is that correct?
9 A    Yes, sir.
10 Q   So you have not approved a permanent
11 telework position on the EOIR project?
12 A   No, sir.
13 Q   And the expectation is that absent some
14 type of accommodation that is granted, the workers on
15 the project are going to be physically present at the
16 office in Falls Church, Virginia?
17     MR. STERN: Objection as to form.
18 A   That would be the statement in the contract
19 under the place of performance.
20 BY MR. ORTBALS:
21 Q   The place of performance is Falls Church,
22 Virginia in the contract?

**Page 91**

1 A    Correct.
2 Q    The listing of the various immigration
3 courts' locations throughout the United States is not a
4 statement about the place of work?
5 A    For the most part, no. If you read the
6 contract carefully, originally when Avaya was awarded a
7 contract, they were provided a system called Digital
8 Audio Recording, which was actually installed at the
9 different courts. So it was possible some of the Avaya
10 people would have to go out there and troubleshoot a
11 problem with it.
12     That work in a later mod was transitioned
13 from Avaya to another contractor.
14 Q   That was before the Camber acquisition?
15 A   Yes, I believe so. I would have to look up
16 the specific mod, but that is why those courts are
17 listed under place of performance along with
18 headquarters.
19 Q   And the folks from Camber under the EOIR
20 project were not working in those different
21 courthouses?
22 A   No, they were not.

**Page 92**

1 Q    All right.
2 A    Not at that point in time.
3 Q    Do you know how long the telework
4 accommodation for Mr. Pai was approved?
5 A    Not exactly, no.
6 Q    Was it a matter of months or weeks?
7 A    I believe months. It was a couple of
8 months he was doing -- he was on telework and it was
9 one or two days a week. It was not continuous
10 telework.
11 Q   Was it your understanding that those were
12 times when he was traveling back to California?
13 A   I did not realize he lived in California.
14 Q   All right. But you knew he needed to be
15 gone for something to do with his son's medical
16 condition?
17 A   We were told his son had some sort of
18 medical issue that he needed to be there to take care
19 of.
20 Q   And that was Mr. Khalil that requested that
21 accommodation?
22 A   Correct.

**93**

1  Q  Why did that accommodation end?
2  A  I don't actually remember us ending it, now
3  that you mention it. I think it was still in place at
4  the time he resigned.
5  Q  Was that accommodation discussed at these
6  weekly meetings between you and --
7  A  I don't remember exactly when we discussed
8  it, but it would have been verbally approved because I
9  don't have a written record of it.
10  Q  What do you understand the nature of
11  Mr. Pai's son's medical condition to be?
12  A  I have no idea.
13  Q  So it sounds like you were just made aware
14  that he had some type of medical issue?
15  A  Correct, sir.
16  Q  Do you remember anything else that
17  Mr. Khalil told you about the circumstances surrounding
18  Mr. Pai's need for telework?
19  A  No, sir, it was a pretty straightforward
20  request.
21  Q  Could Camber have approved Mr. Pai to
22  permanently work for EOIR from California?

**94**

1  MR. STERN: Objection as to form.
2  A  I don't think so. I would have had to have
3  taken that one up with the contracting officer.
4  BY MR. ORTBALS:
5  Q  And is that because it would have involved
6  changing the place of performance?
7  A  Possibly. That would be what I would have
8  to discuss with the contracting officer.
9  Q  But it sounds like it is certainly not a
10  decision that Camber could make on its own?
11  MR. STERN: Objection as to form.
12  A  I would have required network access for
13  somebody to work remote. The network access would have
14  to be approved by a government employee in order for
15  them to access our systems.
16  So for any hands-on access, they would need
17  me to approve their DOJ Connect account.
18  Q  When Mr. Khalil informed you about Mr. Pai
19  resigning, that wasn't unusual in any way.
20  Is that correct?
21  A  There is generally a fair amount of
22  turnover on any contract. So as you can see from the

**95**

1  status reports, every couple of months there tends to
2  be somebody on-boarding and somebody off-boarding.
3  Q  And updates about the staffing of the
4  project were routinely made to you. Is that correct?
5  A  Yes, sir.
6  Q  So there was nothing in particular about
7  Mr. Pai's situation that was unusual in your mind?
8  A  It didn't stand out, no.
9  Q  Had you ever heard Mr. Khalil say anything
10  disparaging about Mr. Pai's age?
11  A  No, sir.
12  Q  Have you ever heard Mr. Khalil say anything
13  disparaging about Mr. Pai's son's disability?
14  A  No, sir.
15  Q  Had you ever heard any other Camber
16  employee make a disparaging comment about Mr. Pai's
17  age?
18  A  No, sir.
19  Q  Had you ever heard any other Camber
20  employee make a disparaging comment about Mr. Pai's
21  son's disability?
22  A  No, sir.

**96**

1  Q  Are there any other accommodations that you
2  were asked to make for Mr. Pai that you recall?
3  A  None that I remember. Just the telework.
4  Q  Did you ever express any concerns about
5  Mr. Pai's attendance to Camber?
6  A  No, sir.
7  Q  Did you ever have any concerns that Mr. Pai
8  was being discriminated against because of his age or
9  his son's disability?
10  A  No, sir, I did not.
11  Q  I believe earlier when Mr. Stern asked you
12  about whether EOIR had changed their requirements per
13  Mr. Pai's position, you thought for a moment, and then
14  your response was "the short answer is no."
15  Is that right?
16  A  Yes, sir.
17  Q  What did you mean by "the short answer is
18  no"?
19  A  We don't set a labor category on a
20  position-by-position basis as the government.
21  What we do is, we tell the contractor,
22  "Here is the work we are planning to do."