# EXHIBIT  D

Transcript of Adesh Jain
Conducted on March 19, 2018

**1**

```
 1        IN THE UNITED STATES DISCTRICT COURT
 2        FOR THE EASTERN DISTRICT OF VIRGINIA
 3              ALEXANDRIA DIVISION
 4    -----------------------------------x
 5    United States Equal Employment   : Case No.:
 6    Opportunity Commission,          : 1:17cv1084
 7            Plaintiff,               : (AJT/JFA)
 8        v.                           :
 9    Camber Corporation,              :
10            Defendant.               :
11    -----------------------------------x
12
13            Deposition of ADESH JAIN
14                TYSONS CORNER, VA
15              Monday, March 19, 2018
16                  9:30 a.m.
17
18
19
20    Job No.: 182492
21    Pages: 1 - 91
22    Transcribed by: Christian Naaden
```

**2**

```
 1        Deposition of ADESH JAIN, held at the offices
 2    of:
 3
 4
 5    PLANET DEPOS - Tysons Corner
 6    8270 Greensboro Drive
 7    Suite 110
 8    McLean (Tysons Corner), VA 22102
 9
10
11
12
13
14        Pursuant to agreement, before Anthony
15    Vorndran, Digital Reporter in and for the State of
16    Virginia.
17
18
19
20
21
22
```

**3**

```
 1              A P P E A R A N C E S
 2
 3    ON BEHALF OF THE PLAINTIFF, UNITED STATES EQUAL
 4    EMPLOYMENT OPPORTUNITY COMMISSION:
 5          JEFFREY STERN
 6          EQUAL EMPLOYMENT OPPORTUNITY COMMISSION -
 7          CLEVELAND FIELD OFFICE
 8          CLEVELAND, OH 44199
 9          (800) 669-4000
10
11    ON BEHALF OF THE DEFENDANT, CAMBER CORPORATION:
12          ROBERT ORTBALS
13          CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
14          7733 FORSYTH BLVD.
15          SUITE 1325
16          ST. LOUIS, MO 63105
17          (314) 338-3740
18
19
20
21
22
```

**4**

```
 1              C O N T E N T S
 2    EXAMINATION OF ADESH JAIN              PAGE
 3    By Mr. Stern                            7
 4
 5
 6
 7              E X H I B I T S
 8              (Retained by counsel)
 9
10    Exhibit 1    Ashok Pai chain of command
11                 PAI000517                  21
12    Exhibit 2    Training course records
13                 PAI002330 and 31           30
14    Exhibit 3    E-mail string dated 9/8/14
15                 EEOC000025 and 26          40
16    Exhibit 4    Email string dated 9/18/14
17                 PAI000045 through 68       43
18    Exhibit 5    Email string dated 10/1/14
19                 EVOC000163 through 185     57
20    Exhibit 6    Email string dated 10/1/14
21                 PAI 000152 through 154     72
22
```

Transcript of Adesh Jain
Conducted on March 19, 2018

5 (17 to 20)

17

1   So that is based on that refresher when this
2   thing happened and what my involvement was during that
3   time frame. That's what we talked about.
4       I think it's still freeze.
5   Q   Once again, please. I didn't hear your last
6   comment. I'm sorry.
7       MR. VORNDRAN:  This is the court reporter.
8   The screen had just froze for a moment.
9       MR. STERN:  Now, is it working okay again?
10      MR. VORNDRAN:  Yeah. We're back.
11  BY MR. STERN:
12  Q   Was your call with Atif before or after your
13  talk with Bob?
14  A   Before. Bob and I talked last Friday, and
15  Atif and I talked the day we received an e-mail two
16  weeks ago. And again, that call was about something
17  else, but I asked him about, hey, did he also receive
18  this e-mail that talks about deposition.
19  Q   What else did the e-mail talk about?
20  A   I can pull the e-mail, but I think all it
21  says was that you are requested or asked to be at the
22  deposition and, if you would like to be subpoenaed,

18

1   then please let me know. And then the time frame that
2   he was asking me to be available is next week, and
3   then I said I would be out of country starting this
4   Friday for 10 days. And that's when we rescheduled it
5   for today. That's what I --
6   Q   Do you have any plans to be out of country in
7   June, July, or August of this year?
8   A   Not at this point. However, that's the time
9   frame when kids are out. So, you know, sometimes I
10  can't tell you what vacation plan we make, and we tend
11  to make a lot of vacation at the last moment. So at
12  this point we do not have any plan to be out of
13  country during that time frame.
14  Q   You currently reside in Fairfax County,
15  Virginia?
16  A   Yes, sir.
17  Q   Do you have any plans to move your residence
18  outside of Virginia in June, July, or August of this
19  year?
20  A   I do not.
21  Q   Now, your office at NikSoft Systems
22  Corporation, is that at the corporate headquarters or

19

1   Falls Church or Dayton, Ohio or some other location?
2   A   It's at corporate headquarters, 1984 Isaac
3   Newton in Reston.
4   Q   Reston, Virginia 20190?
5   A   Yes, sir.
6   Q   And the phone number there to reach you is
7   what?
8   A   I do not remember my office number, but my
9   cell phone number is (571) 220-6722.
10  Q   I think you had mentioned you had given a
11  deposition some years ago. Did that involve the
12  deposition in a case about an employer?
13  A   No, sir. It was our suit against the company.
14  So Avaya Government Solution sued a company, and this
15  was company to company about a teaming
16  agreement/subcontract.
17  Q   When did you start working for Avaya
18  Government Solutions, I think you called it? When did
19  you start with Avaya?
20  A   So I started with the same company 2001. The
21  company name at that time was AC Technologies. That
22  company was purchased by PEC Solutions I believe the

20

1   next year. PEC Solutions was purchased by Nortel, and
2   we became Nortel Government Solutions. This business
3   of Nortel was purchased by Avaya. We became Avaya
4   Government Solutions, and then in 2004, 2005 time
5   frame Avaya Government Solutions business -- this
6   business was bought by Camber and we became Camber. So
7   same company since 2001. I had been there until about
8   two years ago.
9   Q   Let's talk briefly about your career with
10  that chain of companies that you discussed a minute
11  ago. And it's -- which way is easier, to go backwards
12  from your last position at Camber or go forwards from
13  I believe you said it was known as AC Tech? Was that
14  the first one?
15  A   Yeah. Either way is fine. I can start with AC
16  Tech. AC Tech --
17  Q   By all means, do so.
18  A   AC Technologies --
19  Q   Go ahead.
20  A   -- I was a program manager or a project
21  manager. I don't remember exact title at that time. I
22  was working on a contract, and then from there I

Transcript of Adesh Jain
Conducted on March 19, 2018

6 (21 to 24)

---

21

1  became program director. And then when PEC Solutions
2  bought us, within a year after that I became vice
3  president.
4        And then since then I have been vice
5  president and general manager. So I would say probably
6  2003, 2004 time -- 2003 time frame I had been vice
7  president and general manager for my division. And the
8  division responsibilities changed over time. So maybe
9  I started out with about 80 people when I started out
10 in 2003, and then by the time I left I was managing
11 about 500-plus employees being a vice president and
12 general manager of my division.
13    Q   Now, so this [inaudible] with more than 500
14 employees, that was -- that was a responsibility you
15 had at Camber?
16    A   That is correct. So in June of 2016 I had
17 500-plus people under my business unit.
18        MR. STERN: Anthony, if you could locate in
19 your document package a one-page document, lower
20 right-hand corner, the meeting initials are capital P-
21 capital A-capital I, and the number is 000517. Single-
22 page document PAI000517 in the lower right-hand

---

22

1  corner.
2        MR. VORNDRAN: Got it. Jain 1.
3        MR. STERN: You can mark that. Thank you.
4        Bob, you got it?
5        MR. ORTBALS: Yeah. I got it.
6        MR. VORNDRAN: Exhibit is placed in front of
7  the witness.
8  BY MR. STERN:
9     Q   Mr. Jain, directing your attention to this
10 exhibit, the top there, Ashok Pai chain of command, it
11 says, through Pai's employment to October 31st, 2014.
12 And what's the first name and position listed there?
13    A   Michael Page [ph].
14    Q   Michael. With respect to your position then
15 in October 2014, what was Mr. Page?
16    A   So Michael Page was running the business unit
17 that used to be Avaya Government Solutions within
18 Camber. So he was over in charge of what used to be
19 Avaya Government Solutions and now became a business
20 unit within Camber. And I directly reported to Mike
21 Page.
22    Q   This entry for you immediately under Mr. Page

---

23

1  says, VP. That's vice president. Was there any other
2  part of that title that isn't depicted there? Vice
3  president for some part, unit? Vice president of what?
4     A   I believe my unit was called Software
5  Engineering Division.
6     Q   Was Vice President Page a reviewer or
7  assessor of your performance at that time?
8     A   Correct. Yes.
9     Q   And the name directly underneath, it says
10 Atil [sic] Khalil, center director. Is that Atif
11 Khalil --
12    A   That --
13    Q   -- that you discussed?
14    A   Yes.
15    Q   Yes? Any other part of his title under you
16 other than center director?
17    A   No. We didn't name the centers. So there was
18 -- I mean, his title was center director, but there
19 was no name for that center. I think, if anything, we
20 might have called that center DOJ EOIR because he was
21 running that program.
22    Q   DOJ, that's United States Department of

---

24

1  Justice?
2     A   That's correct.
3     Q   EOIR, that's Executive Office of Immigration
4  Review?
5     A   That's correct.
6     Q   How many Camber employees were employed at
7  that center at that time, that is at the DOJ EIOR --
8  EOIR? Excuse me.
9     A   I do not know the exact number, but I would
10 say approximately 60 people within that center.
11    Q   And were you a reviewer or appraiser of Mr.
12 Khalil's performance as center director at the time
13 the incident -- at the time of this exhibit that is
14 through Mr. Pai's employment to October 31st, 2014?
15    A   Yes. I was.
16    Q   At the time that Senior Vice President Page
17 was your person you reported to, who decided what your
18 compensation would be in terms of increases and such?
19    A   Michael Page.
20    Q   And at that time who decided what Mr.
21 Khalil's compensation would be?
22    A   That would be me, and then it would be re-

---

Transcript of Adesh Jain
Conducted on March 19, 2018

11 (41 to 44)

41

1       MR. VORNDRAN:  Okay.
2       MR. STERN:  This is what? Exhibit 3?
3       MR. VORNDRAN:  Yes, sir.
4   BY MR. STERN:
5   Q    Mr. Jain, this is a brief Camber e-mail
6   string Lisa Thompson, Atif Khalil, copy you. The
7   subject, transition request HR-5 on September 8th,
8   2014?
9   A    Uh-huh.
10  Q    That's a yes, affirmative?
11  A    Yes.
12  Q    And the top of the first page, that EEOC25,
13  the right top there it says, from Lisa Thompson to
14  Atif, copy to you; correct?
15  A    Yes.
16  Q    And it's dated Monday, September 8th, 11:42
17  a.m.?
18  A    Yes.
19  Q    And that is Lisa's response to immediately
20  following e-mail string from Atif at 11:08 a.m. saying
21  nay to Lisa Thompson, copy you?
22  A    Yes.

42

1   Q    In that e-mail string Mr. Khalil asked Lisa
2   Thompson -- he writes, "Ashok returned from California
3   this week and has decided to move back home, realizing
4   he's unable to continue working on the east coast.
5   Please see this e-mail below." He then asks, "Is this
6   sufficient for the displacement letter? I will move
7   forward with creating the req and identify a
8   replacement as soon as I hear back from you." Correct?
9   A    Yes.
10  Q    And she responds, "This is sufficient for
11  resignation purposes, and we will have it effective
12  10/31/14. If anything changes, let me know. Thanks."
13  A    Yes.
14  Q    Mr. Khalil had forwarded it towards the
15  bottom there an e-mail from Mr. Pai on the same day
16  about a half hour before. That is 10:32 a.m.?
17  A    Yes.
18  Q    Mr. Pai wrote, "Hi Atif. As discussed, my
19  family medical issues have become increasingly severe
20  precluding our planned relocation to D.C. metro area,
21  and I am compelled to explore the possibility of a
22  transfer to the Southern California area or to any of

43

1   the western states."
2       Was this e-mail string the first time you had
3   heard or learned anything about Mr. Pai expressing an
4   interest to explore a possibility of transferring to
5   Southern California or western states?
6   A    Yes.
7       MR. STERN:  Anthony, the next exhibit lower
8   right-hand corner, production number is PAI, P-A-I,
9   000045 through 68.
10      MR. VORNDRAN:  There we go. Labeling now.
11      Here you go, sir.
12  BY MR. STERN:
13  Q    Are you ready to talk about exhibit 4 to your
14  deposition?
15  A    Yes.
16  Q    If you -- exhibit 4 to this deposition is an
17  e-mail string from Lisa Thompson to Atif Khalil and a
18  copy to you, subject transition request, top of the
19  first page dated Thursday, September 18 at 1:22 p.m.?
20  A    Yes.
21  Q    And the earliest e-mail in the string on the
22  third page of this exhibit is the e-mail from Mr. Pai

44

1   to Khalil on Monday, September 8th at 9:33 a.m.
2   Subject is exploring transfer possibilities?
3   A    Yes.
4   Q    First page of this exhibit, the e-mail to
5   which Lisa Thompson is responding. It's from Khalil.
6   It's about halfway down the first page. Sent
7   [inaudible] September 18, 2014, 12:41 p.m.?
8   A    Yes.
9   Q    Who is Lisa Thompson?
10  A    HR, human resources specialist or whatever
11  her title was.
12  Q    Where was she stationed?
13  A    Fair Lakes, Virginia.
14  Q    Atif wrote to Lisa at the time, "See Ashok's
15  e-mail below. He plans to leave the project effective
16  10/31/14 with notice to the immediate Camber employer-
17  employee supporting not billable work from
18  California."
19      Atif writes further, "As far as I know,
20  that's not an option we are offering him."
21      What did you know about options that were or
22  were not offered to Mr. Pai?

Transcript of Adesh Jain

12 (45 to 48)

Conducted on March 19, 2018

45

1   A   Nothing really. This is program operations in
2   general, and program manager directly work with our
3   human resources. And then sometimes I'm copied on the
4   request like this so that I'm aware of what is going
5   on.
6       Q   Atif went on to write, "Based on this,"
7   referring to Mr. Pai, "based on his 9/08/14 e-mail,
8   could you," -- that's Lisa -- "generate a separation
9   letter so he's clear on his options? Deidra also
10  offered him FMLA. So I don't know how that plays into
11  this situation."
12      Who's -- who's Deidra?
13  A   She's also human resources, and then I'm not
14  sure if she is manager of Lisa or peer to Lisa. I
15  don't remember that.
16  Q   Was she also stationed in Fair Lakes or some
17  other place?
18  A   No. I believe she was in Huntsville.
19  Q   Khalil goes on to write, "We have notified my
20  client that Ashok will be leaving the project
21  effective 10/31/14, and we have started searching for
22  a replacement, per their directions."

46

1       Who was the client referenced regarding
2   Ashok?
3   A   DOJ EOIR.
4   Q   Direct your attention to the third page of
5   this exhibit. We're looking at Mr. Pai's first e-mail
6   to Khalil. Let me know when you're there. We'll talk
7   about that briefly.
8   A   I'm here.
9   Q   That portion of the string is an e-mail from
10  Mr. Pai at EOIR, Monday, September 8th at 9:33 a.m. to
11  Atif, also -- also the EOIR, subject exploring
12  transfer possibilities?
13  A   Yes.
14  Q   Mr. Pai wrote, "Came over a couple times to
15  your office this morning. I want -- because I want to
16  explore possibilities of transferring within Camber."
17  Goes on to say, "My son's hospitalization has
18  emphasized the need for me to be near my family, and
19  though not urgent, I need to plan for it."
20      Mr. Pai had -- had worked in your unit --
21  business unit that was servicing EOIR before it became
22  Camber; yes?

47

1   A   Yes.
2   Q   And continued to do so when Camber -- after
3   Camber acquired Avaya?
4   A   Yes.
5   Q   Other than these e-mail strings that we've
6   been going through, other than -- that that, did you
7   have any understanding of Mr. Pai's son's condition or
8   hospitalization?
9   A   No. I did not. [inaudible].
10      MR. STERN: Pardon. I didn't hear the last
11  comment. Did someone make a comment? I thought I heard
12  something but couldn't understand it.
13      MR. VORNDRAN: This is the court reporter. He
14  had just said that the screen cut out. He was letting
15  me know. We can hear you, but we cannot see you.
16      MR. STERN: Can't see me?
17      MR. VORNDRAN: We cannot see anybody. Just a
18  black screen. But if you can hear us --
19      MR. STERN: Bob, can you hear?
20      MR. ORTBALS: Yeah. I'm here. I'm hearing
21  everything fine.
22      MR. STERN: Can you see everything fine?

48

1       MR. ORTBALS: Yeah. I can still see
2   everything.
3       MR. STERN: I've got three pictures with the
4   picture here. I can see Mr. Jain. I can see Bob. I can
5   see myself. Shall we continue, or shall we get some
6   technical assistance to get the screen at the court
7   reporter's office to illuminate?
8       MR. VORNDRAN: So I actually am a technician
9   when it comes to these things as well. I -- I have no
10  problem proceeding, if you guys don't have an issue
11  with it. It looks like we're back up now. If it
12  continues, we can reset the system, but it looks like
13  we're good.
14      MR. STERN: Okay. Then we'll just keep on
15  keeping on.
16      MR. VORNDRAN: Sorry for the interruption.
17      MR. STERN: No problem.
18      MR. STERN: Well, in segment I lost my last
19  question. What -- what was the last question I asked,
20  Anthony? Can you just --
21      MR. VORNDRAN: I am going to play that back
22  because I'm a digital reporter today.

Transcript of Adesh Jain
Conducted on March 19, 2018

49

1    My playback is having issues. I'm going to
2  have to go off the record and play back the last
3  question. Is that okay?
4    MR. STERN: Okay.
5    THE WITNESS: I think I already answered
6  that. It was after that one more question.
7    MR. STERN: I think mister -- Mr. Jain
8  actually caught what my last question is, and while I
9  still have it in my mind I -- I think we're ready to
10  go back on whenever Anthony, you can get ready to --
11    MR. VORNDRAN: Yeah.
12    MR. STERN: -- go back on the record.
13    MR. VORNDRAN: Yes, sir. I am ready.
14  BY MR. STERN:
15    Q    Mr. Jain, it is my understanding that other
16  than these e-mail strings that we've been looking at,
17  you didn't at that time know anything about Mr. Pai's
18  son's condition, hospitalization mentioned in an e-
19  mail?
20    A    **That's correct. I did not know that.**
21    Q    Mr. Jain, directing your attention to the e-
22  mail at the bottom of the first page of this string,

50

1  I'm looking at page 54065 in the lower right-hand
2  corner. It's the first page of exhibit 4. Looking at
3  the e-mail portion of the string starting at the
4  bottom there from Mr. Pai to Atif Khalil, September 18
5  at 12:25 p.m.
6    A    Yes.
7    Q    Mr. Pai writes, among other things, "As a
8  couple of Camber team members have stated this, I must
9  point out I have not resigned."
10    Have you heard anything about Camber team
11  members saying anything about Mr. Pai having resigned?
12    A    **No. I have not.**
13    Q    Mr. Pai continues to write now at the top of
14  page 66, second page of this exhibit.
15    A    **Yes.**
16    Q    And he writes in the first full paragraph
17  there, "I am requesting a transfer here to the
18  Southern California region." And goes on to say that,
19  "As you," meaning Atif, "wanted to plan [inaudible]
20  and graciously suggested October 31, 2014, I put that
21  date in my transition request."
22    Then he goes on to [inaudible] Camber

51

1  Corporation being a rapidly growing company,
2  cybersecurity being a major growth area. He narrates
3  various cybersecurity certifications that he has?
4    A    **Yes.**
5    Q    When Camber was either putting in a bid or --
6  or anticipating responding to a request for proposals
7  for projects, did Camber evaluate which of their
8  existing staff might be assets for anticipated
9  business that hadn't yet been sold and funded?
10    A    **It really depends on what is being asked in**
11  **that request for proposal. Typically, RFP would have**
12  **key personnel requirements, and then if we need to**
13  **find those key personnel prior to the bid, then**
14  **typically we would look for those key personnel within**
15  **the company.**
16    **Anything outside of that, we will never do**
17  **that. We never did that, but within the key personnel**
18  **constraint our preference would be to have people**
19  **within the company to be able to find.**
20    Q    Was there many cybersecurity or other Camber
21  business that was being perhaps put together in an RFP
22  or were anticipated to do so between March and the end

52

1  of 2014, specifically in Southern California?
2    A    **Not that I remember anything. No.**
3    Q    Still on page two of this exhibit marked
4  number 66 in the lower right-hand corner --
5    A    **Uh-huh.**
6    Q    -- Mr. Pai goes on to write, "If it's not
7  possible" -- starting in the middle of the page there,
8  "If it's not possible to justify my current salary
9  when non-billable, my pay would be temporarily reduced
10  with -- not with family leave. In Southern California
11  my expenses are much less."
12    What's your understanding as to what non-
13  billable meaning at Camber in 2014? What's not
14  billable hours?
15    A    **Non-billable would mean that anybody who is**
16  **not on a project. So -- so anybody who is not working**
17  **for the program, we are a project-based organization.**
18  **So all my programs under my portfolio were customer-**
19  **billable programs. And anybody who is not on that**
20  **customer program would be a non-billable person.**
21    Q    Mr. Pai goes on to write, "I can contribute
22  by creating and delivering training programs."

Transcript of Adesh Jain
Conducted on March 19, 2018

14 (53 to 56)

53

1       Are training programs and those being
2  delivered by non-billable hours at Camber?
3       A   I didn't have any training programs. I'm not
4  sure what this is about. I didn't have any training
5  programs within my BU.
6       Q   Within your what?
7       A   Business unit.
8       Q   Oh, BU, business unit. Got it. And you --
9  right? That was BU?
10      A   Correct.
11      Q   Letter B, letter --
12      A   Correct.
13      Q   Business unit?
14      A   Correct.
15      Q   It goes on to write, "As well as helping you
16  with business development and proposal writing for a
17  cyber security share point [inaudible] in your BL."
18  Does BL ring a bell for you?
19      A   BI would be business intelligence.
20      Q   What is business intelligence?
21      A   Business intelligence is collecting all this
22  data and making information out of that, such as

54

1  analytics stuff that people do and a BI analyst would
2  make sense out of the data. Create reports, you know,
3  do analysis of the data, and things like that. So
4  that's BI.
5       Q   Did your unit, business unit, have anyone
6  working on new business development or proposal
7  writing for cyber security or share point migrations
8  or this business intelligence we discussed?
9       A   I never had a dedicated person to do proposal
10  writing. Unfortunately, we never could really afford
11  to do that so I had pretty much center directors
12  pitching in whenever the proposal need was there. And
13  then, center director in turn might pull other people
14  that might know more about that capabilities to help
15  write that proposal.
16      Q   And time spent on proposal writing was not --
17  in your business unit was not billed to the customer,
18  was it?
19      A   It's a little bit more complex, but I can
20  attempt to explain. So we have business units. So at
21  that time, like within the business unit of Michael
22  Page, there were three divisions. That would primarily

55

1  be focused on the delivery aspect and there are
2  multiple business unit within Camber. So we were, I
3  think, one of the three business units that Camber had
4  overall.
5       Then, there is a business development growth
6  called strategic business development, SDB [sic]. And
7  the proposal writing department and the business
8  development folks would be in that business unit or in
9  that growth, but -- and then, we'd select proposals so
10  then they decide and sometimes that word they is more
11  than just them. They will work with a division VP like
12  myself to say okay. I want to go after this proposal
13  and have a discussion.
14      So once that decision has been made to go
15  after that bid, most of the work would be done by SDB
16  organization that has proposal people and business
17  development folks. But some of the subject matter
18  expert writing would come from the business unit and
19  they would rely on the business unit to help write
20  those proposal, which, in that case, would be my
21  business unit if it is something to do with my
22  business unit.

56

1       And then, I, in turn, would find people and,
2  in most cases, it was center directors pitching in to
3  write that piece of the proposal.
4       Q   The subject matter persons that would be
5  assisting in proposal writing on a particular subject,
6  their time on that is not -- was their time on that
7  billed to their then existing customer?
8       A   No, sir. So if they worked on that proposal,
9  many times that work would be done outside of those
10  billable hours. And in some cases -- so they will
11  spend time, big nights or weekends, and that would not
12  be billable to the customer.
13      And in some cases, if something very urgent
14  that they have to work on, then they will request time
15  off from that customer project and help with that
16  proposal. And that time also would not be billable to
17  the customer.
18      Q   In the time period that we've been
19  discussing here concerning Mr. Pai, which is basically
20  the middle of 2014 -- from March 2014 until the
21  termination of his job at the end of October 2014,
22  there were approximately -- if I understand your

Transcript of Adesh Jain
Conducted on March 19, 2018

57

1  earlier testimony correct -- probably 250 employees in
2  -- under your jurisdiction as VP?
3      A    Correct. Approximately. Correct.
4      Q    Approximately. Were any of those employees
5  working on non-billable work during that period? Such
6  as assisting SBD, being subject matter person,
7  development of business, and so forth?
8      A    So, like I said before, sir, if there were
9  people working for those non-billable activities, in
10 majority of the cases, those would be just the center
11 directors.
12         In -- like I said, in very few cases, it
13 would be people below the center director only when
14 needed and that will be decided by the center director
15 that are here. I need to reach out to this and this
16 person because he's the subject matter expert on that
17 particular piece of work.
18     Q    Directing your attention briefly to the third
19 page of this exhibit. That's document page PAI67 in
20 the lower right-hand corner.
21     A    Yes.
22     Q    Mr. Pai's concluding remarks at the bottom of

58

1  that e-mail was September 8th, 9:33 A.M. at the bottom
2  of that page. "I want to explore the possibility of
3  supporting cyber security proposals for Camber and
4  being able to reunite with your family."
5         Was anyone shopping, preparing a cyber
6  security proposal for Camber at that time?
7      A    Not that I'm aware of. No, sir.
8      Q    And the name of the next exhibit, I guess,
9  this will be Jain dep Exhibit 5, is a three-page
10 document. Lower right-hand corner, production number
11 EVOC000163, 164, 165.
12     A    Okay.
13     Q    Mr. Jain, let me know when you're ready to
14 discuss this exhibit.
15     A    I'm ready.
16     Q    This exhibit is a three-page e-mail string.
17 Starting at the top of the first page, an e-mail from
18 you on Wednesday, October 1st, 2014, 12:59 P.M. to
19 Deborah Whitten, with copies to Lisa Thompson and
20 Atif. The subject is forwarding replacement of Ashok
21 Pai?
22     A    Yes.

59

1      Q    You wrote the -- that e-mail at the top of
2  the first page. Yes?
3      A    Yes.
4      Q    And a bold part above that Whitten comma
5  Deborah, is that indicating that that was the user who
6  printed this e-mail string that we're looking at?
7      A    Sorry. What's your --
8      Q    Does the bold part at the very top of the
9  first page, it says Whitten comma Deborah in bold
10 followed by a line. Is that -- does that inform you
11 that that was the user who printed this particular
12 document?
13     A    That is the user to -- I'm -- that is the
14 user --
15     Q    It was Deborah Whit- --- yeah. Was Deborah
16 Whitten the Camber e-mail user who printed this
17 specimen?
18     A    I believe so because of the way it is
19 printed. Correct.
20     Q    This was an e-mail from you to Deborah;
21 right?
22     A    Correct.

60

1      Q    And the forwarded e-mail below -- again,
2  we're still on that first page, 163, about the middle
3  from Atif.
4      A    Yes.
5      Q    The same day, Wednes- -- October 1st, 11:20
6  a.m.? Replacement of Ashok Pai. That Mr. Khalil's e-
7  mail to Lisa; right?
8      A    Yes.
9      Q    And that's Khalil's response to a question on
10 an e-mail on page 164? It's the second page of this
11 exhibit. From Deborah Whitten to Lisa.
12     A    Yes.
13     Q    And that question e-mail from Deborah to Lisa
14 was prompted by Atif's e-mail at the bottom of the
15 second page to Lisa Thompson?
16     A    Yes.
17     Q    Where he's answering her and he attaches a
18 copy on the third page of an e-mail from Howard Meyer
19 to Atif?
20     A    Yes.
21     Q    How did you learn that Atif had sent the e-
22 mail at the bottom of the first page? It's all part of

Transcript of Adesh Jain
Conducted on March 19, 2018

16 (61 to 64)

61

1  the string, but I didn't see you listed as a CC
2  recipient of Atif's e-mail to Lisa Thompson, bottom
3  half of the first page of this Exhibit Number 5 to
4  your deposition. How did you learn that that e-mail
5  had been sent?
6  **A   I do not remember, but I can say one of the**
7  **two things. Either he send that e-mail to me and then**
8  **I forwarded that to Deborah without his notes to me.**
9  **Could be one option. Or he might have blank copied me,**
10 **which I doubt.**
11 Q   Do you recognize any of the handwriting in
12 the middle right-hand side of the first page of this
13 exhibit?
14 **A   No. I do not.**
15 Q   Looking at your e-mail to Deborah, the top of
16 the first page --
17 **A   Uh-huh.**
18 Q   You wrote I understand -- "Yes. I understand
19 this is a difficult situation and we need to comply --
20 be compliant with rules and regulations."
21      What was the difficult -- difficulty you are
22 referencing? What is difficult?

62

1  **A   Based on my recollection, basically, these**
2  **are day-to-day operational issues for all programs.**
3  **When that happens, if customer asks for the removal of**
4  **a person or -- there's so many different reasons that**
5  **person could be removed. The program manager work with**
6  **human resources to take action and in this case, I**
7  **guess it was taking him longer than it should and**
8  **probably rightfully so, that human resources had to**
9  **make sure that it is a legitimate termination.**
10 **But it was taking longer and he needed my**
11 **help to facilitate that termination and which is why I**
12 **was saying that we understand this might be more**
13 **complex or difficult. But kind of stay on top of it**
14 **and let's try to make sure that we are engaged**
15 **completely to take that action.**
16 Q   Now, the term of your e-mail you're
17 discussing on October 1st, 2014, you had talked to
18 Atif about the termination of Mr. Pai?
19 **A   I would think so. We have monthly program**
20 **reviews and he was direct report. So we had -- at this**
21 **one, I can't recall, but maybe weekly communication.**
22 **So -- so I would say I was aware of his challenges**

63

1  **that would impact his ability to do his job and those**
2  **are the kind of things he would make me aware. And --**
3  **and the e-mail is not necessarily the only way for me**
4  **to be aware of those things.**
5  Q   You went on to write, "We need to be
6  compliant with rules and regulations."
7      What rules and regulations were you concerned
8  about when you wrote that?
9  **A   So my concern is making sure that all the**
10 **things that we as HR when we do termination, which**
11 **they are responsible and accountable for. So when HR**
12 **is taking that action, they have to cross the I's, dot**
13 **the T's and there could be so many different rules**
14 **that they have to make sure they are complying with.**
15 **So that's why I meant in that e-mail when I said rules**
16 **and regulation.**
17 **Really, the intent behind that e-mail is to**
18 **make sure that HR is on top of these actions and**
19 **diligently working efficiently to -- to stay on top of**
20 **it. So HR job is to make sure that they are doing the**
21 **termination correct- -- rightfully, making sure**
22 **they're meeting all the rules, and our job on**

64

1  operation side is to make sure we are fulfilling the
2  requirements of the customer. And then, together, we
3  make sure that everything is being done correctly.
4  Q   Your e-mail goes on to say, "We've been going
5  back and forth on this issue to the point the customer
6  is getting frustrated."
7      How did you learn about customer frustration
8  with respect to termination of Mr. Pai?
9  **A   That would be to Atif. That goes back to my**
10 **previous comment that our job is to make sure we are**
11 **fulfilling the requirement of the customer on the**
12 **operations side and making sure we never have a**
13 **complaint from the customer.**
14 Q   What did you learn from Atif about customer
15 frustration in this instance?
16 **A   There was overall, I would say,**
17 **dissatisfaction on the customer side for the**
18 **responsibilities that Ashok was responsible for and**
19 **not getting that work done. And those issues must have**
20 **been reported either directly to Atif or through**
21 **Atif's direct report about getting the work done. And**
22 **my general impression through Atif about Ashok Pai was**

Transcript of Adesh Jain
Conducted on March 19, 2018

65

1 there were a lot of absences and the work was not
2 getting done in the timely manner.
3    Q   Your email sent to Deborah Whitten goes on to
4 say, "I believe we have done everything required from
5 our side and are taking very minimal risk to terminate
6 this employee."
7        Risk of what? What are you referring to?
8    A   I think -- I'm not sure what I meant by
9 minimal risk. Maybe I'm speaking to more than what HR
10 should be responsible for. So maybe I'm speaking for
11 HR when I say I'm taking minimal risk. So the first
12 sentence -- first part of that sentence is, hey,
13 whatever you asked of us, in order to terminate the
14 employee, we have given everything that you asked for.
15 And the second part of the sentence, I guess the
16 intent behind that is from HR perspective. Whatever
17 risks you think you are taking is minimal. That's more
18 of an opinion.
19    Q   You went on to write, "Let me know if we need
20 to discuss this or if we need to get someone else
21 involved."
22        Did there come a time when you did discuss

66

1 this with HR?
2    A   I don't recall that. I think HR must have
3 spoken to whoever they needed to talk to. So I don't
4 think we had to discuss that. At least between Deborah
5 and I, I don't remember having that discussion.
6    Q   Did there come a time when someone else got
7 involved?
8    A   Not that I can recall.
9    Q   Directing your attention to the bottom half
10 of the first page of this exhibit. This is the Atif e-
11 mail to Lisa Thompson at 11:20 a.m. It's the one you
12 forwarded.
13    A   Uh-huh. Yes.
14    Q   Khalil writes, "Lisa, based on your feedback
15 on Friday" dot dot dot, then a quoted material. Was
16 there any discussion on the preceding Friday, that is
17 the Friday before Wednesday, October 1st, regarding
18 this Mr. Pai, involving Lisa Thompson, Atif Khalil,
19 and/or yourself.
20    A   I do not recall any discussion.
21    Q   The forwarded e-mail from Khalil, one that
22 you forwarded, says, "In order to move forward with

67

1 termination, it needs to be client request due to
2 changing requirements for the job for which he is not
3 qualified or the client specifically requests that he
4 is removed."
5    Q   Is that your understanding of what HR told
6 Khalil would have to be done in order to terminate Mr.
7 Pai?
8    A   I do not recall, but any terminations and
9 hirings are typically done between the hiring manager
10 and HR. And if HR would request additional material
11 for termination, then hiring manager would make sure
12 that he provides that additional information. And
13 that's what I see in this e-mail. So she's looking for
14 more information before she can proceed and I think in
15 prior communication, that's what was going on. So Atif
16 was being diligent enough to provide whatever
17 information was needed.
18    Q   Now, Deborah Whitten, on the second page of
19 this exhibit, asks Lisa Thompson with regard to the
20 replacement of Mr. Pai, "At one point, you said the
21 customer was changing the requirements for the
22 position. Is that the case, and if so, can we get

68

1 something in writing from them?" And Lisa, right above
2 that, sends that question to Atif. "See below from
3 Deborah. Thanks." So HR is asking Atif to get
4 something from the customer changing the requirements
5 of the position?
6    A   Uh-huh. Yes.
7    Q   Yes? Now, that was in response to Atif's
8 forwarding of the last page of that -- this exhibit.
9 That is the e-mail from Howard Meyer EOIR to Khalil.
10 "Atif, please proceed with replacement of Ashok Pai
11 from the dot net team at the government request."
12    A   Yes.
13    Q   That is what Atif Khalil had sent to Lisa
14 Thompson; right?
15    A   Yes.
16    Q   And that's what was forwarded and
17 precipitated Deborah Whitten's request, "At one point,
18 you said the customer was changing requirements for
19 the position. Is that the case, and if so, can get
20 something in writing from them?"
21    A   Yes.
22    Q   The e-mail from Khalil that you forwarded to

Transcript of Adesh Jain
Conducted on March 19, 2018

---

81

1    A    I have no idea.

2    Q    Is Kiran the person doing the replacing or is

3  Kiran the person who is being replaced?

4    A    I have no idea. And these recs, by the way,

5  are -- sometimes are copied and pasted. So I have no

6  idea who Kiran is and what is the role of this person

7  over here.

8    Q    Looking at the first page of this exhibit

9  bearing document page number lower right-hand corner,

10  322.

11    A    Yes.

12    Q    All right. I'm looking at the comments

13  section on 11/02/14. It looks like 7:20 p.m. by Eddie

14  Firosee. Mr. Firosee writes, "Have not been able to

15  find a technically competent candidate that matches

16  other requirements, commute, clearance, et cetera. We

17  have done 20-plus full screens and approximately 10

18  face-to-face interviews.

19         Three candidates accepted other offers while

20  we were processing them. We are flexible on the

21  salary, on the rated salary, and have two reqs open

22  now for (mid-level and senior). I sent a reminder to

---

82

1  the agencies yesterday to submit more candidates."

2         Do you recall any discussion that you had

3  concerning the filling of this requisition?

4    A    No. I don't have any discussions as far as

5  selecting the candidates or hiring the candidates. But

6  looking at just the comments, basically what seems to

7  me is Eddie, as a recruiter, is trying to find as many

8  candidates as possible.

9         And then he's having a little challenge in

10  terms of finding the right candidate. So then he

11  opened up to more reqs. That's basically what the

12  comment says is what I can gather, but --

13    Q    Now, looking at the top of this page 322,

14  first page of this deposition exhibit, it says

15  requisition senior dot net developer. Do you believe

16  that this requisition is an additional one, that is

17  that there's a mid-level one referenced by Eddie, and

18  a senior referenced by Eddie, and there's also this

19  senior net developer requisition?

20    A    I have no idea. This is the first time I'm

21  even looking at this req itself. Typically, the way I

22  managed the business is I would see an Excel

---

83

1  spreadsheet of whatever number of openings I have

2  within my business unit and ask for a status of how

3  that is going. But individual comments and things like

4  that, I have no idea what they are writing and --

5    Q    The requisition in this exhibit is not a mid-

6  level requisition, is it? It says at the top senior

7  dot net developer.

8    A    Yes.

9    Q    This requisition is not mid-level; correct?

10    A    Correct.

11    Q    When we were discussing the e-mail strings in

12  Exhibit 6 and 5, where we were looking at Deborah

13  Whitten's question, "At one point, you said the

14  customer is changing requirements for the position,"

15  and you gave me an opinion as to what you thought Atif

16  was trying to do when he was answering at the bottom

17  of the first page of Exhibit 6 with the -- some

18  differences in Ashok's position and a new req we have

19  opened.

20         Do you know if the customer ever did change

21  the requirements for the position held by Mr. Pai?

22    A    For DOJ EOIR there's always change about the

---

84

1  requirements and the position. There's constant

2  something or the other. So for me to specifically

3  remember at what point they changed the requirement of

4  the position, I couldn't answer that because I

5  directly did not work with the customer.

6    Q    Do you know if the customer ever changed the

7  requirements for the position held by Mr. Pai?

8    A    I would say yes.

9    Q    And the basis of your knowledge is what? How

10  do you know that's what the customer did?

11    A    That would be based on the program status and

12  discussions with the program manager.

13    Q    That was Atif; yes?

14    A    Yes.

15         MR. STERN: Do you have any questions, Bob?

16         MR. ORTBALS: No. Are you closing your

17  examination at this point?

18         MR. STERN: Subject to any re-cross after you

19  ask questions.

20         MR. ORTBALS: Okay. No. I don't have any

21  questions.

22         MR. STERN: Bob, will -- will Camber waive

---