IN THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT
OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| **United States Equal Employment Opportunity Commission**, | Case No.  1:17-cv-01084-AJT-JFA |
| Plaintiff, | |
| vs. | **Plaintiff's Statement of Disputed Material Facts and Memorandum in Opposition to Defendant's Motion for Summary Judgment** |
| **Camber Corporation**, | |
| Defendant. | |

_____

A reasonable jury could return a verdict for EEOC that Ashok Pai's association with his disabled son was a determining factor in Camber's decision to discharge Pai and also that he was discharged because of his age. The facts must be viewed, and all reasonable inferences drawn, in the light most favorable to EECO, the non-moving party.  Defendant's Motion for Summary Judgment (Doc. 36) must be denied.

### STATEMENT OF DISPUTED MATERIAL FACTS

1.  Sometime in the summer of 2014, during one of his son Ashwin's hospitalizations, Camber employee Ashok Pai told Camber's Program Manager and Center Director Atif Khalil (SOF 7) that Ashwin was totally disabled, nonverbal, and unable to talk (Ex. B, Pai Dep. 65:15-21). Camber concedes that Khalil, who is nearly 25 years younger than Pai (Doc. 37-5, Khalil Dep. Ex 2, pg.2), learned about Ashwin's disability that summer. (SOF 17).

2.  Howard Myatt, the United States Department of Justice, Executive Office of Immigration Review (EOIR) contract officer representative on the Camber contract, testifies (Ex.G., Myatt Deposition, 19:13-15) that Askok Pai was a DotNetSharepoint developer

employed by Camber on the EIOR contract and was on the DotNet development team. (Id. 20:1-8).

3.      Around August 31, 2014, Ashwin was hospitalized in a California intensive care unit. Pai was granted leave to care for his hospitalized son in California. (SOF 25). When Pai returned from leave on September 8th, he sent Khalil two emails saying that he sought a transfer within Camber so that he could live and work nearer to Ashwin. (see SOFs 26 and 31).

4.       In Pai's first email sent to Khalil on September 8th at 9:30 a.m., he said he wanted to explore possibilities of transferring within Camber due to his son's hospitalization. Pai wrote his need to be nearer his family was not urgent but that he needed to plan for it. (Doc. 37-14, Ex. N, Khalil Dep. Ex.3).

5.      Pai and Khalil then discussed Pai's transfer request in Khalil's office. Pai testifies that Khalil told him to send another email including a transition date of October 31, 2014 (SOF 32).  Pai did as Khalil told him and emailed his repeated transfer request to Khalil that morning at 10:32 a.m. (Doc. 37-14, Ex. O, Khalil Dep. Ex.4).  Pai wrote that his family medical issues had increased and that he was compelled to explore the possibility of a transfer to the Southern California area, or to any of the western states and requested transition out of his current project as of October 31st.  Further, he will continue to do his best to serve the client and Camber before and after the transition. One minute later, at 10:33 a.m., Pai followed up with another email to Khalil, asking if Khalil wanted any changes to the second email. (Doc. 37-25, Ex. Y, Khalil Dep. Ex. 10, middle of pg. EEOC000407).

6.      Instead of replying to Pai's emails, Khalil forwarded Pai's second email to Camber's Human Resources generalist 36 minutes later, asking for a "displacement letter" and

stating he will move forward with creating a job requisition and identify a replacement as soon as he hears back.  (Doc. 37-1, Ex. Y, Khalil Dep. Ex. 5, pg. EEOC000025).

7.      Khalil heard back 34 minutes later when Camber's Human Resources generalist replied "[t]his is sufficient for resignation purposes and we will have it effective 10/31/14."  (Doc. 37-16, Ex. P, Khalil Dep. Ex. 5, EEOC000025).  Camber admits the generalist then began processing paperwork terminating Pai.  (Ex.A, Anderson Declaration, Attachment 1, Position Statement of Camber Corporation, at pg. EEOC000014).

8.      Early afternoon the next day, September 9th, Khalil prepared and sent Camber's weekly Program Manager meeting agenda to Howard Myatt. Khalil reported "Ashok Pai (10/31/14)" as a "resignation" and reported opening a requisition for a ".NET/SP Dev" as "(Ashok's backfill)."  (Ex.H, Myatt Dep. Ex. 4, pg. 2).

9.      Pai, unaware that Camber was processing his transfer request as a "resignation," sought FMLA leave necessitated by his son's medical condition. Between September 9th and 15th, he exchanged emails with Camber's Benefits Manager concerning FMLA leave. (Doc. 37-20, Whitten Dep. Ex. 8, pgs. PAI002313-16). On September 10, 2014, Camber granted Pai's request to take 480 hours of FMLA leave to be used during a 12-month rolling period starting on September 10th. These emails were forwarded to Khalil by Pai. (Doc. 37-24, Ex. X, Khalil Dep. Ex. 9, pg. PAI000066).  Khalil did not tell Pai Camber had already begun processing his transfer request as a resignation.

10.      On September 18th, after Pai was told he had been "resigned", he sent Khalil an email saying, in part, "I must point out that I have not 'resigned'!" and "I only requested a transfer nearer to the Southern California region." In the email, Pai made clear that his approved

FMLA leave would extend beyond October 31st and, therefore, asked Camber to continue seeking a transfer for him during the course of his FMLA period. Pai also told Khalil that he was willing to accept a lower paying position within Camber. He also offered to create and provide training programs for Camber's staff to off-set any inconvenience caused by his FMLA absence and transfer.  (Doc. 37-23, Ex.W, Khalil Dep. Ex. 8, PAI000061).

11.     The same day, Pai also forwarded that email to Camber's HR Generalist Lisa Thompson and exchanged further emails with her throughout that afternoon.  He wrote he was never told his "Transition Request" would be treated as a resignation, that he never made any statement that he is resigning and asked if he should withdraw his Transition Request. Thompson replied to Pai the next morning (copy to Khalil), admitting Camber now understands Pai did not intend to resign and that nothing further was needed from him.  (Doc. 37-25, Ex. Y, Khalil Dep. Ex. 10, pg. EEOC000404).

12.     Center Director Khalil did not reply to Pai's September 18th email. Instead, he continued to pursue Pai's termination on other grounds. On Friday, September 26th, Khalil conferred with Camber Human Resources about Pai's employment. In a later email, Khalil said that he received feedback on September 26th about how to move forward with Pai's termination. (Doc. 37-27, Ex. AA, Khalil Dep. Ex. 13, pg. EEOC000163). He was told: "In order to move forward with the termination it will need to be client request due to changing requirements for the job – for which [Pai] is not qualified or the client specifically request that he is removed." The Human Resources representative who gave Khalil this advice was Lisa Thompson, the same person who had erroneously processed Pai's transfer request as a resignation and then sent him an email on September 19th saying that Camber understood that he had not resigned.

13.     Camber admits that Khalil was also conferring with EOIR in this period, to persuade it to replace Pai. According to Camber's Position Statement, Khalil "communicated to [Camber's] government customer that it would be better served with a replacement for Mr. Pai with a different skill set . . ." and told EOIR that it needed "to replace [Mr. Pai] with someone possessing a different skill set." (Ex. A, Anderson Declaration, Attachment 1, Position Statement of Camber Corporation, at pg. EEOC000015). Howard Myatt, applications development chief in the EOIR's Office of Information Technology, was the EOIR's contract officer representative on the Camber contract. (Ex.G., Myatt Deposition, 6:17-8:8).

14.     On October 1, 2014, Myatt sent an email to Atif Khalil, Camber's PM or Program Manager on the EOIR contract, Subject: Replacement of Ashok Pai "Please proceed with replacement of Ashok Pai from the DotNet team at the government's request." (SOF 63; Ex.G., Myatt Deposition, 67:6-68:2, 72:19-20, Ex. K, Myatt Dep. Ex. 5).  Myatt's October 1st replacement email was not a request to remove Pai because EOIR had already been told by Camber that Pai had resigned.  (Ex.G., Myatt Deposition, 68:17-20). Although Myatt was not 100% certain at deposition why he wrote the October 1, 2014 email to Camber, it likely was his response to Camber's request for confirmation that Pai's position was going to be backfilled. (Ex.G., Myatt Deposition, 68:6-12).

15.     Khalil immediately sent Myatt's October 1st email to Camber's HR Department, stating "I would like to proceed with the 10/31/14 separation." (Doc. 37-27, Khalil Dep. Ex. 13, pgs. EEOC000164-165, SOF 65).  Camber's HR representative Lisa Thompson forwarded Khalil's email to Camber's HR Manager Deborah Whitten on October 1st and asked her to approve Pai's termination effective October 31, 2014. In her email to Whitten, Thompson

stated that EOIR was requesting Pai's "removal." (Doc. 37-27, Khalil Dep. Ex. 13 on pg. EEOC000164; SOF 66). Whitten replied to Thompson about an hour later, "[a]t one point you said the customer was changing the requirements for the position. Is that the case and if so can we get something in writing from them?" Thompson forwarded Whitten's question to Khalil. (Doc. 37-27 on pg. EEOC000164, SOF 75).

16.     Khalil replied to Thompson about Whitten's request to get something in writing from the customer changing the requirements for Pai's position, stating in part; "It's not good for us to engage the client in this issue extensively. They expect us to handle our own issues." (Doc. 37-27 on pg. EEOC000163, SOF 76).

17.     An hour and a half later, Camber's Vice President and Division Manager Adesh Jain sent an email to Whitten about terminating Pai. Vice President Jain wrote that he understood that Camber must comply with "rules/regulations" but that he needed her help "to meet the customer needs . . . ." Vice President Jain added, "We have been going back and forth on this issue to the point that the customer is getting frustrated. I believe we have done everything required from our side and are taking a very minimal risk to terminate this employee. Let me know if we need to discuss this or if you need to get someone else involved." (Doc. 37-27 on pg. EEOC000163, SOF 77).

18.     On October 1, 2015, Camber identified Peter Chu, over age 40, as Mr. Pai's replacement and argued that raised serious doubts about the age discrimination claim. (Ex.A, Anderson Declaration, Attachment 1, Position Statement of Camber Corporation, at pg. EEOC000016).

19.     In its January 31, 2017 response to EEOC's requests for further information,

6

Camber stated that Chu was born in 1970, was 45 years old when hired as a Senior .NET Developer on April 20, 2015, and resigned on November 13, 2015. (Ex. A, Anderson Declaration, Attachment 2, Camber letter responding to EEOC's request for additional documents and information, at pg. EEOC000228).

20.    Camber admitted that Atif Khalil selected Mr. Chu for a Senior .NET Developer position on or about March 30, 2015.  (Ex. A, Anderson Declaration, Attachment 2, Camber letter responding to EEOC's request for additional documents and information, at pg. EEOC000229). According to Camber, it did not fill Pai's vacated position until Chu was hired on April 20, 2015. (*Id.* at EEOC000227-228). According to Camber, no one filled the vacancy created by Pai's resignation after Chu's November 13, 2015 resignation. (*Id.* at pg. EEOC000228).

21.    Further according to Camber, it had earlier offered the position to Emishaw Dadi, who accepted it on December 24th but later decided not to take it because it was taking too long to get security clearance; Camber reposted the job in March, 2015 resulting in Chu's hire (*Id.* at pg. EEOC000228, fn.1).

22.    Emishaw (surnamed Dejene, a.k.a. Dadi) ultimately was hired by Defendant in June 2015, was born in 1973 and was 42 years old (Ex. N, Khalil Dep. 38:7 – 41:7, Khalil Dep. Ex. 2 (Doc. 37-5 pg.2) and Ex.A, Anderson Dec., Attachment 2 at pg. EEOC000232, updated employee list).

23.    Pai was the oldest Camber employee working at the EOIR.  (Khalil Dep. Ex 2, Doc. 37-5 pg.2).

24.    During the EEOC investigation of Pai's charge, Camber produced a job

requisition to replace a Kiran Kalithkar as a .NET developer, as the job requisition issued to replace Pai. In response to EEOC's question asking why the requisition for Pai's replacement sought to replace Kalithkar, Camber stated it wanted to model the Senior .NET developer position for Pai's replacement on the position previously replacing Kalithkar, and was copied from the Kalithkar requisition and pasted into the Pai replacement requisition due a scriveners' error. (Ex. A, Anderson Declaration, Attachment 2, Camber letter responding to EEOC's request for additional documents and information, at pg. EEOC000234).

25. When Deborah Whitten was first responding to Pai's discrimination charge in 2015, she talked with Atif Khalil about who replaced Pai and he told Whitten that Peter Chu replaced Pai. (Ex. C, excerpts of Whitten Dep. 74:22 – 75:6, 97:5-24). In her April, 2018 deposition, Whitten identified Saritha Prathipati as Pai's replacement, hired in May, 2015 as a temporary-to-permanent conversion and the May 8, 2015. Prathipati job offer request email from the HR Generalist to Whitten states the job was a senior.Net developer. (*Id*. 73:11 - 74:21; see also Prathipati offer letter for Camber employment as a "Senior Developer", Ex.D. (PAI002980-81) and first page of Prathipati's Camber Employee Performance Evaluation form, Ex. E. (PAI003001) listing her job title as "Sr. Net Developer").

26. Whitten did not find any Camber job requisition regarding Prathipati when she was gathering information and documents to respond to Pai's charge, because Khalil didn't provide Prathipati's name to her during the investigation. (Ex. C, Whitten Dep. 107:15-108:1).

27. On January 6, 2017, Whitten was gathering further information to answer EEOC's further questions during the investigation of Pai's charge and asked Khalil whether anyone filled Pai's position temporary between his October 21, 2014 termination and Chu's hire

on April 20 2015.  Khalil responded "No, we did not fill the position during that time."  (Ex. F, Khalil Dep. Ex. 26).

28.     Camber, in its weekly Program Manager meeting agendas sent to Myatt by Khalil, consistently reported the Pai's position was to be backfilled as a dot net sharepoint developer position ".NET/SP Dev (Ashok's backfill)".  (Ex.G., Myatt Deposition, 29:21 – 31:4 and Ex.H, Myatt Dep. Ex. 4, even numbered pages). This exhibit includes both Camber's September 9, 2014 agenda reporting that Pai had resigned effective October 31st and reporting the .NET/SP Dev (Ashok's backfill) activity as well as Camber's December 16, 2014 agenda reporting the selection of Saritha Prathipati as the .NET/SP Ashok backfill at the ISA3 labor category. (Ex.H, Myatt Dep. Ex. 4, pgs. 2 and 20). Camber's December 16, 2014 agenda reporting Prathipati's selection as Pai's backfill was part of the Department of Justice's Friday afternoon March 23, 2018 production in response to an EEOC *duces tecum* subpoena.  (Ex.I, Myatt Dep. Ex. 2).

29.     Joe Barbaretta was Camber's software architect (Ex.G., Myatt Deposition 36:12-15).

30.     Pai was engaged as a software developer on the EOIR contract, working on both DotNet and SharePoint applications with a focus on DotNet coding but the app he was working on was sitting on top of a SharePoint platform. (Id. 74:22-75:4).

31.     A DotNet/Sharepoint developer has the same skill sets as a DotNet developer with the addition of knowledge of the SharePoint platform (Id. 30:2-11).

32.     EOIR never requested the removal of Ashok Pai (Id. 42:21-43:1).  EOIR did not change the requirements for Pai's developer position. (Ex.G., Myatt Deposition, 70:9-11).

33.     Both Pai and replacement Prathipati were employed by Camber at the EOIR in the highest-rated Information Services Analyst labor category available under the EOIR contract – ISA3 – and EOIR never downgraded the backfilling of Ashok Pai's position from ISA3 to ISA1 or 2.  EOIR never changed the stated skills and requirements for the ISA3 category as stated in the contract.  (Ex.G., Myatt Deposition, 62:16-65:6, 72:19-20 and Ex. J, excerpts from Myatt Dep. Ex. 7).

34.     The March 24, 2014 performance plan and final warning discussed in Defendant's SOFs 12-14 was issued to Pai by his prior employer Avaya, not by Camber. (Doc. 37-8, Ex. H, Pai Dep. Ex. 4(PAI000344)).

35.     Camber was fully aware on March 14, 2014 of the circumstances leading to the performance plan and final warning, including Atif Khalil's and Adesh Jain's requests that Pai be terminated for taking three days disapproved leave to attend a software conference. (Doc. 37-6, Ex. F, Pai Dep. Ex. 3(PAI000335-340)).

36.     Camber hired Pai on March 31, 2014 (Doc. 37-9, Ex. I, Camber Notification Letter (EEOC0000134)). Pai had master's degrees in aeronautical engineering technology and in business administration in finance and banking. Among other certifications, Pai maintains certification as an Information System Security Professional which is recognized as the top certification in cyber security.   Pai had worked for federal agencies and had security clearances for the Department of Defense, the Justice Management Division of the Department of Justice, the United States Treasury and the Federal Reserve Board.  (Ex.B, Pai Deposition, 32:13-14, 34:14-16, 35:3-11, 154: 9-13 and Doc.37-24 pg. PAI000066).

37.     The performance improvement plan expired April 11, 2014 (Doc. 37-8, Ex. H,

Pai Dep. Ex. 4, PAI000344), without further action having been taken by Avaya or Camber.

38.     The "struggles" with Pai's performance since the beginning, claimed by Atif Khalil as the "context" for his writing that it was not good to engage the client extensively on the issue of replacing Pai (Doc. 37-2, Ex.B. Khalil Dep. 109:6 – 111:19), were not documented and not stated in support of replacing Pai. (*Id.* 111:20-112:10).  Khalil's claim that others saw Pai sleeping in his cubicle is speculation. (*Id.* 121:1-5).  Camber's letter terminating Pai does not mention performance, does not mention sleeping in the cubicle, does not mention absences or Monday lateness. (*Id.* 130:22-131:8).  Howard Myatt, the EOIR contracting officer representative, never expressed any concerns to Camber about Pai's attendance. (Ex. G, Myatt Dep. 96:4-6). Myatt does not recall any discussion with Khalil about Pai's performance. (*Id.* 79:6-14).

39.     The performance "struggles" from the beginning claimed by Khalil are not mentioned in Avaya's ratings of Pai for the review period of October 1, 2012 to September 30, 2013 (Ex. M, Avaya Pai Ratings, PAI AVAYA000005-8).  Avaya rated seven of Pai's work behaviors "GOOD/OK" with eight behaviors rated "Consistently Strong."  Overall for that entire year, Pai was rated "Successful Relative Contribution."  Pai's overall rating for the first six months of that period, October 1, 2012 to March 31, 2013, had been "Low Relative Contribution."  (Ex. M, Avaya Pai Ratings, PAI AVAYA000002-4).  Pai was not rated for the rest of his work with Avaya and with Camber.

40.     On August, 27, 2015, Camber documented (ECF Doc. 37-38, Ex. LL, Whitten Dep. Ex. 9, pg. 11 of 11 (EEOC000301)) its decision to offer to transfer 28 year old Reneika Nance (Anderson Declaration, Attachment 2, Camber letter responding to EEOC's request for

additional documents and information, at pg. EEOC000231) from its Alexandria, Virginia facility to a new job in a new facility in Norfolk, Virginia to fill a future contingent position that did not exist because the project contract and Task Order had not yet been awarded.   Camber's Program Manager wrote "we would like to hire Reneika Nance if we get awarded Sailor 2025…Shane Prestegard spoke to Reneika about the status of things and told her that we would be prepared to execute the internal transfer (ECN) upon T/O award sometime around 10.15.15. I need to get your approval on the ECN and transfer."  (ECF Doc. 37-38, Ex. LL, Whitten Dep. Ex. 9, pg. 11 of 11 (EEOC000301)).

41.      Senior Recruiter Prestegard asked Senior Business Operations Manager Bacak to review Nance's profitability on October 20th also writing: "She will be relocating to the Va Beach area as her husband is stationed there." (Id. at pg.8 of 11, EEOC000298).   The ECN Profitability Assessment was completed and the last approval was obtained by Deborah Whitten the morning of October 21st.  (Id. at pg. 7 of 11, EEOC000296 and 297).

42.      After contract award, the position, no longer contingent, was created for Nance and on October 21, 2015, Camber offered Nance the transfer to the position of Junior Instructional Developer/Data Entry located in Norfolk, Virginia, which she accepted on October 27, 2015 (ECF Doc. 37-38, Ex. LL, Whitten Dep. Ex. 9, pg. 2 of 11, EEOC000292).

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### 1. Camber is not entitled to summary judgment.

The issue to be decided on this motion is whether a reasonable jury could return a verdict for EEOC that the disability of Pai's son, or Pai's age, were determining factors in Camber's discharging Pai. The facts must be viewed, and all reasonable inferences drawn, in the light most favorable to EEOC. *Penn v. Aero. Corp.*, No. 1:08cv620 (AJT/TRJ), 2009 U.S. Dist. LEXIS 17083, at *8-9, 2009 WL 585839 (E.D. Va. Mar. 6, 2009) (granting defendant's motion for summary judgment because plaintiff failed to demonstrate similar employees outside the protected class were treated differently).[1]

"The ADA prohibits employers from taking adverse employment action 'because of the *known disability* of an individual with whom the qualified individual is known to have a relationship or association.'" *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 214 (4th Cir. 1994) (quoting 42 U.S.C. § 12112(b)(4) (emphasis added)).

Defendant relies on *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 215 (4th Cir. 2002) in effort to cabin the ADA's associational provision to protection of qualified individuals against adverse actions based on unfounded stereotypes and assumptions arising from the employee's relationship with particular disabled persons. *Freilich* however, is

---

[1] This Court's decision in *Wright v. Hilldrup Moving & Storage*, No. 1:16-cv-1349 (AJT/JFA), 2017 WL 2262842 (E.D. Va. May 23, 2017), cited in fn.2 of Defendant's Memorandum in Support is distinguishable. *Wright* was dismissed on summary judgment - all of the record evidence showed Plaintiff failed to meet performance expectations from the start of her job and she was replaced by an older individual. Here, each of Pai's replacements identified by Defendant were decades younger than him and the record evidence does not show he failed to meet performance expectations from the start of his job. (EEOC's Statement of Disputed Material Facts, "SODF" 19, 22, 35-40 and Defendant's SOF 87).

distinguishable.    *Freilich* and the cases on which it relied, claimed associational discrimination based on

an individual's advocacy on behalf of persons with disabilities. *Id.* at 215-16.   What the Fourth Circuit did not

hold in *Freilich* was that the statute was meant to be read narrowly to exclude other types of associational

claims.  *Barkhorn v. Ports Am. Chesapeake, LLC*, No. JKB-10-750, 2011 U.S. Dist. LEXIS 109776, at *22

(D. Md. Sep. 26, 2011) (denied summary judgment; stevedore gang members claimed gang was

discriminated against in job assignments because one or more of its members were disabled, held not

analogous to *Freilich*).   Similarly, EEOC is not required to prove Defendant's discharge of Pai was

motivated by unfounded stereotypes, myths, fears, disparagements or assumptions arising from

Pai's disabled son.   It will be enough to prove that Camber discharged Pai because of his

association  with  his  disabled  son  and  that  Camber's  explanation(s)  are  pretextual.  The

*McDonnell  Douglas  Corp,  v.  Green,*  411  U.S.792,  802–05  (1973)  paradigm  applies  to

circumstantial associational disability discrimination claims under the ADA.

 Defendant cites *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 57-58 (4th

Cir. 1995) for the proposition that a modified *McDonnell Douglas* paradigm applies to associational

disability claims under the ADA. Under the  modified paradigm, a *prima facie* case can be

established with proof that: (1) Pai was in  the  protected class; (2) Pai was discharged; (3) at the

time of the discharge, Pai was performing his  job at a level that met the employer's legitimate

expectations; and (4) the discharge occurred under  circumstances that raise a reasonable inference

of unlawful discrimination. *Ennis*, 53 F.3d at 58.   According to Defendant, the fourth *Ennis* prong

requires EEOC to present some "affirmative evidence that disability was the  determining factor

in the employer's decision."

Defendant has, however, misquoted *Ennis*' cited sentence about determining factors

and in so doing, invents a higher burden of causation than *Ennis* requires (Doc. 37 on ECF

14

pgs. 24, 25 and 26 of 33).  *Ennis*' cited sentence actually states: "affirmative evidence that disability was **a** determining factor in the employer's decision." [emphasis added].   (See Ex. L, QuoteCheck Report on 53 F.3d at 59, showing that the quote used in Defendant's Memorandum, "the determining factor" differs from the quote as retrieved from the decision as published "a determining factor").

Defendant argues, albeit using its made-up "the determining factor" causation standard, that EEOC cannot establish the fourth prong of its *prima facie* case—that the disability of Pai's son was "the determining factor" in Camber's decision, thus conceding on this motion that EEOC could establish the first three prongs.  (ECF Doc. 37 at pgs. 24-26 of 33).

### 1.A. The disability of Pai's son was a determining factor in Pai's discharge.

In the summer of 2014, during one of Ashwin's hospitalizations, Pai told Atif Khalil that his son was completely disabled. Camber concedes that Khalil, who is nearly 25 years younger than Pai, learned about Ashwin's disability that summer. (SODF 1, SOF 17). When Pai returned from caring for his hospitalized son on September 8th, he sent Khalil two emails saying that he sought a transfer within Camber so that he could live and work nearer to Ashwin. (SODF 3). Pai's first email said that he wanted to explore the possibilities of transferring within Camber due to Ashwin's hospitalization.  Pai and Khalil discussed Pai's transfer request and Khalil told him to send another email including a transition date of October 31, 2014 (SOF 32).  Pai quickly did as Khalil told him and emailed his repeated transfer request to Khalil that morning at 10:32 a.m. Pai wrote that his family medical issues had increased, that he was compelled to explore the possibility of a transfer to the Southern California area, or to any of the western states and requested transition out of his current project as of October 31st. (SODF 5). Khalil forwarded

15

Pai's second email to Camber's Human Resources generalist 36 minutes later, asking for Pai's "displacement" and stating he will move forward with creating a job requisition and identify a replacement as soon as he hears back, which he did 34 minutes later when she wrote "this is sufficient for resignation purposes …." (SODF 6 and 7). In a little more than an hour, Khalil and Camber converted Pai's transfer requests into a resignation and began processing his termination. (SODF 7).

A jury can reasonably infer that Pai's documented requests for a transfer to care for his disabled son led to Camber's converting those requests into a "resignation" within an hour.[2] Camber's September 19th admission it now understands Pai did not intend to resign (SODF 11), did not halt Khalil's continued pursuit of Pai's termination on other grounds (SODF 12).

On September 26th, Khalil spoke with Camber HR about how to move forward with Pai's termination and was told "[i]n order to move forward with the termination it will need to be client request due to changing requirements for the job – for which [Pai] is not qualified or the client specifically request that he is removed." (SODF 12). Khalil conferred with EOIR to persuade it to replace Pai. (SODF 13) and then received EOIR's October 1st email to proceed with replacement of Ashok Pai from the DotNet team at the government's request. (SODF 14). Khalil immediately forwarded Myatt's email to Lisa Thompson in Camber's HR Department, stating "I would like to proceed with the 10/31/14 separation." (SODF 15). Myatt's email says nothing about removing Pai or changing the requirements of the job.

Thompson forwarded the email to Camber's HR Manager Whitten, stating that EOIR was

---

[2] *Sutherland v. SOSi Int'l, Ltd.,* 541 F. Supp. 2d 787, 793 (E.D. Va. 2008)(discriminatory motivation reasonably inferred from temporal proximity between employer's new realization about extent of plaintiff's reservist obligations and discharge, USERRA case).

requesting Pai's "removal."  Whitten responds, asking whether EOIR changed the job's requirements and if so, can Camber get something in writing from them. (SODF 15, SOF 75). Knowing that he had recommended changing requirements to the customer, Khalil ignored Whitten's question and resisted her suggestion. Instead, as Thompson had done earlier that morning, he argued that Myatt's email saying that he wanted a "replacement" for Pai proved that EOIR wanted him removed. Khalil reminded Thompson of their meeting on September 26th during which she told him that Pai could be fired for one of two reasons – 1) because the client changed the job requirements such that Pai was no longer qualified, or 2) because the client specifically requested that he be removed. Khalil explained that he "went with the option to specifically request his removal by name" because, although the job would be changed from a senior to mid-level position, Pai was qualified for the mid-level position. Khalil knew that Pai was willing to accept a lower paying position – he had offered to do so in his email dated September 18th. As a result, Khalil's email cautions Camber against relying on the changing-job- requirements-justification because Pai "can still argue that he qualifies for that job and will take a pay cut." To avoid that possibility, Khalil argued, "Removal by name is a cleaner option." (SODF 16, SOF 76, Doc. 37-27 EEOC000163).

Camber's Vice President and Division Manager Jain pressured Whitten to approve terminating Pai, writing that he understood that Camber must comply with "rules/regulations" but that he needed her help "to meet the customer needs . . . ." Vice President Jain added, "I believe we have done everything required from our side and are taking a very minimal risk to terminate this employee. Let me know if we need to discuss this or if you need to get someone else involved." (SODF 17).

Camber HR continued its efforts to blame the customer for Pai's termination.  This time, Khalil was asked to describe the differences between Pai's senior level position and the revised mid-level position.  Whitten was not satisfied with Khalil's answer and again asked him to confirm that it was the customer who was changing the job requirements.  Having spent much of the day lobbying for Pai's termination, Khalil replied "Yes, that's correct," (SOF 80, 81), knowing that he was the one who persuaded EOIR to "replace" Pai.

On October 17, 2014, while Pai was on approved FMLA leave for his son's disability, Camber sent Pai a letter terminating his employment October 31st. Camber's letter says he was fired "due to the customer changing the requirements for your position." The same day, Khalil sent Pai an email attaching the termination letter and stating, in part, "As you can see from the attached letter, unfortunately, your employment with Camber will be terminated effective 10/31/14. The client has decided to change the requirements for your position. The position is being changed to a mid level .NET developer." (SOF 82, 83).

All three replacements identified by Camber were decades younger than Pai (SODFs 19, 22 and SOF 87), as was Khalil (SODF 1) and Pai was the oldest Camber employee working at EOIR (SODF 23).  Pai's termination and replacement by much younger workers raises an inference of age discrimination. Defendant's "same actor" defense (Doc. 37 at pg. 31 of 33) does not preclude the jury finding an inference of age discrimination.

As noted by this Court, where the same person hired and fired the plaintiff within a relatively short period of time, there's an inference that the employer's stated reason for termination is not pretextual.  *Spruill v. Kip Killmon's Tysons Ford, Inc.,* No. 1:12-cv-806(AJT/TRJ), 2012 U.S. Dist. LEXIS 146180, at *14-16 (E.D. Va. Oct. 10, 2012). In this case,

however, Pai was fired 2 and a half years after he was hired – that's not a "relatively short period of time" and Defendant has not cited to any Fourth Circuit authority holding that it is.  The only authority applying the same actor inference to a time period longer than 2 and a half years cited by Defendant, was itself distinguished by the Fourth Circuit where the defendant's proffered reasons for its failure to hire have constantly changed and there was abundant evidence of pretext.[3] In this case, Camber's defenses have changed and there's abundant evidence of pretext.

Contrary to Defendant's argument that a belief that an employee has resigned is a legitimate, nondiscriminatory reason for taking action, it can be proof of pretext in cases where the employee sent correspondence to the employer clearly expressing a desire to remain employed. *Harris v. Powhatan Cnty. Sch. Bd.*, 543 Fed. Appx. 343, 2013 U.S. App. LEXIS 21393, 120 FEP 694 (4th Cir. 2013) (*unpublished*) (plaintiff demonstrated question of fact whether he wanted to retire).  In this case, Pai's transfer request emails expressly stated he was requesting transfers and nowhere mentioned resignation or quitting Camber (SODFs 4 and 5) and Defendant agreed Pai didn't intend to resign (SODF 11).

**1.B. Sufficient Evidence of Pretext.**

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 120 S. Ct. 2097 (2000), cited by Defendant in its tutorial on the *McDonnell Douglas* circumstantial case paradigm (Doc. 37 at pg. 24 of 33), informs the evidentiary burden borne by plaintiffs in proving intentional discrimination through indirect evidence:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly
> if disbelief is accompanied by a suspicion of mendacity) may, together with the

---

[3] *EEOC v. Sears Roebuck & Co.,* 243 F.3d 846, 856 (4th Cir. 2001), distinguishing *Schnabel v. Abramson,* 232 F.3d 83 (2d Cir. 2000)(3 year period) in a case where Defendant's reasons for failure to hire constantly changed and there's abundant pretext evidence.

> elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.

530 U.S. at 147, quoting with favor *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1981).

There's more than sufficient evidence in this case to permit the jury to disbelieve Defendant's reason for Pai's discharge, accompanied by suspicion of mendacity, together with the prima facie case elements above, and find intentional discrimination:

- EOIR did not change the requirements for Pai's software developer position and did not request Pai's removal (SODFs 30 and 32);

- Camber consistently admitted that Pai's position, and as backfilled by Prathapati, remained a .NET/SP Developer; the .NET/SP Developer position remained at the highest-rated Information Services Analyst labor category - ISA3 – and EOIR never changed the requirements for that position (SODF 33);

- Camber did not change Pai's position to that of a mid-level developer – Prathipati was hired as a "Senior Developer" also called a "Sr. Net Developer" (SODF 25);

- Camber changed its explanation[4] that Pai was replaced by two age-protected hires (Chu and Dadi), that no one worked Pai's position temporary between Pai's termination and Chu's hire, that the requisitions to replace Pai listed a different resigned person to replace and did so due to "scriviner's error," while it knew all along that Pai was replaced by Prathipati shortly after Pai's termination and that she worked temporary in that role until

---

[4] An employer's shifting explanations is proof of pretext. *EEOC v. Aeronca, Inc.,* 1983 U.S. Dist. LEXIS 19599 *27-28, 29-30, 31 Empl. Prac. Dec. (CCH) P33,369 (S.D. Ohio 1983) (Defendant's 1980 position letter to EEOC compared to different explanation at trial years later); *Skaggs Pay Less Drug Stores v.* 19 *NLRB*, 466 F.2d 971, 972 (9th Cir. 1972).

formally hired by Camber six months later (SODFs 18, 19, 20, 21, 22, 24, 25);

- Khalil falsely told Whitten that Chu replaced Pai, Khalil didn't provide Prathpati's name to her during investigation and that Khalil did not identify Prathipati in response to Whitten's question to him whether anyone filled the Pai position as a temporary between Pai's termination and Chu's hire (SODFs 25, 26, 27);

- Immediately after Pai sought a transfer due to his disabled son's hospitalization, Khalil did everything in his power to prevent him from returning to work at EOIR, including misrepresenting the circumstances of his departure to EOIR in an effort to secure its agreement to "replace" him, falsely representing EOIR's involvement in changing the requirements of the job, urging HR to agree with discharging Pai and to create a false but "clean" pretext to justify his termination;

- Camber didn't transfer Pai and made no effort to transfer him, Khalil responding that he lacked "purview", professing ignorance of Camber opportunities outside his EOIR unit, telling Pai he was not the right person to discuss transfers (SOFs 29, 30) and ultimately terminated him, compared to Camber's decision to offer transfer to the much younger Reneika Nance from Camber's Alexandria, Virginia facility to a new job facility in Norfolk, Virginia as her husband was stationed nearby (SODF's 40, 41 and 42); numerous Camber managers were involved, with emails exchanged and several forms prepared and Camber committed to the transfer even before the new job existed because the contract for that facility had not yet been awarded.

## CONCLUSION

The evidence is such that a reasonable jury could return a verdict for EEOC that Ashok

Pai's association with his disabled son was a determining factor in Camber's decision to discharge

Pai and also that he was discharged because of his age.

Respectfully submitted,

Jeffrey A. Stern
Senior Trial Attorney admitted *pro hac vice*
Jeffrey A. Stern (Ohio Bar No. 0020107)
Jeffrey.Stern@eeoc.gov

U.S. EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Cleveland Field Office
AJC Federal Bldg.
1240 East Ninth St., Ste. 3001
Cleveland, OH 44199
(216) 522-7458
(216) 522-7430 (fax)


KATE NORTHRUP
Supervisory Trial Attorney
U.S. EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION

By:

s/David Staudt
David Staudt
Va. Bar ID # 47442
Attorney for Plaintiff EEOC
U.S. EQUAL EMPLOYMENT OPPORTUNITY
   COMMISSION
Baltimore Field Office
GH Fallon Federal Building
31 Hopkins Plaza, Suite 1432
Baltimore, MD 21201
Phone: 410-209-2249
Fax: 410-962-4270
david.staudt@eeoc.gov

22

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of May, 2018, I filed the foregoing Plaintiff's

Statement of Disputed Material Facts and Memorandum in Opposition to Defendant's Motion

for Summary Judgment with the Clerk of Court using the CM/ECF system, which will send a

notification of such filing (NEF) to all ECF counsel of record in this matter.


                        s/David Staudt

                        David Staudt

                        Va. Bar ID # 47442

                        Attorney for Plaintiff EEOC

                        U.S. EQUAL EMPLOYMENT OPPORTUNITY
                          COMMISSION

                        Baltimore Field Office

                        GH Fallon Federal Building

                        31 Hopkins Plaza, Suite 1432

                        Baltimore, MD 21201

                        Phone: 410-209-2249

                        Fax: 410-962-4270

                        david.staudt@eeoc.gov